# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island,<br><br>    Defendant. | Case No. 1:25-cv-00639<br>(Hon. Mary McElroy) |

**COMMON CAUSE INTERVENORS' COMBINED MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO THE MOTION TO COMPEL**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

LEGAL STANDARD.......................................................................................................... 8

ARGUMENT ...................................................................................................................... 9

I.    THE COMPLAINT IS LEGALLY DEFICIENT AND MUST BE DISMISSED.............. 9

   A.    The United States' Demand for Records Fails to Meet the Requisite Statutory
   Requirements of the CRA......................................................................................... 10

   B.    The United States' Demand Is Invalid Because It Does Not Allow for Redactions and
   Modifications to Protect the Privacy and Constitutional Rights of Voters............................ 16

II.   THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS
CRA CLAIM. .................................................................................................................. 20

   A.    The Ancient Title III Cases on Which the United States Relies are Inapposite............ 20

   B.    The United States's Attempt to Obtain the Records at Issue Via the Civil Litigation
   Process Must Proceed According to the Federal Rules of Civil Procedure........................... 24

CONCLUSION.................................................................................................................. 27

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. United States,*
    304 F.2d 583 (5th Cir. 1962) ........................................................................ 21

*Alabama v. United States,*
    371 U.S. 37 (1962) ........................................................................................ 21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................... 8

*Ayers v. Securities and Exchange Commission,*
    482 F. Supp. 747 (D. Mont. 1980) ............................................................... 24

*Ayers-Schaffner v. DiStefano,*
    37 F.3d 726 (1st Cir. 1994) ........................................................................... 1

*Becker v. United States,*
    451 U.S. 1306 (1981) ............................................................................. 24, 25

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ...................................................................................... 1

*Coleman v. Kennedy,*
    313 F.2d 867 (5th Cir. 1963) ................................................................. 10, 23

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System,*
    603 U.S. 799 (2024) ...................................................................................... 15

*Coro, Inc. v. Federal Trade Commission,*
    338 F.2d 149 (1st Cir. 1964) ......................................................................... 11

*Crook v. South Carolina Election Commission,*
    No. 2025-CP-40-06539 (S.C. Oct. 1, 2025) ................................................ 22

*Crystal v. United States,*
    172 F.3d 1141 (9th Cir. 1999) ...................................................................... 24

*Dinkens v. Attorney General of United States,*
    285 F.2d 430 (5th Cir. 1961) ........................................................................ 20

*Federal Deposit Insurance Corporation v. Wentz,*
    55 F.3d 905 (3d Cir. 1995) ........................................................................... 11

*In re Coleman*,
  208 F. Supp. 199 (S.D. Miss. 1962) ................................................................ 10, 19, 23

*Kennedy v. Lynd*,
  306 F.2d 222 (5th Cir. 1962) ................................................ 10, 11, 19, 21, 22, 23, 26

*New Hampshire Fire Insurance Co. v. Scanlon*,
  362 U.S. 404 (1960) ...................................................................................... 25

*Niz-Chavez v. Garland*,
  593 U.S. 155 (2021) ...................................................................................... 15

*PA Fair Elections v. Pennsylvania Department of State*,
  337 A.3d 598 (Pa. Commw. Ct. 2025) ................................................................ 7

*Project Vote/Voting for America, Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) ........................................................ 16, 18, 19, 20

*Public Interest Legal Foundation v. Benson*,
  136 F.4th 613 (6th Cir. 2025) ........................................................................ 13

*Public Interest Legal Foundation v. Boockvar*,
  431 F. Supp. 3d 553 (M.D. Pa. 2019) .............................................................. 17

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
  673 F. Supp. 3d 1004 (D. Alaska 2023) ............................................................ 17

*Public Interest Legal Foundation, Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) ................................................................ 17

*Public Interest Legal Foundation, Inc. v. Matthews*,
  No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) .............................. 17

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
  996 F.3d 257 (4th Cir. 2021) .......................................................................... 17

*QueerDoc, PLLC v. United States Department of Justice*,
  No. 2:25-MC-00042-JNW, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025) .............. 23

*Schatz v. Republican State Leadership Commission*,
  669 F.3d 50 (1st Cir. 2012) .......................................................................... 8, 9

*State of Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ................................................................ 2, 20

*Sugarloaf Funding, LLC v. United States Department of Treasury*,
    584 F.3d 340 (1st Cir. 2009) ..................................................................... 11, 25

*Torrens v. Lockheed Martin Services Group, Inc.*,
    396 F.3d 468 (1st Cir. 2005) ..................................................................... 14

*Town of Sanford v. United States*,
    140 F.3d 20 (1st Cir. 1998) ....................................................................... 14

*United States v. Cartwright*,
    230 F. Supp 873 (M.D. Ala. 1964) ............................................................ 21

*United States v. Westinghouse Electric Corp.*,
    788 F.2d 164 (3d Cir. 1986) ...................................................................... 23

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) .................................................................................. 1

