**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| | ) |
| v. | )     Civil Action No. 25-cv-639-MSM-PAS |
| | ) |
| GREGG M. AMORE, in his official capacity | ) |
| as Secretary of State for the State of Rhode | ) |
| Island, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
<u>SECRETARY OF STATE GREGG M. AMORE'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

FACTUAL AND REGULATORY BACKGROUND ................................................................ 2

    I.    FEDERAL VOTER LIST GENERAL PROGRAM AND MAINTENANCE REQUIREMENTS ................. 2

    II.    RHODE ISLAND'S VOTER REGISTRATION SYSTEM ...................................................... 4

    III.    RHODE ISLAND'S LIST MAINTENANCE EFFORTS ......................................................... 7

        A.    Automated and online voter registration system ............................................. 7

        B.    Residence confirmation procedures ................................................................ 8

        C.    Periodic updates with U.S. Postal Service records ........................................... 9

        D.    Removing deceased voter names ................................................................... 10

        E.    Coordination with multi-state maintenance efforts ....................................... 10

        F.    Removing incarcerated felon names .............................................................. 11

    IV.    DOJ'S RECORDS DEMANDS TO RHODE ISLAND AND OTHER STATES ............................ 12

ARGUMENT ................................................................................................................... 14

    I.    STANDARD OF REVIEW ........................................................................................ 14

    II.    STATES HAVE PRIMARY AUTHORITY IN CONDUCTING VOTER REGISTRATION AND LIST
        MAINTENANCE. .................................................................................................. 15

    III.    DOJ FAILS TO STATE A CLAIM UNDER TITLE III OF THE CRA TO DEMAND AN ELECTRONIC
        VERSION OF RHODE ISLAND'S COMPLETE VOTER REGISTRATION LIST. ............................ 16

        A.    Title III of the CRA was enacted to enable DOJ to remedy race discrimination in
            voting, not to enable DOJ to troll through confidential and sensitive information
            for unspecified purposes. ............................................................................. 16

        B.    The Complaint fails to allege a statement of "the basis" and "the purpose" for
            DOJ's records demand under the CRA. ........................................................... 18

            1.    No plausible statement of "the purpose." .................................................. 19

      2.    No plausible statement of "the basis." ........................................................ 22

    C.    DOJ cannot bypass the statutory prerequisites for CRA record demands by invoking so-called "special statutory procedures." ............................................. 23

    D.    DOJ's demand for unredacted voting records is contrary to the later-enacted statutes it purports to enforce. ................................................................ 26

IV.  DOJ'S DEMAND FOR AN ELECTRONIC VERSION OF RHODE ISLAND'S VOTER REGISTRATION LIST EXCEEDS THE LIMITED FORM OF PRODUCTION THE CRA REQUIRES. .......................... 28

V.  DOJ'S DEMAND FOR RHODE ISLAND'S COMPLETE VOTER REGISTRATION LIST VIOLATES STATE CONFIDENTIALITY AND FEDERAL PRIVACY LAWS .................................................... 29

    A.    DOJ's demand for Rhode Island's complete voter registration list violates the confidentiality protections afforded by state election laws................................... 29

        1.    State election laws protect confidential voter information. .......................... 30

        2.    State confidentiality protections are not preempted..................................... 31

    B.    DOJ's demand for Rhode Island's complete voter registration list violates the Privacy Act................................................................................................... 33

    C.    DOJ's demand for Rhode Island's complete voter registration list violates the E-Government Act............................................................................................ 37

    D.    DOJ must comply with federal and state privacy protections. ............................. 38

CONCLUSION........................................................................................................ 40

CERTIFICATE OF SERVICE ................................................................................. 41

## TABLE OF AUTHORITIES

**Cases**

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom,*
    *Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961) ...................................... 16, 17, 32

*Albright v. United States*, 631 F.2d 915 (D.C. Cir. 1980) ............................................. 34

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013) ........................... 15

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................. 14, 23

*Association to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40 (1st Cir. 2025) ......... 32

*Becker v. United States*, 451 U.S. 1306 (1981) ............................................................ 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 14

*Bellitto v. Snipes*, 935 F.3d 1192 (11th Cir. 2019) ................................................... 4, 20

*Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999) ......................................... 35

*California v. ARC Am.Corp.,* 490 U.S. 93 (1989) ........................................................ 31

*Capron v. Attorney Gen.*, 944 F.3d 9 (1st Cir. 2019) ................................................... 32

*Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582 (2011) ................................... 32

*Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285 (S.D.N.Y. 2020)............................. 3

*Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982
    (9th Cir. 2020)............................................................................................... 19

*Consumer Fin. Protection Bureau v. Accrediting Council for*
    *Independent Colleges & Schs*, 854 F.3d 68 (D.C. Cir. 2017).................................... 18

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).................... 18

*Crook v. S.C. Election Comm'n*, No. 2025-CP-40-06539
    (Richland Cty. Comm. Pleas Oct. 1, 2025) .......................................................... 39

*Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999).................................................. 35

*Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539 (S.D.N.Y. 1980).............................. 34

*Electronic Privacy Information Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297 (D.D.C. 2017) ............................................. 38

*Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ............................... 31

*Gent v. Mutual Ins. Soc'y*, 611 F.3d 79, (1st Cir. 2010) ...................................... 15

*Giragosian v. Ryan*, 547 F.3d 59 (1st Cir. 2008) ............................................ 14

*Greater Birmingham Ministries, Inc. v. Secretary of State for Ala.,* 105 F.4th 1324 (11th Cir. 2024) ............................................................................... 28

*Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979) .......... 35

*In re Colonial Mortgage Bankers Corp.,* 324 F.3d 12 (1st Cir. 2003) ........................ 14

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ...................................... 18, 25

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ....................................... 18, 25

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ................................... 19, 24, 25

*Kowalski v. Gagne,* 914 F.2d 299 (1st Cir.1990) ............................................ 13

*Kusper v. Pontikes*, 414 U.S. 51 (1973) ................................................... 35

*Laccinole v. Appriss, Inc.*, 453 F. Supp. 3d 499 (D.R.I. 2020) ............................. 15

*Maryland v. Louisiana*, 451 U.S. 725 (1981) ........................................... 31, 32

*McCloskey v. Mueller*, 446 F.3d 262 (1st Cir. 2006) ........................................ 23

*Murphy v. Central Falls Detention Facility Corp.,* No. 14-203, 2015 WL 1969178 (D.R.I. Apr. 20, 2015) ...................................................................... 13

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ............................................... 18

*Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466 (2019) .................................. 24

*Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373 (2015) ........................................ 31

*Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190 (1983) ......................................................................... 31

*Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697 (E.D. Va. 2010) ........... 26

*Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ............................ 3, 26, 31, 33

*Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) ..... 27

*Public Interest Leg Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021) ....................................................................................................... 26, 39

*Republican Nat'l Comm. v. Benson*, No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025) ... 20

*Ritter v. United States*, 177 Fed. Cl. 84 (Fed. Cl. 2025) ................................................. 34

*Rodi v. S. New England Sch. of Law*, 389 F.3d 5 (1st Cir. 2004). .................................... 29

*Ross v. Cox R.I., LLC*, No. 21-118-JJM, 2022 WL 1100862 (D.R.I. Apr. 13, 2022) .................. 24

*Schafer v. Am. Cyanamid Co.*, 20 F.3d 1 (1st Cir. 1994) .............................................. 32

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ............................................................ 40

*Smiley v. Holm*, 285 U.S. 355 (1932) ..................................................................... 15

*Trans–Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315 (1st Cir. 2008) ...................... 14

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2014) ................................... 27

*Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25 (D.D.C. 1999) ......................... 35

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377 (1st Cir. 2011) ...................... 14

*United States v. Bass*, 404 U.S. 336 (1971) ............................................................. 31

*United States v. Classic*, 313 U.S. 299 (1941) ........................................................... 15

*United States v. Iannone*, 610 F.2d 943 (D.C. Cir. 1979) ................................................ 4

*United States v. Lynd,* 301 F.2d 818 (5th Cir. 1962) .................................................... 17

*United States v. Powell*, 379 U.S. 48 (1964) ............................................................ 25

*United States v. Walker,* 665 F.3d 212 (1st Cir. 2011) .................................................. 19

*United States v. Will*, 671 F.2d 963 (6th Cir. 1982) ..................................................... 25

*Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer*, 29 F.3d 727 (1st Cir. 1994) ............. 27, 38

*Virginia Uranium, Inc. v. Warren*, 587 U.S. 761 (2019) ................................................ 32

**Statutes**

5 U.S.C. § 552a(a)(4) ....................................................................................... 34

5 U.S.C. § 552a(e)(4) ........................................................................... 35, 36, 37

5 U.S.C. § 552a(e)(7) ....................................................................................... 34

26 U.S.C. § 7604(a) .......................................................................................... 25

52 U.S.C. § 20507(a)-(f) ........................................................................ 3, 20, 21

52 U.S.C. § 20701 ...................................................................................... 16, 28

52 U.S.C. § 20703 ..................................................................................... passim

52 U.S.C. § 20705 ....................................................................................... 3, 24

52 U.S.C. § 21083(a)(1)(A) ......................................................................... 3, 21

52 U.S.C. § 21085 ....................................................................................... 4, 15

52 U.S.C. § 21111 .............................................................................................. 4

Pub. L. No. 107-347, 116 Stat. 2899 (2002) ................................................... 37

Pub. L. No. 93-579, 88 Stat. 1896 (1974) ....................................................... 35

R.I. Gen. Laws § 17-6-1.2 .................................................................................. 4

R.I. Gen. Laws § 17-6-1.2(b) ......................................................................... 7, 8

R.I. Gen. Laws § 17-9.1-1 .................................................................................. 4

R.I. Gen. Laws § 17-9.1-7 to § 17-9.1-10 ......................................................... 5

R.I. Gen. Laws § 17-9.1-7(d) ............................................................................. 7

R.I. Gen. Laws § 17-9.1-11 ................................................................................ 5

R.I. Gen. Laws § 17-9.1-12 ................................................................................ 6

R.I. Gen. Laws § 17-9.1-19 ......................................................................... 5, 10

R.I. Gen. Laws § 17-9.1-20 .................................................................................................... 9

R.I. Gen. Laws § 17-9.1-25 .................................................................................................... 8

R.I. Gen. Laws, § 17-9.1-26 .......................................................................................... 8, 9, 10

R.I. Gen. Laws. § 17-9.1-27 ................................................................................................... 9