**Statutes**

5 U.S.C. § 552a ................................................................................................ 15

18 U.S.C. § 2721 .............................................................................................. 26

26 U.S.C. § 7604 .............................................................................................. 25

42 U.S.C. § 1971 .............................................................................................. 22

44 U.S.C. § 3351 .............................................................................................. 26

52 U.S.C. § 10101 ............................................................................................ 22

52 U.S.C. § 20501 ............................................................................................ 2, 14

52 U.S.C. § 20507 ............................................................. 12, 13, 14, 15, 16, 17

52 U.S.C. § 20701 ............................................................................ 2, 10, 20

52 U.S.C. § 20705 ........................................................................... 24, 25, 26

52 U.S.C. § 21083 ............................................................................... 13, 14

52 U.S.C. § 21085 ............................................................................... 13, 14

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 (2002) ........................................... 26

Privacy Act of 1974,
Pub. L. No. 93-579, 88 Stat. 1896 (1974) ............................................................... 26

Rhode Island General Laws § 17-9.1-34(f) ................................................................. 18

**Other Authorities**

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025,
https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html ............................................................................................................... 6

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*,
PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q .................................... 7

Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*,
SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 .................................... 7

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*,
N.Y. TIMES, Sept. 9, 2025,
https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html ............. 5

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*,
PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6 .................................... 7

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*,
N.Y. TIMES MAGAZINE, Nov. 16, 2025,
https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html ............................................................................................... 6

Eric H. Holder, Jr., *MLK50 Symposium: Where Do We Go from Here? Keynote Address*,
49 U. Mem. L. Rev. 33 (2018) ................................................................................. 21

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*,
NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E ..................................................... 7

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025,
https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post ............................................................ 7

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ ........................................... 7

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security .................................................................................................................................. 6

Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ ........................................... 15

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 ...................................................... 7

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ .......................................................................................... 3

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters ................................................................ 7

Press Release, United States Department of Justice, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January 6, 2026), https://perma.cc/YCM2-QQKM ................................................. 5

Press Release, United States Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ ............. 5

Press Release, United States Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B ...................................................................... 5

Press Release, United States Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC ............................................................. 5

Press Release, United States Department of Justice,
*Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD ........................................ 5

Press Release, United States Department of Justice,
*Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA ........................................................ 5

Press Release, United States Department of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements*
(July 5, 2018)
https://perma.cc/G2EZUUA5 ...................................................................... 13

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*,
REUTERS, Sept. 9, 2025,
https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09 ........................................ 6

Steven F. Lawson,
*Black Ballots: Voting Rights in the South, 1944-1969* (1976) ................................ 22

*U.S. Court of Appeals for the Fifth Circuit – Brief History*,
United States Court of Appeals for the Fifth Circuit, (last visited Dec. 14, 2025),
https://perma.cc/H8CL-8D2W ...................................................................... 22

United States Department of Justice, Civil Rights Division,
*Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021),
https://perma.cc/74CP-58EH ...................................................................... 2

**Rules**

410 Code of Rhode Island Rules 20-00-19.5(I)(1). ...................................................... 18

Federal Rules of Civil Procedure, Rule 1 .................................................................. 24

Federal Rules of Civil Procedure, Rule 12(b)(6) ...................................................... 8

Federal Rules of Civil Procedure, Rule 81 ............................................................ 24

**Reports**

House of Representatives No. 86-956 (1959) ................................................... 2, 9, 22

Intervenors Common Cause, Catherine Saunders, Stuart Waldman, and Julia Sanches hereby (1) move to dismiss the United States' Complaint (Dkt. 1) ("Compl.") pursuant to Rule 12 of the Federal Rules of Civil Procedure for failure to state a claim; and (2) oppose the United States's Motion to Compel (Dkt. 2) as unwarranted and contrary to the Federal Rules of Civil Procedure and governing law. Pursuant to **Local Rule 7(c)**, Intervenors request oral argument on the motions and estimate no more than two hours are needed for all parties to present their respective positions. Intervenors do not request an evidentiary hearing.

## INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. But neither the information requests propounded by the U.S. Department of Justice ("DOJ") on the State of Rhode Island, nor the Complaint itself, satisfy the core statutory requirement that any federal demand for information under the Civil Rights Act of 1960 include a disclosure of "the basis and the purpose" for the federal data request. 52 U.S.C. § 20703. Because the United States failed to disclose the basis and purpose of its request for the data, it has failed to state a claim. And even if the Complaint were not fatally defective as a matter of law, DOJ's attempt to end-run the Federal Rules and summarily dispose of this case via an improper motion to compel must be rejected.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994) (quoting *Burdick v. Takushi,* 504 U.S. 428, 433 (1992)). It is "preservative of all other rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas amongst our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

1

Congress has repeatedly legislated to protect the franchise, including through Title III of the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq*., as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*., and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq*. These statutes were enacted for the purpose of ensuring that all eligible Americans—especially racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As the United States Department of Justice itself explains, Title III of the CRA, the election records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959).

The United States' demand for Rhode Island's unredacted voter file—which contains sensitive personal information such as full birth dates, driver's license numbers, and Social Security numbers from every voter in the state—undermines these statutes' core purposes and is contrary to law.