R.I. Gen. Laws § 17-9.1-34 ............................................................................................. 2, 30

R.I. Gen. Laws § 17-10-1(c) ................................................................................................ 10

R.I. Gen. Laws § 23-3-5(a)(6) ............................................................................................. 10

### Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 14, 31

Fed. R. Civ. P. 81(a)(5) ....................................................................................................... 24

### Regulations

100 RICR-20-00-5(C) ................................................................................................ 6, 10, 11

410 RICR-20-00-19.5 ................................................................................................... passim

410-RICR-20-00-19.5(A) .................................................................................................. 5, 6

410-RICR-20-00-19.5(I)(1) ................................................................................................. 30

68 Fed. Reg. 47610–01 (Aug. 11, 2003) ............................................................................. 36

OMB Circular A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act* ............................................................................. 37

OMB Guidance, M-03-22 (Sept. 26, 2003) ......................................................................... 38

### Constitutional Provisions

U.S. Const. art. I, § 4 .................................................................................................. 4, 15, 16

R.I. Const. art. 2, § 1 ...................................................................................................... 4, 11

**Other Authorities**

3 *Records of the Federal Convention of 1787* (M. Farrand ed. 1911) .......................................... 15

*Black's Law Dictionary*, "basis" (12th ed. 2024) ......................................................... 23

*Black's Law Dictionary,* "purpose" (12th ed. 2024) .................................................... 19

*Brief for the United States as Amicus Curiae*, 2023 WL 4882397 (Jul. 25, 2023),
   filed in *Public Interest Legal Found. v. Bellows*, First Cir. No. 23-1361 ................................ 26

Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National
   Voter Roll*, N.Y. Times, Sept. 9, 2025 ...................................................................... 22

Executive Order No. 14248, *Preserving and Protecting the Integrity of
   American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) ...................................................... 22

George W. Bush, *Statement on Signing the Help America Vote Act of 2002*,
   The American Presidency Project (Oct 29, 2002)................................................................. 22

H.R. Rep. No. 86-956 (1959)............................................................................................ 17

Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*,
   Stateline, Sept. 12, 2025 ........................................................................................ 22

*Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights
   of the S. Comm. on the Judiciary*, 86th Cong. 14 (Mar. 20, 1959).......................................... 28

R.I. Secretary of State*, Improving Elections in Rhode Island: An Update (April 2018),*
   available at https://vote.sos.ri.gov/Content/Pdfs/improving_elections_report_2018.pdf......... 10

S. Rep. No. 93-1183 (1974), reprinted in 1974 U.S.C.C.A.N. 6916, 6917 .................................... 34

*The Effects of the Voting Rights Act: A Case Study*, 72 Wash. U. L.Q. 725 (1994) ...................... 17

*Voting Rights; Mechanism for Social Change*, 76 Ala. L. Rev. 603 (2025).................................. 17

**INTRODUCTION**

Secretary of State Gregg M. Amore's motion to dismiss should be granted because the United States fails to state a plausible claim under Title III of the Civil Rights Act of 1960 (CRA) to justify its unprecedented demand to release confidential and sensitive personal information relating to 744,618 active registered voters in Rhode Island.[1]   The United States, through its Department of Justice (DOJ), claims it needs confidential and sensitive personal information, consisting of each registered voter's full name, date of birth, residential address, state driver's license number or the last four digits of the registrant's Social Security number, purportedly to assess whether Rhode Island's "general programs" for voter list maintenance demonstrate the "reasonable efforts" required by the National Voter Registration Act of 1993 (NVRA) and Help America Vote Act of 2002 (HAVA).[2]

Although Secretary Amore expressed a willingness to provide DOJ with Rhode Island's publicly available voter registration list that, consistent with federal and state laws, protects confidential and sensitive information from disclosure, DOJ commenced this action to compel Secretary Amore to produce an electronic version of Rhode Island's complete voter registration list, including non-public personally identifiable information.   The only authority DOJ provides for its demand is the CRA, which permits DOJ to seek some voter records from states but only as part of an investigation into racially discriminatory voting practices.   No such racially discriminatory voting practices are alleged here.   The CRA further requires DOJ to state both "the basis" and "the purpose" for any records demand.   The Complaint fails to allege the basis for

_____

[1] This number reflects active status registered voters as of January 2026 as maintained by the Rhode Island Department of State, available at https://datahub.sos.ri.gov/ RegisteredVoter.aspx (last visited Jan. 13, 2026).

[2] *See* 52 U.S.C §§ 20501 to 20511 (NVRA) and 52 U.S.C. §§ 21081 to 21085, 21111 (HAVA).

DOJ's demand, and the only alleged purpose is to "ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 20. Both statutes, however, make clear that list maintenance is a responsibility committed to the states' broad discretion, and any purported assessment of Rhode Island's "reasonable efforts" to comply with federal requirements do not plausibly require granting DOJ electronic access to a trove of confidential and sensitive records containing personal information on hundreds of thousands of registered voters in Rhode Island.

Indeed, release of confidential and sensitive information contained in Rhode Island's electronic voter registration list would violate state confidentiality and federal privacy laws. Rhode Island law specifically prohibits the disclosure of confidential voter information, including a registrant's state driver's license and last 4 digits of a registrant's Social Security number. R.I. Gen. L. § 17-9.1-34(f); 410 RICR-20-00-19.5. The federal Privacy Act of 1974 and E-Government Act of 2002 likewise preclude DOJ from collecting the confidential voter records it seeks.

In sum, because DOJ has no valid legal basis for demanding an electronic version of Rhode Island's complete voter registration list, including non-public personally identifiable information, Secretary Amore's motion to dismiss should be granted.[3]

## FACTUAL AND REGULATORY BACKGROUND

### I. Federal voter list general program and maintenance requirements

Two federal laws, NVRA and HAVA, require states to undertake reasonable efforts to maintain the accuracy and currency of their statewide voter registration lists. NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of

---

[3] DOJ's accompanying motion to compel (ECF No. 2) must likewise be denied as it is premised on the same flawed legal claim and theories as the Complaint.

ineligible voters from the official lists of eligible voters" who die or change their residence, as well as to send confirmation notices to voters following any change in residence. 52 U.S.C. § 20507(a)-(f). The "reasonable effort" requirement is modest; a state program suffices as long as it reflects a "serious attempt that is rational and sensible[.]" *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025)*, petition for cert. pending*, No. 25-437 (filed Oct. 7, 2025). Subject to certain restrictions designed to protect voters from being wrongfully purged from voting lists,[4] NVRA generally leaves it to the covered state to design and operate its list-maintenance program. *See Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 313 (S.D.N.Y. 2020) ("NVRA leaves substantial discretion to the states"). To facilitate public oversight, each covered state must "maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," subject to specific exemptions. *Id.* at § 20705(i). Nothing in NVRA "prohibits the appropriate redaction of uniquely or highly sensitive personal information" from voting registration records. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases).

HAVA requires states to develop a "single . . . computerized statewide voter registration list" that is "uniform, official, interactive[,]" and includes a unique identifier for each registered voter. 52 U.S.C. § 21083(a)(1)(A). As part of this requirement, states must also adopt a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." *Id.* at § 21083(a)(4)(A). HAVA clarified that NVRA's

---

[4] NVRA, for instance, allows states to remove the names of registrants who, "as provided by state law," have been rendered ineligible by reason of criminal convictions. 52 U.S.C. § 20507(3)(B).

list maintenance requirements apply to new voter registration databases, but "[n]othing in HAVA broadens the scope of the NVRA's list-maintenance obligations." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Significantly, HAVA has no public disclosure requirements and provides DOJ with no subpoena authority. *See* 52 U.S.C. § 21111; *United States v. Iannone*, 610 F.2d 943, 945-46 (D.C. Cir. 1979) (rejecting claim of implied subpoena authority). In deference to the states' constitutional role as the primary administrators of federal elections, *see* U.S. Const. art. I, § 4, Congress expressly left the "specific choices on the methods of complying" with HAVA's election technology and administration requirements to the discretion of each state. 52 U.S.C. § 21085.

## II. Rhode Island's voter registration system

Article 2, § 1 of the Rhode Island Constitution grants "[e]very citizen of the United States of the age of eighteen years or over who has had a residence and home in this state for thirty days next preceding the time of voting, who has resided thirty days in the town or city from which such citizen desires to vote, and whose name shall be registered at least thirty days preceding the time of voting as provided by law, shall have the right to vote. . . ." *See also* R.I. Gen. Laws § 17-9.1-1 (voter registration requirements). The state constitution further provides that "[n]o person who is incarcerated in a correctional facility upon a felony conviction shall be permitted to vote until such person is discharged from the facility." R.I. Const. art. 2, § 1.

In 2005, the Rhode Island Secretary of State implemented a statewide central voter register called the Central Voter Registration System (CVRS). R.I. Gen. Laws § 17-6-1.2. The CVRS is the centralized voter registration system, overseen by the Department of State, that is used by all 39 Rhode Island cities and towns to manage voter registration activity and maintain the statewide voter registration database. *See* https://vote.sos.ri.gov/Elections/Administration.

Eligible persons may register to vote or update their voter information in multiple ways: they may use the Department of State's online voter registration portal; register in person at the Division of Motor Vehicles (DMV) and other designated agencies, including their local board of canvassers; or register by mail. *See* R.I. Gen. Laws § 17-9.1-7 to § 17-9.1-10; https://vote.sos.ri.gov/Voter/RegisterToVote. Regardless of which means or place of registration is used, a person seeking to register to vote must complete the Voter Registration Form, a copy of which is available on the Department of State's official website. 410-RICR-20-00-19.5(A); *see also* https://vote.sos.ri.gov/Forms/elections/Forms/Voter RegFormEng.pdf. No voter may have more than one voter registration. R.I. Gen. Laws § 17-9.1-19. "Any voter who is registered more than once shall be deemed to have authorized the cancellation of all registrations other than the most recent. . . ." *Id.* at (a).

Rhode Island's Voter Registration Form collects a range of confidential and sensitive personally identifiable information. It requires each registrant to confirm United States citizenship, residence in Rhode Island, and that they are at least 16 years of age (noting that voters must be 18 years old to vote in general elections). *See also* R.I. Gen. Laws § 17-9.1-11 ("Before the name of any person shall be placed on the voting list, the person shall, at the time of registration, certify or declare that the person is a citizen of the United States."); § 17-9.1-33 (establishing minimum age). An applicant who checks "no" to any of these questions, is instructed not to complete the rest of the form. 410-RICR-20-00-19.5(A)(1)(b)(2); *see also* https://vote.sos.ri.gov/Forms/elections/Forms/Voter RegFormEng.pdf.