Although the public disclosure of carefully redacted state voting records can help ensure transparency and the accuracy of the voter rolls, demanding the production of unredacted voter records, thereby revealing protected personal identifying information such as driver's license numbers and Social Security numbers, would only deter voter participation and undermine the right to vote. Especially so here, where the United States' *actual* reason for the data demand, which it never disclosed in its request but has been widely reported, is to create an unauthorized and unlawful national voter database, and to use this illicit tool to illegally target and challenge voters.

For good reason, there is no statutory right to demand the type of sensitive voter information at issue here without fully and accurately setting forth "the basis and the purpose" for the data request. Because the Complaint fails to establish United States' entitlement to a complete, unredacted, non-public Rhode Island voter file—much less its entitlement to obtain this sensitive data at the very beginning of the case, without any discovery process or any of the other protections and procedures required by the Federal Rules—this Court should deny the motion to compel and dismiss this action.

## BACKGROUND

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, Brennan Ctr. for Just., *Tracker of Justice Department Requests for Voter Information* (updated Dec. 5, 2025), https://perma.cc/A73C-8YDZ.

On September 8, 2025, DOJ sent a letter to the Rhode Island Secretary of State ("the Secretary") demanding an electronic copy of Rhode Island's entire statewide voter registration list. Compl. ¶¶ 18–20; Ex. 1, Letter from Harmeet K. Dhillon to Gregg Amore dated September 8, 2025 ("September 8 Letter"), Dkt. No. 2-2. DOJ specified that it was seeking an unredacted electronic copy of the statewide voter registration list that "contain[s] *all fields*," including "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Compl. ¶ 20; September 8 Letter. In this September 8 letter, DOJ cited the NVRA, HAVA, and Title III of the CRA as authority for its records request, and stated that "[t]he purpose of this request is to ascertain Rhode Island's compliance with the list

maintenance requirements of the NVRA and HAVA," but did not elaborate further in this regard or refer to any compliance deficiencies by Rhode Island with respect to those statutes' voter list maintenance requirements. Compl. ¶¶ 19–20; September 8 Letter. DOJ requested that this full and unredacted copy of Rhode Island's state voter registration list be provided within fourteen days. *See* September 8 Letter. at 3.

On September 16, 2025, the Secretary agreed to provide a copy of Rhode Island's requested state voter registration list, but noted that "as Secretary of State," he "must protect the personally identifiable information of Rhode Island voters," including voters' state driver's license numbers and the last four digits of their Social Security Numbers, and would not provide that information without "a proper legal basis" or "a court order." Compl. ¶ 25; Ex. 2, Letter from Gregg Amore to Harmeet K. Dhillon dated September 16, 2025 ("September 16 Letter"), Dkt. No. 2-2. The Secretary addressed DOJ's claimed sources of authority, the NVRA, HAVA, and the CRA, and why these did not authorize the demand for a full and unredacted copy of Rhode Island's state voter registration list. September 16 Letter. The Secretary asserted that the "CRA allows access to voter records only in connection with an investigation into the infringement or denial of constitutional voting rights," which is not what was cited in DOJ's September 8 letter. *Id.* at 2. The Secretary also stated: "[Y]our request for Rhode Island voters' PII does not comply with the [federal] Privacy Act of 1974 or the e-Government Act of 2004. You fail to show that any of the statutory prerequisites for the protection of PII under those acts is in place." *Id.* at 1.

The Secretary also spoke to Rhode Island's list maintenance efforts, noting that he was "proud of the work we have done in Rhode Island to increase voter participation, maintain accurate voter rolls, and conduct fair elections." September 16 Letter at 2. He further noted that "[s]ince 2023, we have removed over 105,000 voters from our voter list, all carefully following state and

federal law," and that Rhode Island is "one of the few states that conducts post-election risk-limiting audits" to further "ensure the accuracy of our elections." *Id*.

According to documents in the public record, DOJ never responded to the Secretary's September 16 letter and never provided any additional legal arguments to support its position or address the Secretary's objections and concerns. Instead, months later, on December 2, 2025, the United States sued the Secretary—one of at least twenty-four suits that DOJ has initiated recently against states and election officials—seeking to compel the production of this sensitive voter data.[1]

Notably, according to public reporting, DOJ's requests for private, sensitive voter data from Rhode Island and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be in connection with novel efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.  DOJ is coordinating these novel efforts with the federal Department of Homeland Security ("DHS"),

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (January 6, 2026), https://perma.cc/YCM2-QQKM ; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

according to reported statements from DOJ and DHS. *Id.*; *see also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09. One article extensively quoted a recently-departed lawyer from DOJ's Civil Rights Division describing DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

According to additional public reporting, these efforts are being conducted with the involvement of self-proclaimed "election integrity" advocates within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[2] Also

---

[2] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-

involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[3] These actors and their associates have previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (determining that complaint brought by group affiliated with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to the federal Help America Vote Act, was meritless).[4]

Here, DOJ's actions also indicate that it may focus on or target specific groups of voters in its use of the requested data. In letters to other States requesting the same private voter data, DOJ also requested information about how elections officials, among other things, process applications

---

election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://perma.cc/CE7A-6RY6.