To establish their identity, registrants must provide either a Rhode Island driver's license or State ID card number. 410-RICR-20-00-19.5(A)(1)(d)(1); *see also* https://vote.sos.ri.gov/Forms/elections/Forms/Voter_RegFormEng.pdf. If they have neither,

registrants must enter the last 4 digits of their Social Security number.  *Id.*  In addition, registrants must provide the following personal information:

- full name
- date of birth
- physical home address, including zip code (not a P.O. Box)
- mailing address (if different from home address)

410-RICR-20-00-19.5(A)(1)(e)-(j); *see also* https://vote.sos.ri.gov/Forms/elections/Forms/Voter RegFormEng.pdf.  *Id.*  Registrants may also provide their political party affiliation, phone number, or email address, but these are optional requirements.  *Id.* A registrant who does not select a political party affiliation will be registered as "unaffiliated." *Id.*

All registrants must "swear or affirm" that they are a U.S. citizen, live at the address listed on the form, and will be at least eighteen years old before voting in next general election.  410-RICR-20-00-19.5(A)(1)(k); *see also* https://vote.sos.ri.gov/Forms/elections/Forms/Voter RegFormEng.pdf.  The attestation also includes a statement that the registrant is "not incarcerated in a correctional facility upon a felony conviction" and has "not been lawfully judged 'mentally incompetent' to vote by a court of law." *Id.*  These attestations must be signed under the pains and penalties of perjury and are subject to criminal prosecution should the registrant provide any false information.  *See* R.I. Gen. Laws § 17-9.1-12 (making it a felony for any person to "knowingly or willfully" make "any false certificate or declaration in registering his or her name" on the voter registration list).

The same Voter Registration Form is used to update or change voter information, including the voter's name, residence, address, or party affiliation.  *See* 410-RICR-20-00-19.5(A)(1)(a); *see also* https://vote.sos.ri.gov/Forms/elections/Forms/VoterRegFormEng.pdf.  Once the local board of canvassers processes the voter registration request, the voter's updated information is added to the voter registration list.  *See* 100-RICR-20-00-5(C).

### III. Rhode Island's list maintenance efforts

Rhode Island uses several different methods as part of its reasonable efforts to prevent duplication, confirm residence, and remove deceased or otherwise ineligible voters from the voter registration list. Those reasonable efforts include the following:

#### A. Automated and online voter registration system

Rhode Island uses Automated Voter Registration (AVR) to help maintain the accuracy of its voter registration list. https://vote.sos.ri.gov/Elections/Administration. AVR improves the voter registration process, beginning at the DMV, by automatically registering citizens to vote unless they choose to "opt-out" of the process. *Id.* This means when someone updates their address at the DMV they will also update their voter registration information. *Id.* AVR, therefore, is a critical tool in reducing the risk of unintentional, duplicate voter registrations, as well as detecting potential voter fraud. *See* https://vote.sos.ri.gov/Elections/Administration. AVR also ensures that voter information is as accurate as possible because the DMV generally has the most up-to-date information for voters. *See* https://vote.sos.ri.gov/Elections/Administration. Daily records are electronically sent from the DMV to the CVRS *via* the Department of State's secure transfer process. *See* R.I. Gen. Laws § 17-9.1-7(d). Local boards of canvassers in each city and town process the records to ensure that all updates are accurately recorded in the CVRS. *See id;* R.I. Gen. Laws § 17-6-1.2(b) (local boards of canvassers have the "responsibility and sole authority for any addition, correction, or deletion of information from their local voting records").

Additionally, in 2016, the Department of State launched the online voter registration (OVR) portal, which allows citizens to register to vote or update their voter information at any time. *See* R.I. Gen. Laws § 17-9.1-34; https://vote.sos.ri.gov/Voter/RegisterToVote. Daily records are electronically sent to the CVRS utilizing a secure transfer. *Id.* Local boards of

canvassers in each city and town process the records to ensure that all updates are accurately recorded in the CVRS.  *See id.;* R.I. Gen. Laws § 17-6-1.2(b).

The AVR and OVR voter registration methods allow voters to easily update their voter information to ensure that the CVRS has the most updated information, which keeps the voter list as accurate as possible.

## B. Residence confirmation procedures

Rhode Island also makes reasonable efforts to confirm the residence of all registered voters. It requires the local board of each city or town to "mail an acknowledgement notice to each newly registered voter and to each voter who changes his or her voting residence within seven (7) days after receipt of the registration or change of residence."  R.I. Gen. Laws § 17-9.1-25.  This acknowledgement notice shall be mailed to the applicant at the address from which he or she registered and shall be clearly marked: "Do Not Forward -- Return If Undeliverable."  *Id.*

If an acknowledgement notice, or any official elections mail, is returned as undeliverable (or for one of the other reasons identified in the statute), a confirmation process is required.  R.I. Gen. Laws, § 17-9.1-26.  As part of that process, the local board issues the following notice to the voter:

> The board of canvassers has received information that you may no longer reside at the address from which you are currently registered.  If you have not permanently changed your residence address, or if you have permanently changed your residence address but continue to live in the same city or town, you should immediately return the voter registration form no later than fourteen (14) days after the date of this mailing even if this notice was mailed to your correct current address.  If the voter registration form is not returned, affirmation or confirmation of your current address may be required at the polls on election day.  If the registration form is not returned and you do not vote by _____, which is the date of the second general election following the date of this mailing, then your name may be removed from the voter registration list.  If you have permanently changed residence address to another city or town in Rhode Island, please complete and return the completed voter registration form to the local board of canvassers in the city or town of your current address.

R.I. Gen. Laws § 17-9.1-26(c). If the notice is returned as undeliverable or the voter fails to respond within 14 days, the "voter shall remain on, or be placed on, the inactive list and shall not be permitted to vote until the voter has signed an affirmation form at either the approved polling place or at the local board of canvassers. . . ." *Id.* Additionally, any person who makes a false affirmation "shall be guilty of a felony." R.I. Gen. Laws § 17-9.1-20.

Rhode Island also verifies voter information through various verification mailings conducted each year. *See* R.I. Gen. Laws § 17-9.1-27(b). In 2025, a verification mailing was sent to all active voters at the address listed on the voter registration list. *See Voter List Maintenance - 2025*, available at https://www.sos.ri.gov/mailing. Voters were instructed to review their voter information and notify the Department of State of any changes. *Id.* Local boards of canvassers then process the responses to ensure that all updates are recorded in the CVRS. *Id.* Any verification mail that is returned as undeliverable results in the voter's name being placed on the inactive list pursuant to the process described above. *See Voter List Maintenance in Rhode Island*, available at https://docs.sos.ri.gov/documents/Elections/Voter-Rolls-InfoSheet.pdf.

### C. Periodic updates with U.S. Postal Service records

In addition to the above voter list maintenance initiatives, Rhode Island law requires periodic updating of voter registration records. This is done by both the Department of State and local boards of canvassers in each city or town. R.I. Gen. Laws § 17-9.1-27. "Not less than four (4) times within a calendar year," the Department of State must update Rhode Island's voter registration list by using the U.S. Postal Service National Change of Address (NCOA) Program and share NCOA data with the relevant local board of canvassers to update local records. *Id.* at (a). "The NCOA list of address changes shall be compared by the local board with lists of registered voters, and if address changes are detected for any voter, the local board shall institute

the confirmation process described [above] in § 17-9.1-26." *Id.* Additionally, the local board of canvassers in each city or town must "review their voter registration files on a quarterly basis" to remove any potential "duplicate voter registrations in the central voter registration system. . . ." R.I. Gen. Laws § 17-9.1-19(b).

### D. Removing deceased voter names

Rhode Island's statewide voter registration list is also updated to reflect information relating to the death of registered voters. R.I. Gen. Laws § 17-10-1(c). This is primarily done in two ways. First, the Office of the State Registrar of Vital Records is required to "[e]lectronically transmit to the office of the secretary of state, on a monthly basis, a list of any reported deaths of a person or persons eighteen (18) years of age or older, and maintain a list of those deceased persons." *See* R.I. Gen. Laws § 23-3-5(a)(6); 100-RICR-20-00-5(C)(2). Second, the list is updated by local boards of canvassers with information provided by the federal Social Security Administration's Death Master File. Upon confirmation of death, the deceased voter is removed from the list. R.I. Gen. Laws § 17-10-1(c).

### E. Coordination with multi-state maintenance efforts

Rhode Island also is one of 25 states plus the District of Columbia that participates in the Electronic Registration Information Center (ERIC), a nonpartisan membership organization comprised of state election officials from around the United States. *See* R.I. Secretary of State, *Improving Elections in Rhode Island: An Update (April 2018),* available at https://vote.sos.ri.gov/Content/Pdfs/improving_elections_report_2018.pdf.; DOJ's Motion to Compel, ECF No. 2-1, p. 11 (acknowledging Rhode Island is a member of ERIC). According to ERIC's official website, it is the "most effective tool available to help election officials maintain accurate voter rolls and detect illegal voting." https://ericstates.org/about/. ERIC uses a variety

of datasets including state voter registration and DMV records to determine the accuracy of states' voter rolls. https://vote.sos.ri.gov/Content/Pdfs/improving_elections_report_2018.pdf. ERIC provides reports that indicate which registered voters have died (based, in part, on the Social Security Administration's Death Master File), moved within the state, moved to another ERIC state, as well as those voters who have multiple voter registration records in the same state. *Id.; see also* https://ericstates.org/how-does-it-work/ (providing details on "list maintenance reports" created by ERIC). The Department of State works with local boards of canvassers to ensure that voter records are properly updated based on ERIC data. *See id.* Rhode Island's use of ERIC is an integral part of maintaining the accuracy of its voter registration list.

### F. Removing incarcerated felon names

In addition to the above list maintenance activities, Rhode Island updates the CVRS to remove the names of voters who are ineligible to vote because they have been incarcerated in a correctional facility upon a felony conviction. *See* R.I. Const. art. 2, § 1. The Department of Corrections is required to transmit to the Department of State lists of persons convicted of a felony, who, during the preceding monthly period, have become ineligible to vote because of their incarceration. 100-RICR-20-00-2(2.4)(C)(1-2); 100 RICR-20-00-5(C)(3).