[3] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://perma.cc/J8VZ-X4N4 (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://perma.cc/5W2N-SS2Q ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

[4] *See also* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://perma.cc/YL7J-NUV5 (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://perma.cc/AMZ5-TFHQ (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://perma.cc/9993-RZ6E (same).

to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or citizenship status.[5]

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678*.* A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79.

In order to analyze a motion to dismiss, this Court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and then "take the complaint's well-pled (*i.e.,* non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citations omitted). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels" courts "'to draw on' [their] 'judicial experience and common sense.'" *Id.* (citing *Iqbal*, 556 U.S. at 678–79). To

---

[5] *See, e.g.*, Br. in Supp. of Mot. to Intervene as Defs., Exhibit No. 1, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), *United States v. Pennsylvania*, No. 25-cv-01481 (W.D. Pa. Oct. 9, 2025), Dkt. No. 37-1 (Pennsylvania); Mot. for Leave to File Mot. to Dismiss, Exhibit A, Letter from Michael E. Gates to Sec'y of State Jocelyn Benson (July 21, 2025), *United States v. Benson*, No. 25-cv-01148 (W.D. Mich. Nov. 25, 2025), Dkt. No. 34-3 (Michigan); Decl. of Thomas H. Castelli in Supp. of State Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), *United States v. Oregon*, No. 25-cv-01666 (D. Or. Nov. 17, 2025), Dkt. No. 33-1 (Oregon); Decl. of Malcolm A. Brudigam in Supp. of Defs.' Mot. to Dismiss, Exhibit No. 1, Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Nov. 7, 2025), Dkt. No. 37-2 (California).

perform this review, courts can also "consider (a) implications from documents attached to or fairly incorporated into the complaint, (b) facts susceptible to judicial notice, and (c) concessions in plaintiff's response to the motion to dismiss." *Id.* at 55–56 (quotation marks and citations omitted).

## ARGUMENT

## I.    THE COMPLAINT IS LEGALLY DEFICIENT AND MUST BE DISMISSED

The Complaint does not plausibly articulate a claim for relief because the United States' demand for Rhode Island's full and unredacted electronic voter file exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The United States fails to state a claim under the CRA for at least two distinct reasons. *First*, as set forth in the Complaint, and as reflected in the requests themselves, DOJ failed to set forth a statutorily sufficient statement of "the basis and the purpose" of its demand for Rhode Island's full and unredacted state voter registration list. Compl. ¶¶ 16–26. *Second*, to the extent the United States might be entitled to any records under the CRA, those records would need to be redacted to protect the privacy and constitutional rights of Rhode Island voters. State and federal law would require such redaction, and nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters. The United States' CRA claim seeking the unredacted records is thus legally deficient for that reason as well.

A.    The United States' Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA.

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id.* § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphasis added). The United States failed to provide "a statement of the basis and the purpose" for the requests sufficient to support disclosure of the unredacted voter file.[6] *Id.*; *see* Compl. ¶¶ 16–26.

Consistent with the statutory text, contemporaneous case law immediately following the enactment of Title III of the CRA consistently treated "the basis" and "the purpose" as two related, but distinct, concepts. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). The "basis" is the statement of *why* the Attorney General believes there may be a violation of federal civil rights law in the first place, whereas the "purpose" explains *how* the

---

[6] Intervenors assume for purposes of this Motion that the statewide electronic voter file may constitute a "record" or "paper" "relating to any application, registration, payment of poll tax, or other act requisite to voting" that has "come into [the Secretary's] possession. 52 U.S.C. § 20701. However, no court has ever addressed the question.

requested records would help the Attorney General ultimately determine if there is, in fact, a violation of the law. *Kennedy* 306 F.2d at 229 n.6.

The basis and purpose requirements under the CRA are critical safeguards. They prevent the statute from being used for a fishing expedition to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. The statutory basis and purpose requirements therefore are not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. That is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, where courts have found that the test of whether federal demands for records are enforceable includes an evaluation of whether the underlying investigation is "conducted pursuant to a legitimate purpose," *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (citing *United States v. Powell*, 379 U.S. 48, 57 (1964)); *see also, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (information sought pursuant to an administrative subpoena must be relevant to the inquiry and not unduly burdensome); *Coro, Inc. v. F.T.C.*, 338 F.2d 149, 153 (1st Cir. 1964) (federal authority to obtain information via administrative subpoena is "not license[] for extended fishing expeditions").

As set forth below, the United States failed to articulate in its demand and in the Complaint "the basis and the purpose" for its request for Rhode Island voters' sensitive voter information. The United States' demand fails to meet this requirement of the CRA for at least four distinct reasons. These failures warrant dismissal of the case.