**************

Through these mutually reinforcing efforts, Rhode Island ensures that its voter registration list satisfies the reasonable efforts requirements of NVRA and HAVA. Indeed, since 2023, it has removed over 105,000 ineligible voters from its voter registration list in compliance with the procedural safeguards required by state and federal law. See Compl. ¶ 25 (incorporating by

reference Declaration of Maureen S. Riordan (Riordan. Decl.), filed as ECF No. 2-2); Riordan Decl., Ex. 2, p.2.

### IV. DOJ's records demands to Rhode Island and other states

On September 8, 2025, DOJ sent a letter to Secretary Amore demanding an electronic copy of Rhode Island's complete statewide voter registration list. Compl. ¶¶ 18-20; Riordan Decl., Ex. 1. DOJ specified that it demanded an unredacted copy that "contain[ed] all fields," including "full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number." Compl. ¶ 20; Riordan Decl., Ex. 1. DOJ cited NVRA, HAVA, and Title III of the CRA as the legal bases for its demand. *Id.* Without any elaboration or further explanation, DOJ stated that the "purpose of this request is to ascertain Rhode Island's compliance with the list maintenance requirements of NVRA and HAVA." Compl. ¶¶ 19-20.

Secretary Amore responded to DOJ's demand on September 16, 2025. Compl. ¶ 25; Riordan Decl. at Ex. 2. Although the Rhode Island Department of State would provide DOJ with a copy of Rhode Island's publicly available voter registration list, it would not release fields containing personally identifiable information (such as each registrant's state driver's license number or last four digits of each registrant's Social Security number) "absent a proper demonstration of a proper legal basis to do so or a court order." *Id.* No proper legal basis was presented in DOJ's letter because none of the statutes on which DOJ relied authorized it to demand a full and unredacted, electronic copy of Rhode Island's voter registration list. Riordan Decl., Ex. 2. Regarding the CRA, in particular, the Secretary noted that the "CRA allows access to voter records only in connection with an investigation into the infringement or denial of constitutional voting rights, which was not the basis stated in DOJ's September 8th demand. *Id.* DOJ's demand

also failed to demonstrate compliance with the procedural safeguards Congress established under the Privacy Act and E-Government Act, relating to the collection and use of personally identifiable information on Americans. *Id.* Without responding to Secretary Amore's September 16th letter, or addressing any of his concerns relating to the disclosure of personally identifiable information on hundreds of thousands of Rhode Island voters, DOJ commenced this suit on December 2, 2025.

Rhode Island is among a growing list of states against whom DOJ has made similar records demands and commenced enforcement actions when the responsible state officials declined DOJ's demand to disclose confidential and sensitive voter information. To date, DOJ has filed enforcement complaints under the CRA (and sometimes HAVA and NVRA) against the District of Columbia and 23 states, including Rhode Island.[5] DOJ Press Release (Jan. 6, 2026), *available at*

---

[5] *See United States v. Bellows*, No. 1:25-cv-00468 (D. Me. Sept. 16, 2025); *United States v. Oregon*, No. 6:25-cv-01666 (D. Or. Sept. 16, 2025); *United States v. Simon*, No. 0:25-cv-03761 (D. Minn. Sep. 25, 2025); *United States v. Benson*, No 1:25-cv-01148 (W.D. Mich. Sept. 25, 2025); *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Penn. Sept. 25, 2025); *United States v. Bd. of Elec*s., No. 1:25-cv-01338 (N.D.N.Y. Sept. 25, 2025); *United States v. Scanlan*, No. 1:25-cv-00371 (D.N.H. filed Sept. 25, 2025); *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. No. Sept. 25, 2025); *United States v. Albence*, No. 25-cv-1453 (D. Del. Dec. 2, 2025); *United States v. Demarinis*, No. 1:25-cv-03934 (D. Md. Dec. 2, 2025); *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M. Dec. 2, 2025); *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt. Dec. 2, 2025); *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash. Dec. 2, 2025); *United States v. Galvin*, No. 1:25-cv-13816 (D. Mass. Dec. 11, 2025); *United States v. Nago*, No. 1:25-cv-00522 (D. Haw. Dec. 11, 2025); *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo. Dec. 11, 2025); *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev. Dec. 11, 2025); *United States v. District of Columbia Bd. of Elections*, No. 1:25-cv-04403 (D.D.C. Dec. 18, 2025); *United States v. Matthews*, No. 3:25-cv-3998 (C.D. Ill. Dec. 18, 2025); *United States v. Raffensperger*, No. 5:25-cv-548 (M.D. Ga. Dec. 18, 2025); *United States v. Wisconsin Elections Comm'n*, No. 3:25-cv-1036 (W.D. Wisc. Dec. 18, 2025); *United States v. Fontes*, No. 26-cv-00066 (D. Ariz. Jan. 6, 2026); *United States v. Thomas*, No. 26-cv-00021 (D. Conn. Jan. 6, 2026).

The Court may properly consider court filings and dockets in other cases when ruling on a motion to dismiss. *See Kowalski v. Gagne,* 914 F.2d 299, 305 (1st Cir.1990) ("It is well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand."); *Murphy v. Central Falls Detention Facility Corp.,* No. 14-203, 2015 WL 1969178, *3 at n.2 (D.R.I. Apr. 20, 2015) (taking judicial notice of "materials from judicial proceedings in other courts" in ruling on motion to dismiss).

https://www.justice.gov/opa/pr/justice-department-sues-arizona-and-connecticut-failure-produce-voter-rolls. All 23 states and the District of Columbia are contesting DOJ's unprecedented and sweeping demands for the release of confidential and sensitive information relating to millions of registered voters across the United States.

## ARGUMENT

### I. Standard of review

A district court should dismiss claims under Fed. R. Civ. P. 12(b)(6) when the underlying allegations fail "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A district court should thus dismiss a claim "if the complaint does not set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'" *U.S. ex rel. Hutcheson v. Blackstone Med., Inc*., 647 F.3d 377, 384 (1st Cir. 2011) (quoting *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008)). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (*citing Twombly*, 550 U.S. at 555). "When ruling on a Rule 12(b)(6) motion to dismiss, a district court is generally limited to considering 'facts and documents that are part of or incorporated into the complaint.'" *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (*quoting Trans–Spec Truck Serv., Inc. v. Caterpillar Inc*., 524 F.3d 315, 321 (1st Cir. 2008)). But those "limitations . . . are not absolute"—"[a] district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" *Id.* (quoting *In re Colonial Mortgage Bankers Corp.,* 324 F.3d 12, 20 (1st Cir. 2003)). Material on government websites, as matters of public record, also may be properly considered in

ruling on a motion to dismiss. *Gent v. Mutual Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010); *Laccinole v. Appriss, Inc.*, 453 F. Supp. 3d 499, 502 n.2 (D.R.I. 2020).

## II. States have primary authority in conducting voter registration and list maintenance.

The U.S. Constitution grants States the primary authority to regulate federal elections. *See* U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2, 4. As Madison explained at the Virginia Convention, the Framers assigned the regulation of federal elections "in the first place, to the state governments, as being best acquainted with the situation of the people." 3 *Records of the Federal Convention of 1787*, at 312 (M. Farrand ed. 1911). This grant of power authorizes states to "provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, [and] protection of voters," among other issues. *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States "enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Id.* In short, they are "given, and in fact exercise a wide discretion" in providing for fair and efficient elections. *United States v. Classic*, 313 U.S. 299, 311 (1941).

The broad discretion conferred on states by the U.S. Constitution is subject only to Congress's authority to "make or alter such [r]egulations." U.S. Const., art. I, sec. 4, cl.1.; *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 9 (2013) (ITCA) (Congress may "pre-empt state legislative choices"). Congress expressly left primary responsibility for HAVA and NVRA list maintenance requirements to the discretion of each state. *See* 52 U.S.C. § 21085 ("The specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State."); *Brehm*, 432 F. Supp. 3d at 313 (NVRA leaves "substantial discretion to the states"). DOJ seeks to displace the states' authority by using the CRA to obtain unredacted, electronic copies of statewide voter registration lists from Rhode Island and other states so it can

conduct its own list maintenance/voter-eligibility determinations, without any constitutional or congressional authority to do so. *See* U.S. Const. art. I, § 4, cl. 1.

### III. DOJ fails to state a claim under Title III of the CRA to demand an electronic version of Rhode Island's complete voter registration list.

DOJ premises its demand for an electronic version of Rhode Island's statewide voter registration list on Title III of the CRA. Its reliance on the CRA, however, is flawed because its records demand is beyond the bounds of the CRA and fails to satisfy the CRA's statutory requirements. Further, even if DOJ's records demand under the CRA was legally cognizable, the CRA does not require the disclosure of sensitive personal information relating to all registered voters in Rhode Island and doing so would violate privacy protections afforded by both state and federal law. The Complaint should accordingly be dismissed, and DOJ's parallel motion to compel denied.

#### A. Title III of the CRA was enacted to enable DOJ to remedy race discrimination in voting, not to enable DOJ to troll through confidential and sensitive information for unspecified purposes.

Title III of the CRA was "designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom, Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). To support this purpose, the CRA requires election officers, like Rhode Island's Secretary of State, to "retain and preserve, for a period of twenty-two months from the date of any [federal] . . . election . . . all records and papers which come into [the officer's] possession relating to any application, registration, . . . or other act requisite to voting in such election[.]" 52 U.S.C. § 20701. Under § 20703, any record required to be retained under § 20701, "shall, upon demand in writing by the Attorney General. . . be made available for inspection, reproduction, and copying at the principal office of such custodian. . . ."

16

52 U.S.C. § 20703.  Any such demand "shall contain *a statement of the basis and the purpose therefor*."  *Id.* (emphasis added).