*First*, the United States simply has not stated a "basis" for its demand. The United States alleges that the "purpose" of its request seeking "an electronic copy of Rhode Island's complete and current [voter registration list]" was "to ascertain Rhode Island's compliance with the list

maintenance requirements of the NVRA and HAVA." Compl. ¶ 20; September 8 Letter. But neither the Complaint nor the September 8 DOJ letter that invoked the CRA supply a "basis" for why the United States believes Rhode Island's list maintenance procedures might violate the NVRA or HAVA in the first place. The Complaint alleges that DOJ is investigating Rhode Island's compliance with the NVRA and HAVA based on its review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"), which includes states' "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." Compl. ¶¶ 17-18. But in its initial September 8 letter, DOJ included no reference at all to the 2024 EAVS Report. Riordan Decl. Ex. 1. Moreover, notwithstanding general references to the statistics in the 2024 EAVS Report, neither the Complaint nor the September 8 DOJ letter alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in the data Rhode Island reported to EAVS. *See* Compl. ¶¶ 17-18; September 8 Letter. The failure to set forth *any* "basis" for the demand is sufficient grounds for dismissal of this action.

    *Second*, even if the United States had provided a proper "basis" for its demand—and it did not—it also did not explain, and has not explained, any connection between its purported "purpose" and the vast scope of its records request here, seeking the full and unredacted Rhode Island statewide voter file. The Complaint does not even attempt to articulate *why* unredacted voter files are necessary to determine whether Rhode Island has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507. *See* Compl. ¶ 12. Nor could it, because such unredacted files would not assist DOJ in examining this question: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state

has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. *Id.*; 52 U.S.C. § 20507(a)(4)(A)–(B).

The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See* 52 U.S.C. § 20507(a)(4), (c)(1); § 21083(a)(2)(A); § 21085. Even if the United States used voter file data to identify voters who had moved or died on Rhode Island's voter list at a single point in time, that would not amount to Rhode Island failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[7] It is the *procedures* carried out by a state or locality that establish its compliance with federal list maintenance requirements; the unredacted voter file itself does not.

Moreover, even if some portion of the voter file were necessary to investigate "Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 20; September 8 Letter, the United States has not pleaded or otherwise pointed to any justification for why the full unredacted voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018), https://perma.cc/G2EZUUA5 (describing letters to

---

[7] Indeed, the inclusion on Rhode Island's voter registration list at any particular point in time of some voters who may have moved out of state is, if anything, to be expected. Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). For this reason, too, the Complaint does not plausibly plead that DOJ has met the basis and purpose requirements of the CRA.

*Third*, the Complaint's purported NVRA-and-HAVA-compliance purposes are fatally undermined by the United States' own more recent statements to States in connection with its data requests. The United States has recently sought for a number of States to sign a now-public memorandum of understanding ("MOU") in connection with its requests for statewide voter files. *See* Ex. A, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU"); *see also* Ex. B, Dec. 4 Transcript Excerpts from *United States v. Weber*, No. 25-cv-09149, at 72–73, 90 (DOJ attorney discussing MOU). Far from indicating a purpose of ensuring compliance with the NVRA and HAVA, this MOU runs directly afoul of those statutes.[8]

As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4); § 21083(a)(4)(A). However, the NVRA itself is structured so that potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake. *Id.* § 20507(d)(1)(B). That is consistent with Congress's core goals in the NVRA of protecting and expanding the right to register to vote and participate in democracy. *E.g.*, 52 U.S.C. § 20501. But the MOU indicates multiple contemplated violations of those statutes' requirements. For one, the MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State." *Id.* § 21085; MOU at 2, 5. In addition, the MOU's

---

[8] This Court can take judicial notice of the MOU as a government document produced by DOJ. *See Torrens v. Lockheed Martin Servs. Grp., Inc.*, 396 F.3d 468, 473 (1st Cir. 2005); *see also, e.g.*, *Town of Sanford v. United States*, 140 F.3d 20, 22 (1st Cir. 1998).

substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, 52 U.S.C. § 20507.[9] The MOU demonstrates that DOJ's claimed purpose of ensuring compliance with NVRA and HAVA, as stated in the Complaint, is not accurate or plausible—and that its actual purpose involves defying those statutes by aggrandizing election administration powers to the DOJ.

 *Fourth*, DOJ's failure to fully and accurately provide the actual basis and purpose for its Rhode Island request is independently fatal to its Complaint. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request. By twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–166 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). Yet here, public reporting and public, judicially noticeable documents demonstrate that DOJ apparently did not disclose the main basis and purpose for its demand for Rhode Island's full and unredacted voter file, which was and is to build an unprecedented national voter file for its own use, to be shared with other agencies like DHS for unlawful purposes. *See supra* 4–7 & nn.2–4 (describing reporting in detail). The creation of such a database has never been authorized by Congress, and indeed likely violates the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote). This

---

[9] *See also* Jonathan Shorman, *Trump's DOJ offers states 'confidential' deal to wipe voters flagged by feds as ineligible*, Stateline, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

failure to state the actual basis and purpose of the demand for Rhode Islanders' sensitive voter data is yet another ground for dismissal.

**B.  The United States' Demand Is Invalid Because It Does Not Allow for Redactions and Modifications to Protect the Privacy and Constitutional Rights of Voters.**

Even had the United States provided a valid basis and purpose sufficient to support its demands—which it did not— its request would also be legally deficient because it does not allow for redactions, omissions, or other modifications to protect the privacy rights of Rhode Island voters. The text of Title III of the CRA does not prohibit redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. But the United States has nevertheless sought only the full and unredacted voter file. Compl. ¶¶ 20, 24 & p.8. Its CRA claim is accordingly defective and may be dismissed on that ground as well.