Congress' purpose in conferring the authority to demand records under Title III of the CRA was to enable the federal government to investigate and remediate racially discriminatory voting practices, namely, efforts to prevent eligible minority voters from voting or registering to vote. *Rogers*, 187 F. Supp. at 853-54; *United States v. Lynd,* 301 F.2d 818, 819 (5th Cir. 1962) ("The basis of the government's appeal . . . is its contention that it has been completely frustrated in an effort to obtain an order . . . putting an end to alleged racially discriminatory acts and practices[.]"); *Lynd,* 301 F.2d at 822 (observing that Fifth Circuit had "laid down the rule that the government is entitled to have an order . . . authorizing it to inspect the voting records" based on the Attorney General's "reasonable grounds for belief that certain voters are being discriminatorily denied their voting rights in a given county").  This is confirmed by a contemporaneous House Report, describing the purpose of Title III as protecting voters against discrimination on account of race:

> The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race.  This is the same purpose contained in the Civil Rights Act of 1957. . . . Title III is a necessary supplement to part IV of the Civil Rights Act of 1957, which prohibits threats or intimidation designed to prevent persons from exercising their right to vote.  The new proposal would implement Federal enforcement of this protection . . . .

H.R. Rep. No. 86-956, at 7, 26 (1959).  *See also Voting Rights; Mechanism for Social Change*, 76 Ala. L. Rev. 603, 608-611 (2025) (discussing development of voting rights legislation to remedy racial discrimination, including the Civil Rights Act of 1960); *The Effects of the Voting Rights Act: A Case Study*, 72 Wash. U. L.Q. 725, 727-28 (1994) (same).

DOJ's records demand does not relate to any investigation into racially discriminatory voting practices.  Instead, DOJ's alleged purpose is to "ascertain Rhode Island's compliance with the list maintenance requirements of NVRA and HAVA."  Compl. ¶ 20; Riordan Decl. at Ex. 1, p.2.  But,

compliance with NVRA's and HAVA's list maintenance requirements does not automatically fall within the ambit of a racially discriminatory voting practice subject to the CRA. *See Kennedy v. Bruce*, 298 F.2d 860, 863 & n.2 (5th Cir. 1962) (observing that statistical evidence in a CRA records proceeding indicating a failure to remove voters who moved away or died was "a matter which does not bear any particular importance to the present inquiry"). Even if it did, the Complaint does not allege any facts linking DOJ's records demand to any purported investigation into discriminatory list maintenance practices. For this reason alone, DOJ's reliance on the CRA is misplaced, and the Complaint should be dismissed.

### B. The Complaint fails to allege a statement of "the basis" and "the purpose" for DOJ's records demand under the CRA.

DOJ's reliance on Title III of the CRA also fails to comply with the plain language of 52 U.S.C. § 20703, which requires that any records demand "shall" include a "statement of the basis and the purpose" for the demand. Section 20703's use of the "word 'shall' imposes a mandatory command." *Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("'Shall' means 'must.'").

Additionally, by twice using the definite article ("the"), Section 20703 requires DOJ to state "a discrete thing": the complete basis and purpose of its request and not merely one basis and purpose among many. *Niz-Chavez v. Garland*, 593 U.S. 155, 166 (2021); *see also Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between definite and indefinite article). Without a complete statement of the basis and the purpose for DOJ's records demand, state officials and reviewing courts "cannot accurately determine whether the inquiry is within the authority of the [DOJ] and whether the information sought is reasonably relevant." *Consumer Fin. Protection Bureau v. Accrediting Council for Independent Colleges & Schs*, 854 F.3d 683, 691 (D.C. Cir. 2017); *see also In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) (CRA Title III requests cannot be "used without restraint").

Section 20703's language also is phrased in the conjunctive ("and"), meaning that the requirements for "the basis" and "the purpose" both must be met. *See United States v. Walker,* 665 F.3d 212, 224 (1st Cir. 2011) ("when a rule lists two requirements in the conjunctive, both must be satisfied"); *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020) ("[W]hen 'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'"); *see also Kennedy v. Lynd*, 306 F.2d 222, 229 (5th Cir. 1962) (requiring DOJ to "adequately state[] the basis and the purpose" for its records demand). The statutory language, therefore, constrains DOJ's authority to demand records relating to suspected CRA violations by requiring that DOJ not only disclose how the records will be used (the purpose) but also the factual predicate or circumstances underlying the request (the basis). As shown in the following sections, the Complaint fails to state a plausible basis to establish DOJ's compliance with both mandatory requirements for its CRA records demand.

### 1.    *No plausible statement of "the purpose."*

As already shown, DOJ's stated purpose in making the records demand is unrelated to the CRA's statutory objective of remedying suspected racially discriminatory voting practices. Putting aside this fundamental defect, the Complaint also fails to allege any facts to plausibly explain how or why an unredacted voter registration list is relevant to its stated purpose of assessing Rhode Island's compliance with NVRA's and HAVA's "reasonable effort" requirements for voter list maintenance. *See Black's Law Dictionary,* "purpose" (12th ed. 2024) (defining "purpose as the "objective, goal, or end").

Consistent with Rhode Island law, Secretary Amore offered to provide DOJ with Rhode Island's publicly available voter registration list. Riordan Decl., Ex. 2. The publicly available list includes the registrant's full name, home and mailing addresses, date of birth, party affiliation, voter status, voter registration date, district information, and phone number and email address (if the voter

provided them while registering to vote).  *See* 410 RICR-20-00-19.5(I)(1).  The confidential and

sensitive information Secretary Amore declined to disclose (consistent with state and federal law,

*see infra* at 29-40) included state driver's license numbers and the last four digits of Social Security

numbers for hundreds of thousands of registered voters in Rhode Island.  *See id.*

The Complaint fails to plausibly allege how any of this confidential and sensitive information

is relevant to DOJ's stated purpose of assessing whether Rhode Island—as required by NVRA—has

a "general program" that makes "reasonable effort" to remove the names of registered voters who

become ineligible by reason of death or change in residence.  *See* 52 U.S.C. § 20507(a)(4).  As DOJ

concedes in its motion to compel, compliance with NVRA is assessed by reference to whether Rhode

Island "conducts a general program that makes reasonable effort to remove the names of ineligible

voters," ECF No. 2-1, at 11, not by reference to confidential and sensitive information maintained in

the state's voter registration list.  *See Benson*, 136 F.4th at 624-26 (defining "reasonable effort" as

"a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard"

for assessing compliance); *Bellitto*, 935 F.3d at 1205 (finding a "reasonable effort" based on safe

harbor procedures alone).  Rhode Island has the required "general program" that includes reasonable

procedures to maintain NVRA compliance.  *Supra* at 7-11.

Even if the Complaint alleged (which it does not) an isolated gap or gaps in Rhode Island's

general program to remove voters who moved or died from its registration list, this allegation alone

would not demonstrate that Rhode Island's list maintenance failed to meet NVRA's "reasonable

effort" requirement.  *See Benson*, 136 F.4th at 626-27 (rejecting identification of "27,000 'potentially

deceased' voters on Michigan's registration rolls" as evidence of an NVRA violation); *Republican

Nat'l Comm. v. Benson*, No. 24-1985, 2025 WL 2731704 (6th Cir. Sept. 25, 2025) (per curiam)

(acknowledging that some movers remain on the rolls temporarily due to NVRA's "procedural

restraints"); *see also* 52 U.S.C. § 20507(d)(1) (limiting removal of movers). NRVA, after all, "does not require states to immediately remove every voter" who moved or died; instead, it is sufficient that states perform list maintenance "on a regular and ongoing basis." *Benson*, 136 F.4th at 627.

Focused as it is on a point-in-time snapshot of Rhode Island's voter registration list, DOJ's records demand is irrelevant to any legitimate assessment of the reasonable efforts Rhode Island systemically undertakes to comply with NVRA. NVRA squarely places responsibility for voter registration list maintenance with the states. It does not authorize DOJ to wade through confidential and sensitive voter information maintained on the state's voter registration list in the hopes of finding some basis to challenge registrant eligibility or make its own voter-eligibility determinations.

Nor does the Complaint plausibly allege how the confidential and sensitive voter information Secretary Amore declined to disclose is relevant to assessing whether Rhode Island—as required by HAVA—has a "system of file maintenance" that makes "reasonable effort" to remove ineligible registrants from its registered voting list. 52 U.S.C. § 21083(a)(1)(A); *see also* DOJ's Motion to Compel, ECF No. 2-1, at 11 (conceding that its records demand is meant to determine if Rhode Island "conducts a general program that makes reasonable effort to remove the names of ineligible voters"). Rhode Island has the required "system of file maintenance," and HAVA defers to states in determining what "reasonable efforts" are required. *Supra* at 4. An unredacted, electronic copy of Rhode Island's complete voter registration list is not relevant to evaluating whether Rhode Island's reasonable efforts are sufficient. DOJ could undertake this assessment with the publicly-available voter registration list Secretary Amore already offered to provide. *See* Riordan Decl. at Ex. 2. HAVA provides DOJ with no authority to wade through Rhode Island's entire voter registration list in the hopes of finding some basis to challenge registrant eligibility or make its own voter-eligibility determinations. Those determinations are properly left to the states. *See* George W. Bush, *Statement*

*on Signing the Help America Vote Act of 2002*, The American Presidency Project (Oct 29, 2002) (HAVA is intended to "respect[] the primacy of State and local governments in the administration of elections"), available at https://www.presidency.ucsb.edu/documents/statement-signing-the-help-america-vote-act-2002.

All of this suggests that DOJ's stated purpose may not, in fact, be "the" purpose for its CRA records demand. Indeed, DOJ has publicly stated that it intends to share state voter registration lists with the Department of Homeland Security (DHS), and reporting further indicates that DOJ plans to develop a national voter database. *See* Jonathan Shorman, *DOJ Is Sharing State Voter Roll Lists with Homeland Security*, Stateline, Sept. 12, 2025, https://perma.cc/C6RQ-6ATP (quoting DOJ and DHS statements); Devlin Barrett and Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times, Sept. 9, 2025, https://perma.cc/9PM4-2A6R; *see also Motion of Common Cause et al. to Intervene as Defendants*, ECF No. 5 at 4 (collecting similar public reports and statements).[6] These public statements suggest that DOJ's records demand under CRA has little or nothing to do with its stated purpose of assessing Rhode Island's compliance with NVRA and HAVA list maintenance requirements.

### 2. *No plausible statement of "the basis."*

Furthermore, even if the Complaint contained a plausible statement of the purpose (which it does not), it fails to allege any facts demonstrating the second statutory prerequisite—the basis for its CRA records demand. The plain meaning of the word "basis" requires a statement of the

---

[6] In Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025), the President directed DHS and the Administrator of the Department of Government Efficiency to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities," and to compare that publicly available data to "Federal immigration databases and State records requested" to ensure "consistency with Federal requirements." *Id.* § 2(b)(iii).