Redaction and modification of voting records to ensure voters' privacy is commonplace before a State discloses such records to a requesting party. Title III of the CRA has not been invoked in decades, but the NVRA provides a ready analogue. The NVRA requires States to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" and to make such records available for "public inspection" upon request. 52 U.S.C. § 20507(i); *see also* Compl. ¶¶ 10–15 (discussing the NVRA). Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to such records under the NVRA. Voting rights advocates have thus consistently relied on the NVRA to investigate infringements of the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012)

(nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university). And courts have consistently held that redacting voters' sensitive personal data is necessary under the NVRA.

Because "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," the First Circuit has concluded that such redaction of "certain personal information" may be required to "assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Just like the NVRA, the CRA is also silent as to how sensitive personal information should be treated during disclosure. *Compare* 52 U.S.C. § 20703 *with* § 20507(i)(1). Courts' treatment of information requests under the NVRA is thus highly instructive in this case. *See Bellows*, 92 F.4th at 56.

Redaction of voters' personal identifying information would be required here to comply with state law privacy protections. Rhode Island law includes requirements that where a Rhode

Island state agency provides the secretary of state with voter registration information that is "held confidential," the "secretary of state shall not use or transmit the information or data for any purpose except for voter registration purposes or pursuant to a court order." R.I. Gen. Laws § 17-9.1-34(f). And the Rhode Island Code of Regulations also specifies:

> [A]ll applicants' Rhode Island driver's license numbers, Rhode Island State ID numbers, the last 4 digits of applicants' Social Security numbers or photocopies of all such documents and any other documents submitted in conjunction with meeting the identification requirements for first-time voter registration applicants shall remain confidential and shall only be available to election officials solely for election purposes and shall not be part of the public record or available for public inspection.

410-RICR-20-00-19.5(I)(1).

In addition to the clear requirements of state law, redaction would also be needed to the extent the disclosure of voters' sensitive personal information would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). For example, the Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying pursuant to the NVRA's disclosure provisions, ensured the redaction of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[10] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of voters' personal information risked deterring

---

[10] The United States itself has stated—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae at 11, 25–26, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012) (No. 11-1809), 2011 WL 4947283, at *11, 25–26.

citizens from registering to vote in the first place, and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339.

The public disclosure provisions of statutes like the NVRA and Title III of the CRA must be construed to avoid these intolerable burdens on state and federal privacy rights. *See Bellows*, 92 F.4th at 56; *Long*, 682 F.3d at 339. The danger of imposing those burdens on Rhode Island voters and good-government civic groups like Common Cause is present here. *See* Mot. to Intervene, Ex. 2, Declaration of John Marion at ¶¶ 11–14; Ex. 3, Declaration of Cathy Saunders at ¶¶ 9–11.

The limited case law considering records requests under the CRA (as opposed to the NVRA) is consistent with the more recent NVRA cases. Even in the very different context of the Jim Crow South in the early 1960s, the CRA cases expressly acknowledge that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, and to shield voters' private, sensitive personal information from disclosure. *See id.* at 231 ("[W]e are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection"); *see also In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a records request under Title III of the CRA, multiple considerations not at issue in that case but which could be "[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right").

Despite the need for privacy protections for voters' sensitive personal information, the United States nevertheless demands the full, unredacted voter file with no redactions or modifications to protect voters. That is a fatal deficiency. Even were the United States entitled to

records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information would need to be redacted or omitted. Conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted). The United States's claim seeking the full and unredacted voter file and the sensitive personal identifying information of every registered Rhode Island voter must be dismissed.

## II.    THE UNITED STATES IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.

To the extent the United States's Complaint could survive Rule 12 review—and it cannot—the next step in this case is discovery. The United States' motion to summarily compel the sensitive voter information it seeks in this litigation, thereby resolving the case with no discovery, motion practice, or trial, is contrary to law and must be denied.

### A.  The Ancient Title III Cases on Which the United States Relies are Inapposite.

Title III requires states to retain and preserve "all records and papers that come into [an election officials'] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. These records "shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of [the] custodian." 52 U.S.C. § 20703. Title III, as part of the 1960 Civil Rights Act, provided a mechanism by which "preliminary investigations of registration practices [could] be made in order to determine whether or not such practices conform to constitutional principles." *State of Ala. ex. rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub. nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). After Congress enacted Title III, the federal government used it to investigate jurisdictions that had effectively denied Black Americans the right to register to vote. *See, e.g., Alabama v. United States*, 304 F.2d

583, 585–86 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962) (finding an Alabama county's registration practices were racially discriminatory, leading to less than 10% of Black citizens being registered to vote while nearly 100% of white citizens were registered, despite the county's population being 83% Black); *see also United States v. Cartwright*, 230 F. Supp 873, 875 (M.D. Ala. 1964) (reviewing data from an investigation pursuant to Title III which revealed that voting registrars engaged in racially discriminatory practices resulting in 89% of white citizens being registered to vote but only 7.5% of Black citizens being registered).