"underlying fact or condition" giving rise to the records demand. *See Black's Law Dictionary*, "basis" (12th ed. 2024). Neither the Complaint nor DOJ's September 8th demand letter include any underlying facts or conditions to plausibly establish "the basis" for DOJ's claimed investigation into Rhode Island's "compliance with the list maintenance requirements of NVRA and HAVA." Compl. ¶ 20. DOJ's allegation that its "written demand 'contained a statement of the basis and the purpose therefor,'" Compl. ¶ 28, does not remedy this defect. First, this allegation is a bald legal conclusion that merely repeats the statutory elements for a CRA records demand. This is patently insufficient to survive a motion to dismiss. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Second, even if considered, DOJ's allegation is belied by the demand letter itself, which includes no reference to any underlying facts or conditions establishing the basis for DOJ's demand for an unredacted, electronic copy of Rhode Island's voter registration list. *See* Riordan Decl. at ¶ 6 and Ex. 1.

The Complaint, in short, fails to provide a sufficient factual foundation to demonstrate DOJ's compliance with both of the statutory prerequisites for a records demand under the CRA, and should accordingly be dismissed.

## C. DOJ cannot bypass the statutory prerequisites for CRA record demands by invoking so-called "special statutory procedures."

Absent a statement of "the purpose" and "the basis" for its CRA records demand, DOJ's request reduces to an unauthorized attempt to gain access to a trove of sensitive and confidential information relating to hundreds of thousands of registered voters in Rhode Island. Fishing expeditions like this are not allowed in run-of-the-mill civil cases. *See, e.g., McCloskey v. Mueller*, 446 F.3d 262, 271 (1st Cir. 2006) ("plaintiffs should not be permitted to conduct fishing expeditions in hopes of discovering claims that they do not know they have"); *Ross v. Cox R.I.,*

*LLC*, No. 21-118-JJM, 2022 WL 1100862, *1 (D.R.I. Apr. 13, 2022) (denying motion to compel because the "Court will not allow a fishing expedition over sensitive personal information. . . . ). They certainly should not be allowed where DOJ fails to allege any facts demonstrating its compliance with the statutory safeguards Congress established specifically for CRA record demands.

DOJ suggests, in its accompanying motion to compel, that its records demand pursuant to Title III of the CRA is subject to so-called "special statutory procedures." *See* ECF 2-1 at 5-7 (*quoting Lynd*, 306 F.2d at 225-26). But Title III's text states only that a district court "shall have jurisdiction *by appropriate process* to compel the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). There is no mention of any "special statutory procedures," let alone any procedures that would diminish the federal judiciary's role to a "rubber stamp" approval for any records demand DOJ may seek to compel.

Rather, Title III's use of the phrase "by appropriate process" indicates that judicial scrutiny is required to test the sufficiency of DOJ's proffered "statement of the basis and the purpose" for any CRA records demand. *See Obduskey v. McCarthy & Holthus LLP*, 586 U.S. 466, 476 (2019) (courts "generally presum[e] that statutes do not contain surplusage") (internal citation and quotation marks omitted)). Indeed, the Supreme Court has squarely held that the "Federal Rules apply 'to proceedings to compel the . . . production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings.'" *Becker v. United States*, 451 U.S. 1306, 1308 (1981) (internal citation and quotation marks omitted); *see also* Fed. R. Civ. P. 81(a)(5) (same).

Only two years after the Fifth Circuit's decision in *Lynd*, the principal case on which DOJ relies,[7] the Supreme Court interpreted an IRS summons enforcement provision that, like the CRA's records demand provision, provided federal courts with jurisdiction to enforce an IRS summons for the "production of books, papers, records, or other data" by "appropriate process." 26 U.S.C. § 7604(a). The Supreme Court did not merely rubber stamp the IRS Commissioner's summons or rely on any so-called "special statutory procedures" to enforce it. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964). Instead, it required the IRS Commissioner to establish that all of statutory requirements for issuing the summons were met, allowed the taxpayer an opportunity to "challenge the summons on any appropriate ground," and recognized the court's authority to "inquire into the underlying reasons" for the IRS summons. *Id.* ("It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused."); *see also, e.g., United States v. Will*, 671 F.2d 963, 966 (6th Cir. 1982) (allowing summons recipient opportunity to rebut government's *prima facie* case); *Lynd*, 306 F.2d at 230 (anticipating that "'appropriate process to compel the production' of . . . records and papers will include the power and duty to issue protective orders") (quoting former 42 U.S.C. § 1974d)).

There is, in short, no special statutory procedure that would allow DOJ to evade judicial scrutiny of its compliance with the statutory requirements for a CRA records demand. To the extent *Lynd* suggests otherwise, it has been overruled on this point by *Powell*. Because the Complaint fails to sufficiently allege the requisite "statement of the basis and the purpose," *see* 52

---

[7] DOJ references two other decisions from the same era as *Lynd*. *See* ECF No. 2-1 at 6 (citing *In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) and *Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)). Like *Lynd*, those decisions were issued before the Supreme Court's decisions in *Powell* and *Becker*, and neither examined whether DOJ's subpoenas were issued pursuant to the "appropriate process" required by the CRA. These decisions, therefore, do not excuse DOJ's failure to sufficiently allege the required statement of the basis and the purpose for its CRA records demand, let alone for a purpose untethered from the CRA's statutory scope.

U.S.C. § 20703, DOJ's records demand is not made pursuant to the CRA's "appropriate process" and, therefore, should be dismissed.

### D. DOJ's demand for unredacted voting records is contrary to the later-enacted statutes it purports to enforce.

It also is incongruous for DOJ to demand an unredacted, electronic version of Rhode Island's voter registration list allegedly to assess the state's compliance with NVRA, a statute the First Circuit has held allows "redaction of uniquely or highly sensitive personal information" from voter records.[8] *Bellows*, 92 F.4th at 56. The First Circuit is not alone in interpreting NVRA, a statute enacted decades after Title III of the CRA, as allowing redaction of sensitive personal information from voter records. *See Public Interest Leg Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 264 & 267 n.9 (4th Cir. 2021) (while NVRA "does not contain an explicit exemption from disclosure for sensitive information [such as Social Security numbers] subject to potential abuse . . . the term 'all records' in the disclosure provision does not encompass any relevant record from any source whatsoever. . . ."). Other courts, for example, have held that requiring disclosure of Social Security numbers under NVRA would make potential voters hesitant to register, "potentially undermin[ing] the voter registration goals of the NVRA." *See, e.g., Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 712 (E.D. Va. 2010). Courts also have held that disclosure of voter birthdates, and the attendant risks of identity theft and other harms, likewise "contravenes the NVRA's purpose and historical bases for enactment, and would have the opposite effect than Congress intended." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739

---

[8] This was precisely the position DOJ took in the amicus brief it submitted to the First Circuit in *Bellows*, where DOJ stated: "NVRA does not prohibit States from redacting 'uniquely sensitive information' like voters Social Security Numbers before disclosing records. . . . Nor does it prohibit redacting an even broader set of personal information in certain sensitive circumstances. . . ." *Brief for the United States as Amicus Curiae*, 2023 WL 4882397, **27-28 (Jul. 25, 2023), filed in *Public Interest Legal Found. v. Bellows*, First Cir. No. 23-1361.

(S.D. Miss. 2014). Accordingly, courts interpreting NVRA have allowed states to redact not only birthdates and Social Security numbers, but telephone numbers, street numbers, identifying portions of email addresses, and other highly sensitive personal information. *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 944 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022).

DOJ's reliance on the CRA's records demand provision ignores the limitations imposed by NVRA on the release of confidential and sensitive voter records.[9] Consistent with established canons of statutory interpretation, the protections afforded by NVRA as the later enacted statute, limit the scope of the earlier statute's record demand provision. *See Vimar Seguros Y Reaseguros, S.A. v. M/V Sky Reefer*, 29 F.3d 727, 732 (1st Cir. 1994) ("a later enacted statute generally limits the scope of an earlier statute if the two laws conflict"). Application of this cannon of statutory interpretation has particular resonance here, given heightened privacy and data security considerations related to DOJ's collection of sensitive information since 1960, when Title III of the CRA was enacted.

DOJ, in sum, has no lawful authority to demand the production of an unredacted, electronic version of Rhode Island's voter registration list under the CRA, and its Complaint seeking this relief should accordingly be dismissed.

---

[9] Inexplicably, the Complaint cites HAVA § 21083 as grounds for demanding production of Rhode Island's unredacted voter registration list. *See* Compl. p.8, ¶B. HAVA, however, has no provision requiring the production of records at all and certainly not any provision precluding states from redacting confidential and personal information like that demanded here. In all events, the Complaint asserts no claim under HAVA.

## IV.     DOJ's demand for an electronic version of Rhode Island's voter registration list exceeds the limited form of production the CRA requires.

Assuming without conceding the CRA authorizes DOJ to demand Rhode Island's complete voter registration list, Rhode Island need only make the list available for "inspection, reproduction, and copying" at the Department of State's principal office.  *See* 52 U.S.C. § 20703 ("the person having custody, possession, or control" of records required to be maintained under § 20701 shall "be made available for inspection, reproduction, and copying at the principal office of such custodian").  There is no statutory requirement for Rhode Island to produce its voter registration list in electronic format, as DOJ demands here.  Compl. p. 8; Riordan Decl., Ex. 1.  Allowing DOJ electronic access to Rhode Island's voter registration list would essentially shift *control* of the state's voter records to DOJ.  This option was presented to Congress but rejected in favor of allowing only *inspection* at the custodian's principal office.  As then-Attorney General William P. Rogers explained to Congress in its consideration of the CRA's records demand provision:

> Because of the importance of voting records and the frequent need to refer to them, we believed *it preferable that the legislation should provide for inspection at their location rather than to permit their removal by subpoena to some other place*.  The subpoena power might be viewed by some as an attempt by the federal government to interfere unduly with state control over voting records.  Inspection at the place of custody avoids any such charge.

*Proposed Civil Rights Legislation: Hearing Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary, 86th Cong.* 14 (Mar. 20, 1959) (statement of William P. Rogers, Att'y Gen. of the U.S.), available at https://www.justice.gov/ag/aghistory/rogers/1959/03-20-1959.pdf.  Thus, DOJ's demand for an electronic version of Rhode Island's complete voter registration list is beyond the on-site inspection of records Congress envisioned under the CRA.  *See Greater Birmingham Ministries, Inc. v. Secretary of State for Ala.,* 105 F.4th 1324, 1332-33 (11th Cir. 2024) ("electronic production is neither public inspection nor photocopying; it is an entirely different method of disclosure").