But this robust use of Title III was short lived. Only a few years later, Congress passed the Civil Rights Act of 1964, which outlawed racial segregation altogether. Then, in 1965, Congress passed the Voting Rights Act, the "crown jewel of the civil rights movement,"[11] which established new voter protections, eliminated literacy tests, and led to the enfranchisement of millions of Black citizens. Because Congress enacted more effective voting rights laws—most notably the Voting Rights Act—federal court assessment of Title III has largely been silent since 1965.

In support of its motion to compel, the United States relies entirely on a single set of Fifth Circuit cases from that early 1960's period for the breathtaking claim that Title III universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute was made, explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. of Law in Supp. of the United States' Mot. to Compel Prod. of Records, Dkt. 2-1 ("MTC") at 4–5 (citing, primarily, *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)); *see also* Compl. ¶¶ 1–4.

---

[11] Eric H. Holder, Jr., *MLK50 Symposium: Where Do We Go from Here? Keynote Address*, 49 U. Mem. L. Rev. 33, 38 (2018).

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." MTC at 4 n.1.[12] But it omits the historical context that explains *why* CRA enforcement was limited to the Fifth Circuit in the 1960s.

In the Jim Crow South, particularly in the Fifth Circuit states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas,[13] election officials notoriously refused to register Black voters.[14] Civil rights enforcement efforts confronted strong resistance from local officials and courts in the racially segregated south, and Title III specifically required state election officials to maintain records of denied voter registrations and allowed the federal government to demand inspection of these records. In fact, addressing discrimination in voter registration and voting was the stated intent of Congress's enactment of Title III. H.R. Rep. No. 86-956 at 7.

Title III proved crucial for uncovering evidence showing why Black voter registration was extraordinarily low and allowed the federal government to bring "'pattern or practice'" voter discrimination cases. *Lynd*, 306 F.2d at 228 (citing 42 U.S.C. § 1971 (since transferred to 52 U.S.C. § 10101)). The 1960s Fifth Circuit understood Title III's purpose and required counties to produce documents that were sought for that purpose when a proper statement of basis and purpose were given. *Lynd*, 306 F.2d at 228 (Title III's "purpose is to enable the Attorney General to determine whether § 1971 suits or similar actions should be instituted. And it is to enable him to obtain such

---

[12] The United States also cites *Crook v. S.C. Election Comm.*, No. 2025-CP-40-06539 (S.C. Oct. 1, 2025), a state court decision that briefly discussed Title III in dicta. *See* MTC at 12–13. *Crook* did not address Intervenors' arguments about the basis-and-purpose requirement or the need to redact sensitive voter information.

[13] *U.S. Court of Appeals for the Fifth Circuit – Brief History*, United States Court of Appeals for the Fifth Circuit, (last visited Dec. 14, 2025), https://perma.cc/H8CL-8D2W.

[14] *See generally, e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

evidence for use in such cases if and when filed."). It rejected the notion that the Attorney General needed to prove discrimination before it was entitled to inspect a county's election records because massive racial disparities with respect to registration and voting were clear. *See id.* In that context, "the factual foundation for" the basis and purpose of the Attorney General's CRA requests was utterly self-evident—Jim Crow regimes were using every possible means to block Black Americans from registering to vote, including resistance to federal court orders—and thus plenary "judicial review or ascertainment" of further facts was not warranted. *Id.* at 226.[15] The 1960s Fifth Circuit cases analyzing the CRA cannot be divorced from their historically specific context or taken to stand for the general availability of summary proceedings whenever the CRA is invoked.

Here, more than sixty years later, the context of *this* records request could not be more different. The United States has invoked the CRA for novel purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive, non-public personal identifying information. Even more alarming, there is extensive reporting that the purported basis and purpose of DOJ's request are likely pretextual, and that the data at issue is in fact being sought for unlawful ends.[16] Such improper purposes can *never* justify judicial enforcement of a government records request, summarily or otherwise. *See, e.g.*, *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166–67 (3d Cir. 1986) ("[I]f a subpoena is issued for an improper purpose [], its enforcement constitutes an abuse of the court's process."); *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 2:25-MC-00042-JNW, 2025 WL 3013568, at *5 (W.D. Wash. Oct. 27, 2025) (finding that where litigant makes

---

[15] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

[16] *See supra* 4–7 & nn.2–4.

23

"adequate showing of bad faith or improper purpose, courts may examine whether the agency is 'pursuing the authorized purposes in good faith.'" (quoting *Crystal v. United States*, 172 F.3d 1141, 1145 (9th Cir. 1999))); *Ayers v. SEC*, 482 F. Supp. 747, 751 (D. Mont. 1980) (where a subpoena "was issued 'for an improper purpose, . . . or for any other purpose reflecting on the good faith of the particular investigation,' it shall not be enforced by the courts." (quoting *Powell*, 379 U.S. at 58)). The safeguards and procedures built into the Federal Rules of Civil Procedure, which require appropriate discovery into all the relevant facts, followed by the proper presentation of summary judgment motions on the record or trial, are especially important here, where the United States has failed to properly set forth "the basis and the purpose" for its request as required to establish its entitlement to private voter data, 52 U.S.C. § 20703, and where the *actual* purpose of the request is potentially unlawful and improper.