To be sure, times have changed since Congress considered this issue in 1959. Electronic storage of records is far more commonplace today than it was then. But the mere passage of time does not mean Congress's deliberate choice to permit inspection but not transfer of control can be ignored. The same concerns expressed by then-AG Rogers about federal interference with "state control over voting records" persist today. Indeed, shifting *control* over Rhode Island's voter registration list by transferring those records electronically, rather than permitting the physical inspection Congress envisioned, substantially heightens the risk that confidential and sensitive voter information will be further disseminated and compromised, particularly considering DOJ's public statements about sharing confidential voter information with DHS. *Supra* at 22. This, in turn, poses an increased threat to confidentiality and privacy interests protected by federal and state law, as demonstrated in the following section.

## V. DOJ's demand for Rhode Island's complete voter registration list violates state confidentiality and federal privacy laws.

Even if DOJ satisfied the CRA's appropriate process for its records demand (which it has not), nothing in the CRA's text requires the disclosure of confidential and sensitive voter information protected by state confidentiality and federal privacy laws. The Court can consider these affirmative defenses in a motion to dismiss because "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004).

### A. DOJ's demand for Rhode Island's complete voter registration list violates the confidentiality protections afforded by state elections laws.

Secretary Amore correctly declined DOJ's demand to disclose an unredacted version of Rhode Island's complete voter registration list because doing so was prohibited by state elections

laws.  And the protections afforded by these state laws are not preempted by the CRA's records demand provision.

### 1.   *State election laws protect confidential voter information.*

R.I. Gen. Laws § 17-9.1-34 recognizes the confidentiality of "information and data" obtained in the voter registration process.  It prohibits the Secretary from using or transmitting this "information or data" for any purpose "except for voter registration purposes or pursuant to a court order."  *Id.*  The confidentiality of voter registration records is further protected by 410-RICR-20-00-19.5(I)(1), which provides as follows:

> To the extent permitted by law, all applicants' Rhode Island driver's license numbers, Rhode Island State ID numbers, the last 4 digits of applicants' Social Security numbers or photocopies of all such documents and any other documents submitted in conjunction with meeting the identification requirements for first-time voter registration applicants shall remain confidential and shall only be available to election officials solely for election purposes and shall not be part of the public record or available for public inspection.

Secretary Amore properly relied on these state laws in refusing to disclose confidential "information and data" contained in Rhode Island's voter registration list in response to DOJ's demand that, on its face, was unrelated to any lawful voter registration purpose.  Because there is no lawful basis to direct Secretary Amore to ignore state law, the Complaint should be dismissed for this reason as well.

DOJ's passing suggestion that, because Rhode Island shares data with other ERIC-participating states, it should blithely share confidential voter information with DOJ, *see* ECF No. 2-1 at 22, ignores the carefully crafted restrictions imposed by state law.  Those provisions permit sharing only with other states exclusively for list maintenance responsibilities; DOJ has no such responsibilities and, thus, is not an authorized recipient.  *See* R.I. Gen. Laws § 17-9.1-34(f) (providing that the "secretary of state may enter into an agreement and exchange information or data *with any other state exclusively for the purposes of updating the statewide central voter register and*

*registering voters*, provided such activities are performed under the supervision of the secretary of state and the secretary of state enters into an agreement to protect the confidentiality of such information or data.") (emphasis added). DOJ's argument also ignores the multiple security measures the ERIC system has in place to safeguard all information transmitted on its platform. *See* https://ericstates.org/security/ (describing the extensive security measures ERIC uses to protect state voter data). As noted in subsections B and C below, DOJ has no comparable security measures in place to ensure that Rhode Island's or any other states' voter data will be similarly protected.

### 2. *State confidentiality protections are not preempted.*

Contrary to DOJ's assertion in its motion to compel, the confidentiality protections afforded by Rhode Island's elections laws are not preempted by federal law. ECF No. 2-1 at 11-12. Although the usual presumption against preemption does not apply in the Elections Clause context,[10] *ITCA*, 570 U.S. at 14-15; *Bellows,* 92 F.4th at 52, Congress may preempt state authority over federal elections "by so stating in express terms." *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203 (1983); *Bellows*, 92 F.4th at 52. Alternatively, preemption may be found "where 'compliance with both state and federal law is impossible,' or where 'the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Oneok, Inc. v. Learjet, Inc.,* 575 U.S. 373, 377 (2015) (quoting *California v. ARC Am.Corp.,* 490 U.S. 93, 100-01 (1989)); *Bellows*, 92 F.4th at 52.

---

[10] Outside the Elections Clause context, preemption analysis begins with the presumption that 'Congress did not intend to displace state law.' *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "This assumption provides assurance that the 'federal-state balance,' *United States v. Bass*, 404 U.S. 336, 349 (1971), will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 100 (1992). Reading DOJ's complaint in the light most favorable as Fed. R. Civ. P. 12(b)(6) requires, Secretary Amore assumes but does not concede the presumption against preemption is inapplicable in this particular context.

DOJ does not suggest that the CRA contains any express statement of preemption nor that compliance with both state and federal law is impossible, so its arguments "concern only obstacle preemption." *See Capron v. Attorney Gen.*, 944 F.3d 9, 26 (1st Cir. 2019). First Circuit (and Supreme Court) precedent makes plain that "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law[;]' . . . [t]hus, 'a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law.'" *Association to Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 50-51 (1st Cir. 2025) (quoting *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (citations omitted)). DOJ's bald assertion that there is a conflict between state confidentiality protections for voter records and the CRA's records demand provision falls woefully short of discharging that heavy burden. *See Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("Our precedents 'establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'. . . That threshold is not met here.") (internal citation omitted). The CRA records demand provision was meant to be a tool for investigating and remediating suspected racially discriminatory voting practices. *Rogers*, 187 F. Supp. at 853-54; *supra* at 16-18. No such allegations are made here.

Furthermore, the CRA's records demand provision says nothing at all about state law confidentiality protections or the redaction of personally identifiable information contained in state voter registration lists. *See* 52 U.S.C. § 20703. Federal "[p]re-emption law . . . . cautions us against finding that a congressional act pre-empts a state law through silence." *Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 6 (1st Cir. 1994) (Breyer, C.J.) (citing *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). Thus, in the context of NVRA, the First Circuit held that "appropriate redaction of uniquely or highly sensitive personal information" in state voter files in compliance with state law

was permissible because federal law did not prohibit such redactions.  *Bellows*, 92 F.4th at 56 (collecting cases).  Indeed, the First Circuit concluded that the "proper redaction of certain personal information in the [state voter files] can further assuage the potential privacy risks implicated by the public release of the [state voter files]."  *Id.*  Accordingly, there is no basis for finding conflict or obstacle preemption here.  Indeed, rather than conflicting with or posing an obstacle to the accomplishment of federal objectives, Rhode Island's confidentiality laws complement the protections recognized under federal law, specifically the Privacy Act and E-Government Act, as shown in the following sections.[11]  To quote the First Circuit, these confidentiality protections "further assuage the potential privacy risks implicated by" DOJ's demand for the disclosure of confidential and sensitive information relating to hundreds of thousands of registered voters in Rhode Island without any clear basis or purpose for doing so.  *Bellows*, 92 F.4th at 56.

Accordingly, the Complaint should be dismissed because DOJ's demand for an unredacted version of Rhode Island's voter registration list violates the confidentiality protections afforded by state elections laws, and those state laws are not preempted by the CRA.

### B. DOJ's demand for Rhode Island's complete voter registration list violates the Privacy Act.

Federal law, in all events, affords similar protections against the disclosure of confidential and sensitive information, including personally identifiable information collected as part of the voter registration process.  "The Privacy Act of 1974 serves to safeguard the public interest in

---

[11] As the First Circuit observed, the CRA itself recognizes the need for some level of privacy protection.  *See Bellows*, 92 F.4th at 55.  Even when records are lawfully obtained pursuant to 52 U.S.C. § 20703 (which is not the situation here), the CRA prohibits the Attorney General and DOJ from disclosing them except "to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury."  52 U.S.C. § 20704. These restrictions on disclosure are consistent with the protections afforded by state confidentiality laws, and certainly do not preclude the Secretary from redacting sensitive personally identifiable information contained in Rhode Island's voter registration list.  *Bellows*, 92 F.4th at 56.

informational privacy by delineating the duties and responsibilities of federal agencies that collect, store, and disseminate personal information about many individuals." *Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539, 555 (S.D.N.Y. 1980); *see also Ritter v. United States*, 177 Fed. Cl. 84, 87 (Fed. Cl. 2025) ("The Privacy Act exists to protect individuals from disclosure of government-collected information.").  It is designed, among other things, to prevent "the creation of secret information systems or data banks on Americans by employees of the departments and agencies of the executive branch."  S. Rep. No. 93-1183 (1974), reprinted in 1974 U.S.C.C.A.N. 6916, 6917. Though many of the Privacy Act's provisions are procedural in nature, it flatly forbids federal agencies from maintaining any "record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity[.]"  5 U.S.C. § 552a(e)(7).  This prohibition reflects "Congress' own special concern for the protection of First Amendment rights."  *Albright v. United States*, 631 F.2d 915, 919 (D.C. Cir. 1980).

Each individual entry in Rhode Island's voter registration list is a "record" under the Privacy Act of 1974.  The Act defines a "record" as "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual . . . ."  5 U.S.C. § 552a(a)(4).  The voter record, in this vein, contains each voter's name as well as other "identifying particular[s]" about that voter, including their address, date of birth, and driver's license and/or partial Social Security numbers.[12]  *See* 410-RICR-20-00-19.5; *supra* at 5-6.  Additionally, the voter record

_____

[12] DOJ's reliance on HAVA § 21083(c), which states that the "last 4 digits of a social security number . . . shall not be considered to be a social security number for purposes of section 7 of the Privacy Act. . . .," *see* Compl. ¶21, in no way excuses DOJ's fundamental failure to comply

indicates how each voter exercises rights guaranteed by the First Amendment in several ways. *Id.* It identifies the political party, if any, in which the voter has chosen to enroll, an "integral part" of associational freedom under the First Amendment. *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973). It notes which citizens have chosen to register to vote, a choice that "implicates political thought and expression." *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999). And it shows which Rhode Islanders chose to vote in which elections, an act in which voters "express their political preferences." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979); *see Turner v. D.C. Bd. of Elections & Ethics*, 77 F. Supp. 2d 25, 31 (D.D.C. 1999) ("When a citizen steps into the voting booth to cast a vote on a matter properly on the ballot, he or she intends to send a message in support of or in opposition to the candidate or ballot measure at issue"). A federal database of such information is ripe for the very types of abuses—*e.g.,* targeting voters based on their party affiliation—the Privacy Act was enacted to prevent.