### B. The United States's Attempt to Obtain the Records at Issue Via the Civil Litigation Process Must Proceed According to the Federal Rules of Civil Procedure

Nothing in the text of Title III of the CRA, which provides for judicial enforcement of records requests under the statute "by appropriate process," 52 U.S.C. § 20705, allows the DOJ to evade the Federal Rules of Civil Procedure. *See* 52 U.S.C. § 20703. To the contrary, the Federal Rules "govern the procedure in *all* civil actions and proceedings in the United States district courts." Fed. R. Civ. P. 1 (emphasis added); Fed. R. Civ. P. 81.

Binding case law is unequivocal on this point. In the more than sixty years since *Kennedy v. Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–1308 (1981) (internal citation and quotation marks

omitted); *see also, e.g.*, *Powell*, 379 U.S. at 57–58 (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *Sugarloaf*, 584 F.3d at 347–50 (allowing summons recipient opportunity to rebut government's prima facie case).

*Powell*, which was decided just two years after *Lynd*, is controlling here. *Powell* involved an attempt to enforce a statute providing the United States with the power to request certain books and records relating to taxes and to compel their production "by appropriate process"—terms that are materially identical to the relevant provisions of the CRA. 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data[.]" (emphasis added)), *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . .or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)). And the Supreme Court squarely held that the tax records statute being enforced in *Powell* did *not* authorize any special or summary proceeding that might supplant the Federal Rules. 379 U.S. at 57–58 & n.18.

The United States' demand for a summary resolution to this case, with no discovery into whether it has properly and sufficiently set forth "the basis and the purpose" for its demand as required by the CRA, flies in the face of *Powell* and a half-century of consistent precedent as well as the Federal Rules.[17]

---

[17] *See also, e.g.*, *Becker*, 451 U.S. at 1307–1308; *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960).

Indeed, even the very 1960s Fifth Circuit cases that the United States improperly relies on are in accord. Thus, in *Kennedy v. Lynd*, the court in explaining its findings noted that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." 306 F.2d at 231. The court also noted that Section 305 of the CRA authorizes only jurisdiction by "appropriate process" to compel document production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information such as that at issue in this case. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230. Thus, even in the 1960's, before sensitive personal identifying information such as Social Security Numbers or driver's license numbers was widely collected as part of the voter registration record, and before any federal laws had been passed to protect and constrain access to personal information,[18] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated the possibility that the "duty to issue protective orders" would arise for certain records requests under the CRA, *id.* at 230.

Here, the Secretary has already agreed to provide the *public* records requested by the United States, but has simply declined to provide the "confidential, private" personal identifying information of Rhode Island voters that would *not* ordinarily be open to reasonable inspection. *Id.* at 231. To argue that the United States is entitled to summary relief and the forced provision of an

---

[18] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

unprecedented trove of "confidential, private" information, without *any* discovery into the statutorily mandated basis and the purpose for its demand, would go much further than *Lynd* did in the context of the 1960's Jim Crow South, where, very much unlike here, the federal basis and purpose for the requested voter data were pellucidly clear and not apparently pretextual or unlawful.

The United States' blatant attempt to end-run the Federal Rules and the CRA's requirements must be rejected. Because the motion to compel would improperly circumvent the Rules and summarily award the United States all of the relief it seeks in this lawsuit, the motion should be denied.

## CONCLUSION

The United States' Complaint should be dismissed and its Motion to Compel should be denied either as moot or on the merits.

Dated: January 13, 2026                    Respectfully submitted,

                                            /s/     Ari Savitzky_

Lynette Labinger (Bar No. 1645)            Ari J. Savitzky*
LYNETTE LABINGER, ATTORNEY AT LAW          William Hughes*
128 Dorrance Street, Box 710               Theresa J. Lee*
Providence, RI 02903                       Sophia Lin Lakin*
*Cooperating counsel, American Civil Liberties*   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
*Union Foundation of Rhode Island*         125 Broad Street, 18th Floor
401-465-9565                               New York, NY 10004
LL@labingerlaw.com                         Tel.: (212) 549-2500
                                            asavitzky@aclu.org
                                            whughes@aclu.org
                                            tlee@aclu.org
                                            slakin@aclu.org

                                            Patricia Yan*
                                            AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                            915 15th Street NW
                                            Washington, DC 20005
                                            Tel.: (202) 457-0800

pyan@aclu.org

\* *admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Tuesday, January 13, 2026, I served this Combined Motion to Dismiss and Response in Opposition to the Motion to Compel on all parties in this matter via the CM/ECF system.

Dated: January 13, 2026

Respectfully submitted,

/s/ Ari J. Savitzky
Ari J. Savitzky

*Counsel for Intervenors Common Cause,
Catherine Saunders, Stuart Waldman, and
Julia Sanches*