DOJ's demand also violates the Privacy Act because DOJ has not properly notified the public and Congress of its intentions to collect and compile a database of voters' personally identifiably information, not just from Rhode Island but other states as well. The Privacy Act requires federal agencies to publish public notices, called Systems of Records Notices (SORNs), with nine categories of information describing each "system of records" held by the agency that contains records about individual Americans. 5 U.S.C. § 552a(e)(4). The SORN must include categories of records maintained, categories of individuals contained in the records, expected "routine uses" of the records,

---

with the Privacy Act's requirements for the collection, storage, and dissemination of sensitive personal information on all registered voters in Rhode Island and millions of other states' registered voters. Section 7 of the Privacy Act is an uncodified provision found at Pub. L. No. 93-579, 88 Stat. 1896 (1974), that prohibits denying individuals "any right, benefit, or privilege" due to their refusal to disclose a Social Security number. *See Dittman v. California*, 191 F.3d 1020, 1026 (9th Cir. 1999). It has no bearing on whether DOJ can lawfully demand the disclosure of the last four digits of a voters' Social Security numbers protected under both state and federal law.

categories of users, and policies governing access, storage, disposal. *Id.* The agency must provide notice in the Federal Register 30 days before "any new use or intended use of the information in the system" and allow the public to submit comments on the proposed use. *Id.* § 552a(e)(11). Notice must also be provided to the Office of Management and Budget and Congress. *Id.* § 552a(r).

In its Complaint, DOJ acknowledges that it is bound by the Privacy Act, Compl. ¶22, and points to a specific SORN, the "Central Civil Rights Division Index File and Associated Records" SORN, as amended, which it claims satisfies its Privacy Act obligations, *id.* ¶23; *see* 68 Fed. Reg. 47610–01 (Aug. 11, 2003). DOJ's reliance on the existing SORN, which it incorporated by reference into its Complaint and posted on its website, is inadequate in several respects. *See* Compl. ¶¶ *22-23;* https://civilrights.justice.gov/privacy-policy.

First, the Privacy Act requires the SORN to identify "the categories of individuals on whom records are maintained in the system." 5 U.S.C.A. § 552a(e)(4)(B). Yet the SORN cited by DOJ lists only narrow categories of individuals, such as "subjects of investigations," "victims," and "potential witnesses." 68 Fed. Reg. 47610–01 at 47611. None of the categories cited in the SORN can plausibly be read to include hundreds of thousands of Rhode Island registered voters and millions of registered voters in other states.

Second, the SORN must include "the categories of records maintained in the system[.]" 5 U.S.C. § 552a(e)(4)(C). Yet again, the SORN referenced in the Complaint lists the sort of unremarkable records one would expect in DOJ's files, such as "case files," "memoranda," and "reports." Fed. Reg. at 47611. No reasonable reader of the SORN would come away with the impression that DOJ's files will contain complete state voter registration databases, allowing access to sensitive personally identifiable information on millions of registered voters in Rhode Island and other states.

Lastly, the Privacy Act requires that the SORN identify "the categories of sources of records in the system[.]" 5 U.S.C.A. § 552a(e)(4)(I). DOJ's SORN refers only to "an agency or person who has or offers information related to the law enforcement responsibilities and/or other statutorily-mandated duties of CRT." This description does not alert a reasonable reader that the involuntary collection of entire state voter registration databases is a source of DOJ records.

DOJ is required to publish a new SORN whenever there is a "revision" to its system of records. 5 U.S.C.A. § 552a(e)(4). The Office of Management and Budget interprets this provision to require a revised SORN if there is "[a] substantial increase in the number, type, or category of individuals about whom records are maintained in the system" or "[a] change that expands the types or categories of records maintained in the system." OMB Circular A-108, *Federal Agency Responsibilities for Review, Reporting, and Publication under the Privacy Act*, at 5, https://tinyurl.com/3hkzbyr2. DOJ's decision to begin collecting complete, unredacted voter files from Rhode Island and multiple other states, containing sensitive personally identifiable information on millions of voters as well as information on their First Amendment–protected activities, easily satisfies these standards. The Court should, therefore, dismiss the Complaint because DOJ's records demand is invalid under the Privacy Act.

### C. DOJ's demand for Rhode Island's complete voter registration list violates the E-Government Act.

DOJ's Complaint also should be dismissed because DOJ failed to conduct the privacy impact assessment required by the E-Government Act. Under the E-Government Act, Pub. L. No. 107-347, § 208, 116 Stat. 2899, federal agencies are required to conduct a "privacy impact assessment" prior to taking various actions that impact personal privacy, including any initiation of a new collection of information that will be collected, maintained, or disseminated using information technology and that "includes any information in an identifiable form permitting the physical or online contacting of

a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the Federal Government." *Id.* § 208(b)(1)(A)–(B); OMB Guidance, M-03-22 (Sept. 26, 2003), *available at* https://bidenwhitehouse.archives.gov/wpcontent/uploads/legacy_drupal_files/omb/memoranda/2003/m03_22.pdf .

Rhode Island's voter registration list, which includes names, addresses, dates of birth, and other personally identifiable information, falls within the strictures of the privacy impact assessment requirement. Yet, despite Secretary Amore raising concerns about DOJ's compliance with the E-Government Act in his response to the DOJ's September 8th demand letter, *see* Riordan Decl., Ex. 2, the Complaint fails to allege that DOJ has conducted the required privacy impact assessment. Absent any allegation demonstrating that DOJ has conducted the required assessment, the Complaint should be dismissed for failure to comply with the E-Government Act. *See Electronic Privacy Information Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C. 2017) (privacy impact assessment must be completed "before the agency initiates a new collection of information").

### D. DOJ must comply with federal and state privacy protections.

DOJ suggests, in its parallel motion to compel, that it need not comply with any of the protections afforded by the Privacy Act or E-Government Act.[13] ECF No. 2-1 at 11-13. As already noted, however, a fundamental canon of statutory construction is that later enacted statutes, like the Privacy Act and E-Government Act, limit the "scope of an earlier statute," like the CRA's records demand provision. *See Vimar Seguros Y Reaseguros, S.A.*, 29 F.3d at 732; *see also Public Interest*

---

[13] DOJ's further suggestion that the confidentiality protections afforded by state law are preempted by federal law fails for the reasons detailed in subsection A, above.

*Leg Found.*, 996 F.3d at 263 (holding that NVRA's disclosure provision "must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies").

The only authority DOJ cites for ignoring the privacy protections afforded by the Privacy Act and E-Government Act is an unpublished decision from a South Carolina trial court that is readily distinguishable and perfunctorily reasoned. See Riordan Decl. at Ex. 3 (attaching *Crook v. S.C. Election Comm'n*, No. 2025-CP-40-06539 (Richland Cty. Comm. Pleas Oct. 1, 2025)). In *Crook*, the court denied an individual voter's motion for a preliminary injunction, seeking to enjoin the state elections commission from entering into an agreement with DOJ for the disclosure of that state's voter registration list, including the individual voter's personal information. Although the court expressed "grave concerns about federal overreach and encroachment over [South Carolina's] sovereignty," ECF No. 2-2, #57, it found no likelihood of success on the voter's challenge to the state elections commission's decision because it was based on the commission's "own interpretation of federal law." *Id.* In other words, because the state elections commission did not oppose DOJ's records demand, the court held the individual voter could not prevent the commission from entering into an agreement with DOJ allowing for the records to be disclosed.[14] *Id.*

The context here is entirely different given Secretary Amore's refusal to disclose confidential and sensitive voter information. Significantly, unlike Rhode Island law, the *Crook* court found that

---

[14] Each sovereign state, of course, is free to make its own policy (or other) decisions relating to the confidentiality of sensitive voter records. To date, DOJ reports that 10 states have indicated a willingness to comply with DOJ's records demands and, thus, are not among the 23 states plus the District of Columbia against whom DOJ has filed enforcement actions. *See supra* at 13; DOJ Press Release (Dec. 18, 2025), available at https://www.justice.gov/opa/pr/justice-department-sues-four-states-failure-produce-voter-rolls; *see also* Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34 (last visited Dec. 31, 2025) (reporting that only four states have provided complete, unredacted voter files in response to DOJ's requests).

South Carolina law afforded no protection at all for the disclosure of private information contained in state voting records. ECF No. 2-2, #54. And, with respect to federal law, the *Crook* court summarily found that Title III of the CRA authorized the state elections commission to enter into an agreement with DOJ for release the voter's personal information. *Id*. at #57. In making this determination, the *Crook* court undertook no assessment of DOJ's barebones statement of "the basis" and "the purpose" for its request. *Id*. Nor did it address any of the legal protections afforded under the E-Government Act or Privacy Act. *See id*. The *Crook* decision, in short, is not persuasive, and the judge was correct in expressing "grave concerns" about DOJ's "overreach" and "encroachment" on the state's constitutional "power to regulate elections." *Id*. at ##57-58 (*quoting Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) ("the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections") (internal citation omitted). The same "grave concerns" are present here and warrant dismissal of the Complaint in its entirety.

## CONCLUSION

For these reasons, the Court should grant Secretary Amore's motion to dismiss and enter an order dismissing the Complaint in its entirety, together with such other relief the Court determines to be appropriate, including denial of DOJ's parallel motion to compel.

Respectfully submitted,

SECRETARY OF STATE
GREGG M. AMORE

By his counsel,

40

PETER F. NERONHA
ATTORNEY GENERAL

*/s/ James J. Arguin*
James J. Arguin (#10972)
Kyla Duffy (#10897)
Special Assistant Attorneys General
R.I. Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Facsimile: (401) 222-3016
jarguin@riag.ri.gov
kduffy@riag.ri.gov

Dated: January 13, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2026, a copy of the foregoing document was electronically filed with the Clerk of the Court *via* the Court's CM/ECF system, which sent notification of such filing to all counsel of record by electronic means.

*/s/ James J. Arguin*