**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
|                    *Plaintiff*, | * |
| | |
|        v. | * |
| |     No. 25-cv-639 |
| | * |
| GREGG M. AMORE, in his official | * |
| capacity as Secretary of State of Rhode | * |
| Island, | |
|                  *Defendant*. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**BRIEF OF AMICI CURIAE MARYLAND, MINNESOTA, ARIZONA,
CALIFORNIA, COLORADO, DELAWARE, DISTRICT OF COLUMBIA,
HAWAI'I, ILLINOIS, MAINE, MICHIGAN, NEVADA, NEW JERSEY,
NEW MEXICO, NEW YORK, OREGON, VERMONT, AND WASHINGTON
IN SUPPORT OF MOTIONS TO DISMISS**

ANTHONY G. BROWN
Attorney General of Maryland

VIRGINIA A. WILLIAMSON (pro hac vice)
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
vwilliamson@oag.maryland.gov
(410) 576-6584

January 23, 2026                    Attorneys for the State of Maryland

*[Additional counsel on signature page]*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................. 1

ARGUMENT ...................................................................................................... 1

I.  THE GOVERNMENT'S DEMAND FOR UNREDACTED VOTER REGISTRATION
    DATABASES IS PART OF A BROADER EFFORT TO COLLECT UNPRECEDENTED
    AMOUNTS OF PERSONAL INFORMATION. .................................................. 2

    A.  The Federal Government Has Unlawfully Demanded SNAP Data. .................................. 3

    B.  Federal Health Agencies Have Unlawfully Shared State-Compiled Medicaid Data for
        Immigration Enforcement Purposes. ................................................................. 4

    C.  The Federal Government Demands Voter Registration Databases. ................................... 6

II. THE HELP AMERICA VOTE ACT, NATIONAL VOTER REGISTRATION ACT,
    AND CIVIL RIGHTS ACT DO NOT PERMIT THE FEDERAL GOVERNMENT TO
    DEMAND UNREDACTED VOTER REGISTRATION DATABASES. .............................. 8

    A.  States Have Primary Authority Over Elections, and the Department of Justice's
        Demands Are Unconstitutional Because They Exceed the Scope of Authorizing
        Statutes. ............................................................................................... 9

    B.  The Privacy Act Restricts the Federal Government's Attempted Aggregation of
        Voter Database Information. ......................................................................... 10

    C.  Neither the Help America Vote Act nor the National Voter Registration Act
        Mandates Disclosure. ................................................................................ 12

    D.  The Civil Rights Act of 1960 Does Not Authorize the Department of Justice's
        Demands for Voter Registration Data Unrelated to Civil Rights Violations .................... 15

CONCLUSION ................................................................................................. 18

**TABLE OF AUTHORITIES**

Page

**Cases**

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ................................. 9

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ...................................... 10

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018) ...................................... 9

*League of United Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135
    (D.D.C. 2025) ......................................................................................... 10

*Moore v. Kobach*, 359 F. Supp. 3d 1029 (D. Kan. 2019) .................................... 9

*Peters v. United States*, 853 F.2d 692 (9th Cir. 1988) ...................................... 14

*Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016) ..................... 9, 14

*Public Int. Legal Found. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) ........................ 9, 14

*Public Int. Legal Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257
    (4th Cir. 2021) ..................................................................................... 9, 14

*Smiley v. Holm*, 285 U.S. 355 (1932) .......................................................... 9

*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986) .............................. 9

*True the Vote v. Hosemann*, 43 F. Supp. 3d 693 (S.D. Miss. 2013) ..................... 9, 14

*United States v. Classic*, 313 U.S. 299 (1941) .............................................. 9

*United States v. Michigan*, 866 F. Supp. 890 (W.D. Mich. 1994) ........................ 15

**Statutes**

2 U.S.C. § 1396b .................................................................................... 5

5 U.S.C. § 552a ...................................................................................... 11, 12

7 U.S.C. § 2020 ...................................................................................... 3

8 U.S.C. §§ 1612 ..................................................................................... 4

15 U.S.C. § 1312 ..................................................................................... 15

29 U.S.C. § 1134 ..................................................................................... 15

31 U.S.C. § 3733 ..................................................................................... 15

42 U.S.C. § 1306 ................................................................................................. 5

42 U.S.C. § 1997a-1 ........................................................................................... 15

52 U.S.C. § 20503 ............................................................................................. 13

52 U.S.C. § 20507 ......................................................................................... 8, 13

52 U.S.C. § 20703 ............................................................................................. 15

52 U.S.C. § 21083 ......................................................................................... 6, 12

52 U.S.C. § 21111 ............................................................................................. 14

E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002) ..................... 2

Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995) ............. 2

Privacy Act of 1974, Pub L. No. 93-579, 88 Stat. 1896 (1974) ................................... 2

Ala. Code § 17-3-53 ............................................................................................. 9

Alaska Stat. § 15.07.195 ....................................................................................... 9

Ariz. Rev. Stat. Ann. § 16-152 ............................................................................... 8

Ariz. Rev. Stat. Ann. § 16-153 ............................................................................... 9

Ariz. Rev. Stat. Ann. § 16-168 ............................................................................... 9

Cal. Election Code § 2166 ..................................................................................... 9

Cal. Election Code § 2194 ..................................................................................... 9

Cal. Welf. & Inst. Code § 10850 ............................................................................. 4

Colo. Rev. Stat. § 1-2-302 ..................................................................................... 9

Conn. Gen. Stat. § 9-23h ....................................................................................... 9

Del. Code Ann. tit. 15, § 1305 ............................................................................... 9

Del. Code Ann. tit. 15, § 1305 ............................................................................... 9

Del. Code Ann. tit. 15, § 2033 ............................................................................... 8

D.C. Mun. Regs. tit. 3, § 510.5 ............................................................................... 9

Fla. Stat. § 97.0585 ............................................................................................... 9

Ga. Code Ann. § 21-2-225 ..................................................................................... 9

Ga. Code Ann. § 21-2-417 ..................................................................................... 8

Haw. Rev. Stat. § 11-14 ......................................................................................... 9

Haw. Rev. Stat. § 11-97 ................................................................................. 9

Idaho Code § 34-437 ................................................................................... 9

Idaho Code § 34-437A .................................................................................. 9

10 Ill. Rev. Stat. 5A/1A-25 ........................................................................... 10

Ind. Code § 3-7-26.4-6 ................................................................................. 10

Ind. Code § 3-7-26.4-8 ................................................................................. 10

Ind. Code § 3-7-26.4-10 ............................................................................... 10

Iowa Code §§ 48A.38 ................................................................................... 10

Iowa Code §§ 48A.39 ................................................................................... 10

Kan. Stat. Ann. § 25-2320 ............................................................................ 10

Kan. Stat. Ann. § 25-2320a .......................................................................... 10

Ky. Rev. Stat. Ann. § 116.095 ...................................................................... 10

Ky. Rev. Stat. Ann. § 117.025 ...................................................................... 10

La. Stat. Ann. § 18:104 ................................................................................. 8

La. Stat. Ann. § 18:154 ................................................................................. 10

Mass. Gen. Laws ch. 51, § 47C ................................................................. 8, 10

Me. Stat. tit. 21-A, § 196A ........................................................................... 10

Md. Code Ann., Elec. Law § 3-506 .............................................................. 10

Md. Code Ann., Gen. Provis. § 4-301 ............................................................ 4

Md. Code Ann., Hum. Servs. § 1-201 ............................................................ 4

Md. Code Regs. 33.05.02.02 ........................................................................ 10

Mich. Comp. Laws § 169.168.509gg ............................................................ 10

Minn. Stat. § 201.091 ................................................................................... 10

1 Miss. Code R. pt. 10, R. 7.2 ...................................................................... 10

Mo. Rev. Stat. § 115.157 .......................................................................... 8, 10

Mont. Admin. R. 44.3.1102 .......................................................................... 10

Mont. Code Ann. § 13-2-110 ......................................................................... 8

Mont. Code Ann. § 13-2-122 ....................................................................... 10

N.C. Gen. Stat. § 163-82.10 ..................................................................... 10

N.D. Cent. Code § 16.1-02-15 ................................................................. 10

Neb. Rev. Stat. § 32-330 ......................................................................... 10

Nev. Rev. Stat. § 293.440 ........................................................................ 10

Nev. Rev. Stat. § 293.558 ........................................................................ 10

N.H. Rev. Stat. Ann. § 659:13-b .............................................................. 8

N.H. Rev. Stat. Ann. § 654:31 ................................................................. 10

N.H. Rev. Stat. Ann. § 654:31-a .............................................................. 10

N.J. Stat. Ann. § 19:31-6.4 ...................................................................... 8

N.J. Stat. Ann. § 19:31-18.1 .................................................................... 10

N.M. Stat. Ann. § 1-4-5.4 ........................................................................ 10

N.M. Stat. Ann. § 1-4-5.5 ........................................................................ 10

N.Y. Elec. Law § 3-103 ........................................................................... 10

N.Y. Elec. Law § 8-303 ........................................................................... 8

Ohio Rev. Code Ann. § 3503.13 .............................................................. 10

Okla. Stat. tit. 26, § 4-112 ........................................................................ 10

Okla. Stat. tit. 26, § 7-103.2 ..................................................................... 10

Or. Rev. Stat. § 247.948 ........................................................................... 10

Or. Rev. Stat. § 247.955 ........................................................................... 10

25 Pa. Cons. Stat. § 1404 ......................................................................... 10

17 R.I. Gen. Laws § 17-9.1-21 ................................................................. 10

S.C. Code Ann. § 7-5-170 ........................................................................ 8

S.D. Codified Laws § 12-4-9 .................................................................... 10

Tenn. Code Ann. § 2-2-116 ...................................................................... 8

Tenn. Code Ann. § 2-2-127 ...................................................................... 10

Tenn. Code Ann. § 2-2-138 ...................................................................... 10

Tex. Elec. Code Ann. § 18.009 ................................................................ 10

Tex. Elec. Code Ann. § 18.009 ................................................................ 10

Utah Code Ann. § 20A-2-104 ................................................................. 10

Va. Code Ann. § 24.2-407.1 ................................................................. 10

Vt. Stat. Ann. tit. 17, § 2154 ................................................................ 10

W. Va. Code 3-2-30 ............................................................................. 10

Wash. Rev. Code § 29A.08.710 ........................................................... 10

Wash. Rev. Code § 29A.08.720 ........................................................... 10

Wis. Stat. § 6.34 ................................................................................... 8

Wis. Stat. § 6.36 ................................................................................. 10

Wyo. Stat. Ann. 22-2-113 ................................................................... 10

## Regulations

7 C.F.R. § 271.4 ..................................................................................... 3

7 C.F.R. § 273.2 ..................................................................................... 3

28 C.F.R. § 16.54 ................................................................................. 11

42 C.F.R. § 438.818 ............................................................................... 5

## Miscellaneous

Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025) ...................................... 8

Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information* ........ 7

Charles Doyle, Cong. Rsch. Serv., RL33321, *Administrative Subpoenas in Criminal Investigations: A Brief Legal Analysis* (Dec. 19, 2012) .......................... 15

CMS Information Security & Privacy Program, *Privacy: Overview*, https://tinyurl.com/mrh8vjsj (last visited Nov. 21, 2025) .......................... 5

Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13681 (Mar. 20, 2025) .......................... 2

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) .......................... 2

Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, Associated Press (June 14, 2025)... 5

Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025)...................... 6

Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025) .............................................................. 4

Priscilla Alvarez, et al., *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025) ..................................................................... 3

*Report of the United States Commission on Civil Rights* (Sept. 9, 1959)............................. 16, 17

*Report of United States Commission on Civil Rights* (Sept. 30, 1963) ........................................ 18

U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition* ..................................... 11

U.S. Dep't of Just., Office of Legal Policy, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities* § I.A (2002) ................... 15

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* 132 (June 2025)................................................................................. 7

U.S. Election Assistance Comm'n, *Voter Roll Privacy* (Mar. 15, 2024) ...................................... 7

## STATEMENT OF INTEREST

Amici curiae the States of Maryland, Minnesota, Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Maine, Michigan, Nevada, New Jersey, New Mexico, New York, Oregon, Vermont and Washington and the District of Columbia ("the Amici States") submit this brief supporting the pending motions to dismiss. The Amici States have a strong interest in this case because the federal government's demands for States' voter data are not limited to Rhode Island. Each of the Amici States has received similar sweeping demands, and the United States has already sued 24 States, including 17 of the Amici States in addition to Rhode Island.[1] As set forth more fully below, the Constitution guarantees to the Amici States primary authority over election procedures. In addition to this constitutional interest, the Amici States have strong statutory and policy interests in safeguarding the privacy of their residents' most sensitive data and ensuring their residents' confidence, trust, and participation in the electoral process.

## ARGUMENT

For the past nine months, the federal government has engaged in an unprecedented campaign to sweep up significant volumes of sensitive personal data on those living within its borders, including, and especially targeting data collected and possessed by States. The United States has now come for States' voter registration databases, under the guise of checking for compliance with federal list-maintenance laws. But the federal government is not charged with maintaining voter registration lists, and the information sought does not aid the federal government's limited compliance-enforcement role. Because the Constitution and federal statutes preclude the United States' demands, the Complaint should be dismissed.

---

[1] On January 15, 2026, a District Court dismissed the lawsuit seeking California's unredacted voter file. *United States v. Weber*, No. 2:25-cv-09149-DOC-ADS (C.D. Cal.), Dkt. 128.

# I. THE GOVERNMENT'S DEMAND FOR UNREDACTED VOTER REGISTRATION DATABASES IS PART OF A BROADER EFFORT TO COLLECT UNPRECEDENTED AMOUNTS OF PERSONAL INFORMATION.

Multiple layers of federal law limit how the Executive Branch can gather, aggregate, and share personal information. *See, e.g.*, Privacy Act of 1974, Pub L. No. 93-579, 88 Stat. 1896 (1974); E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002)-; Paperwork Reduction Act of 1995, Pub. L. No. 104-13, 109 Stat. 163 (1995). Still, in March 2025, the President issued two executive orders directing federal officials to undertake novel efforts to aggregate federal and state records containing millions of individuals' personal information. Governmental efforts undertaken in accordance with those orders have been challenged and, for the most part, enjoined as unconstitutional or unlawful.

The first executive order, issued on March 20, 2025, commanded federal officials across agencies to synthesize "agency records, data, software systems, and information technology systems" to pursue "Administration priorities" related to "waste, fraud, and abuse." Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, § 3(a), 90 Fed. Reg. 13681 (Mar. 20, 2025). The order further directed federal officials to establish "unfettered access to comprehensive data *from all State programs* that receive federal funding." *Id*. § 3(b) (emphasis added).

A second executive order, issued on March 25, 2025, sought to impose new requirements on the conduct of federal elections. Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). The President directed the Department of Homeland Security and Administrator of the Department of Government Efficiency to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities," and to compare the publicly available data to "Federal

immigration databases and State records requested" to ensure "consistency with Federal requirements." *Id.* § 2(b)(iii).

Subsequent to these orders, the federal government began taking unprecedented steps to collect and pool Americans' personal data and to pressure States into assisting with this effort. The federal government enlisted technology company Palantir to build a massive repository of data pulled from federal agencies, including the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human Services ("HHS"), to facilitate immigration enforcement and deportations.[2]  At the same time, federal agencies have pressed States to turn over sensitive, personal data collected in administering vital programs like the Supplemental Nutrition Assistance Program ("SNAP").  Seeking to preserve their residents' privacy and the integrity of these programs, the Amici States have repeatedly challenged these unlawful demands.  The Department of Justice's demands for voter registration data must be viewed in the context of these broader efforts to collect and aggregate personal information, including, as set forth below, efforts targeting States' SNAP and Medicaid data.

### A.     The Federal Government Has Unlawfully Demanded SNAP Data.

For sixty years, the Amici States have administered SNAP, which provides low-income families with modest monthly funds to buy groceries.  Federal law delegates to the States the roles of creating and processing SNAP applications, determining eligibility, issuing benefits, and ensuring program integrity.  7 U.S.C. § 2020(a)(1); *see also* 7 C.F.R. § 271.4.  To administer SNAP, each State collects extensive personal information, including applicants' and recipients' names, home addresses, and Social Security numbers.  *See* 7 C.F.R. § 273.2(b), (f)(1)(v).  Federal

---

[2] Priscilla Alvarez et al., *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://tinyurl.com/4bcurxw4.

law requires that States develop "safeguards which prohibit the use or disclosure of information obtained from applicant households," subject only to narrow exceptions. 7 U.S.C. § 2020(e)(8). And State laws throughout the country likewise protect the confidentiality of SNAP data. *See, e.g.*, Cal. Welf. & Inst. Code § 10850(a); Md. Code Ann., Hum. Servs. § 1-201; Md. Code Ann., Gen. Provis. §§ 4-301(a), 4-307; COMAR 07.01.07.01 – 07.01.07.12.

Despite these restrictions, in mid-2025, the U.S. Department of Agriculture ("USDA")— which, through a subagency, oversees the States' administration of SNAP—attempted to obtain the States' SNAP participant data from January 1, 2020 to the present.[3] USDA first requested this data from the States' vendors. Then, it directly notified state agencies of its intent to collect SNAP data. And in June, it published formal notice of its intent to demand SNAP data to compile a national database. National Supplemental Nutrition Association Program (SNAP) Information Database, 90 Fed. Reg. 26, 521 (June 23, 2025).

Twenty-two States and the District of Columbia sued, asserting, among other things, that USDA's demands violated the Administrative Procedure Act because they contravened federal law, were arbitrary and capricious, and flouted notice-and-comment requirements. *California v. v. U.S. Dep't of Agric.*, No. 3:25-cv-06310 (N.D. Cal.), Dkt. 1. The district court entered a preliminary injunction, holding that the plaintiff States were generally likely to succeed on the merits of their contrary-to-law claim. *Id.*, Dkt. 106.

### B. Federal Health Agencies Have Unlawfully Shared State-Compiled Medicaid Data for Immigration Enforcement Purposes.

State agencies administer Medicaid, a joint federal-state insurance program that provides healthcare coverage to individuals with low income or disabilities. As federal law permits, *see* 8

---

[3] Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://tinyurl.com/5yvbdwxt.

U.S.C. §§ 1612, 1613, some States allow non-U.S. citizens to enroll in Medicaid programs, although their coverage is paid for exclusively with the States' own funds. States collect sensitive personal information from all Medicaid applicants and participants, and routinely share portions of it with HHS's Centers for Medicare & Medicaid Services ("CMS"), as required by law. *See* 42 U.S.C. § 1396b(r)(1)(F); 42 C.F.R. § 438.818. Some States' Medicaid data sets include information about enrollees' immigration status.

Historically, States have furnished their Medicaid applicant information to CMS with the expectation that the agency will observe all legal constraints, including the Social Security Act's prohibition against disclosure (including to other federal agencies) unless permitted by regulation or other federal law. 42 U.S.C. § 1306(a)(1). States have also done so keeping in mind CMS's longstanding policy of not sharing patients' personal data for non-healthcare-related reasons. *See* CMS Information Security & Privacy Program, *Privacy: Overview*, https://tinyurl.com/ mrh8vjsj (last visited Nov. 21, 2025). Neither regulation nor other federal law authorized the large-scale transfer of protected health information to the Department of Homeland Security ("DHS").

Nonetheless, in June 2025, CMS transferred a trove of protected health data to DHS. The transferred data included Medicaid data compiled by California, Washington, Illinois, and the District of Columbia, even though those jurisdictions had not consented.[4] Thereafter, CMS executed a data-sharing agreement that provided Immigration and Customs Enforcement ("ICE")

---

[4] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Gives Personal Data of Immigrant Medicaid Enrollees to Deportation Officials*, Associated Press (June 14, 2025), https://tinyurl.com/bdt338e9.

with access to the personal data of 79 million Medicaid enrollees, including home address and ethnicities, for immigration enforcement efforts.[5]

Twenty states filed a lawsuit challenging CMS's disclosure. *California v. U.S. Dep't of Health & Hum. Servs.*, No. 3:25-cv-05536-VC (N.D. Cal.). In August 2025, a district court preliminarily enjoined HHS from sharing the plaintiff States' Medicaid data with DHS for immigration enforcement purposes. *Id.*, Dkt. No. 98, at 4-5.[6] In December 2025, the district court again enjoined HHS from sharing plaintiffs States' Medicaid data regarding citizens and lawful residents, but allowed HHS to share basic biographical data pertaining to undocumented persons. *Id.* Dkt. No. 148.

### C. The Federal Government Demands Voter Registration Databases.

Apparently undeterred by federal court orders enjoining the improper collection and sharing of sensitive data, the federal government has initiated this litigation (and a number of parallel lawsuits against other States) seeking a full, electronic copy of a State's computerized voter-registration database, including "all fields" within the database. (ECF 39-2, at 1.) For every State, the requested data would include personally identifying information used to verify voters' identities, including the last four digits of voters' Social Security and driver's license numbers. *See* 52 U.S.C. § 21083(a)(5)(A)(i). It would also include information whose disclosure federal law expressly restricts—specifically, the voter registration agencies (such as agencies that provide public assistance) through which voters registered to vote. *Id.* § 20507(i)(1). The requested data

---

[5] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025), https://tinyurl.com/32xwt9ws.

[6] The district court later extended its preliminary injunction order to two more States that had joined the litigation following the court's initial order. *California*, No. 3:25-cv-05536-VC, Dkt. 127.

is not only the type that raises general concerns regarding identity theft, privacy, and government overreach; it could also unmask specific voters enrolled in programs that protect the home addresses of victims of domestic and sexual violence, law enforcement officers, and judicial officials. *See* U.S. Election Assistance Comm'n, *Voter Roll Privacy* (Mar. 15, 2024), https://tinyurl.com/48r7skn3.

In the same demands, the federal government also has sought information *about* States' voter registration databases. The Department of Justice directed States to disclose "materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy" of the list. (*See* ECF 39-2, at 1-2.) It included examples of such materials, including a "database user manual" or "coding list." (ECF 39-2, at 1.) The federal government did not clarify *why* it needed those materials. But it seemingly sought to obtain more than read-only access to the computerized database files, potentially because additional information about the database coding would assist in transferring data from State voter registries into other federal databases. To the Amici States' knowledge, the federal government has demanded voter database information from 44 States; only ten have provided complete, unredacted information in response. Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34.

By its very nature, a voter registration database is a unique repository of information. As of the 2024 general election, 86.6% of the estimated national citizen voting-age population was registered to vote. U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* 132, 156-60 (June 2025). Most States reported rates greater than 80%, with sixteen reporting more than 90%. *See id.* at 156-60. Moreover, 32 States and the District of Columbia permit pre-registration, i.e., registration by an underage applicant, which

becomes active when the applicant turns 18.  *Id.* at 173-74.  Those jurisdictions reported recording 1.18 million pre-registrations between 2022 and 2024.  *Id.* at 174.

In addition to the personal information that election officials must collect to verify voter identity and eligibility, voter registration databases may contain information about a voter's electoral participation necessary to administering the State's elections.  In all States, this includes information on whether a voter actually participated in an election, because federal law requires States to remove inactive voters who move out of a jurisdiction.  *See* 52 U.S.C. § 20507(d)(1)(ii). And in 30 States and the District of Columbia, this includes information about party affiliation. Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025), https://tinyurl.com/ yx2aec8b.  Additionally, voter registration databases may contain information on a variety of sensitive topics (used to assist with voting or verify residency), such as disability, religious beliefs, occupation, parents' names, and criminal history, along with documents that include sensitive information, such as paychecks and bank statements.[7]  Obliging a demand for unredacted voter registration database information could reveal large swaths of information that voters never intended to share with law enforcement or other federal agencies, potentially chilling their willingness to continue participating in the electoral process.

## II. THE HELP AMERICA VOTE ACT, NATIONAL VOTER REGISTRATION ACT, AND CIVIL RIGHTS ACT DO NOT PERMIT THE FEDERAL GOVERNMENT TO DEMAND UNREDACTED VOTER REGISTRATION DATABASES.

The United States cites three federal laws as authority for its voter database requests: the Help America Vote Act ("HAVA"), the National Voter Registration Act ("NVRA"), and the Civil

---

[7] *See, e.g.*, Ariz. Rev. Stat. Ann. § 16-152(A)(9), (11); Del. Code Ann. tit. 15, § 2033; Ga. Code Ann. §§ 21-2-220(c), -417(c); La. Stat. Ann. § 18:104(B)(5), (8); Mass. Gen. Laws ch. 51, § 47C; Mo. Rev. Stat. § 115.157(1); Mont. Code Ann. § 13-2-110(5)(b)(ii); N.H. Rev. Stat. Ann. § 659:13-b; N.J. Stat. Ann. § 19:31-6.4; N.Y. Elec. Law § 8-303(3)(a)(2); Tenn. Code Ann. § 2-2-116; Wis. Stat. § 6.34(3)(a)(8)-(9).

Rights Act. None of these laws overcome States' broad authority to decide the status of their own voter data, and none require producing that sensitive personal data in response to the Department of Justice's sweeping demands.

**A.** **States Have Primary Authority Over Elections, and the Department of Justice's Demands Are Unconstitutional Because They Exceed the Scope of Authorizing Statutes.**

State legislatures have primary authority to decide the time, place, and manner of federal elections, subject to displacement only by Congress. U.S. Const. art. I, § 4. States' discretion to set election procedures is broad. *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *United States v. Classic*, 313 U.S. 299, 311 (1941). The Constitution allows States "to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). States' authority encompasses setting procedures for voter registration, maintaining voter rolls, and protecting voter data. *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 774 (2018); *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013); *Smiley*, 285 U.S. at 366.

Collecting voter information implicates significant privacy interests. *See, e.g.*, *Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 55 (1st Cir. 2024); *Public Int. Legal Found. v. North Carolina State Bd. of Elections*, 996 F.3d 257, 266-67 (4th Cir. 2021); *Moore v. Kobach*, 359 F. Supp. 3d 1029, 1049-50 (D. Kan. 2019); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1345 (N.D. Ga. 2016); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 735 (S.D. Miss. 2013). Accordingly, States have exercised their broad powers to protect that information. States vary in their approaches, reflecting State legislatures' differing policy decisions. Most States, however, limit what data is public, who can access data, or how data may be used.[8]

---

[8] Ala. Code § 17-3-53; Alaska Stat. § 15.07.195; Ariz. Rev. Stat. Ann. §§ 16-153, -168(E); Cal. Election Code §§ 2166(b)(2), 2194(a)(2)-(3), (b)(1); Colo. Rev. Stat. § 1-2-302(8); Conn. Gen. Stat. § 9-23h; Del. Code Ann. tit. 15, § 1305; D.C. Mun. Regs. tit. 3, § 510.5; Fla. Stat. § 97.0585; Ga. Code Ann. § 21-2-225(c); Haw. Rev. Stat. §§ 11-14, -97(a); Idaho Code

The United States' demand for voter data runs roughshod over States' prerogative to set these limits. The United States cites an executive order as authority for that demand. (ECF 1, at 2.) But the President has no authority to displace States' election laws; only Congress may do so. U.S. Const. art. I, § 4. Thus, anything the President purports to do by executive order cannot override States' protections on voter data. *See also California v. Trump*, 786 F. Supp. 3d 359, 373 (D. Mass. 2025); *League of United Am. Citizens v. Executive Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025) (observing that "Executive regulatory authority over federal elections does not appear to have crossed the Framers' minds"). Because Congress has not authorized the federal government to make the sweeping requests it has made here, the demands are unconstitutional.

## B. The Privacy Act Restricts the Federal Government's Attempted Aggregation of Voter Database Information.

The federal government's data demands threaten particular harm because they come with no assurance of compliance with the Privacy Act. Congress enacted that statute in 1974 in response to growing concern over the Executive Branch's accumulation of personal information

---

§§ 34-437(1), -437A(3); 10 Ill. Rev. Stat. 5A/1A-25; Ind. Code §§ 3-7-26.4-8, -6, -10; Iowa Code §§ 48A.38(1)(f), .39; Kan. Stat. Ann. §§ 25-2320(b), 2320a; Ky. Rev. Stat. Ann. § 116.095, 117.025(3)(i); La. Stat. Ann. § 18:154(C); Mass. Gen. Laws ch. 51, § 47C; Me. Stat. tit. 21-A, § 96A(1)(K)(2), (6); Md. Code Ann., Elec. Law § 3-506(a)(1); Md. Code Regs. 33.05.02.02(B)(4); Mich. Comp. Laws § 169.168.509gg; Minn. Stat. § 201.091, subds. 4(c), 5, 9; 1 Miss. Code R. pt. 10, R. 7.2; Mo. Rev. Stat. § 115.157(3); Mont. Code Ann. § 13-2-122(1); Mont. Admin. R. 44.3.1102(3); Neb. Rev. Stat. § 32-330(3)(b), (4); Nev. Rev. Stat. §§ 293.440(6), .558(2); N.H. Rev. Stat. Ann. §§ 654:31(VI), :31-a; N.J. Stat. Ann. § 19:31-18.1(c); N.M. Stat. Ann. § 1-4-5.4(C), -5.5(B); N.Y. Elec. Law § 3-103(5); N.C. Gen. Stat. § 163-82.10(a1); N.D. Cent. Code § 16.1-02-15; Ohio Rev. Code Ann. § 3503.13(A)(2); Okla. Stat. tit. 26, §§ 4-112(H), 7-103.2(B)(1), (3); Or. Rev. Stat. § 247.948(2), .955; 25 Pa. Cons. Stat. § 1404(b)(3); 17 R.I. Gen. Laws § 17-9.1-21; S.C. Code Ann. § 7-5-170(1); S.D. Codified Laws § 12-4-9; Tenn. Code Ann. § 2-2-127, -138; Tex. Elec. Code Ann. § 18.009; Utah Code Ann. § 20A-2-104(4)(c), (d); Vt. Stat. Ann. tit. 17, § 2154(b)(1), (c)(1); Va. Code Ann. § 24.2-407, -407.1; Wash. Rev. Code § 29A.08.710(2)(a), .720(3)(a); W. Va. Code 3-2-30(a), (f); Wis. Stat. § 6.36(1)(b)(1)(a); Wyo. Stat. Ann. 22-2-113(a), (d).

and use of surveillance, particularly in the wake of the Watergate and Counterintelligence Program (COINTELPRO) scandals. *See* U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition*, https://tinyurl.com/32zx5h22. The Act was designed to "provide certain safeguards for an individual against an invasion of personal privacy," by establishing federal record collection requirements. Pub. L. No. 93-579, § 2(b), 88 Stat. 1896 (1974).

The Privacy Act requires federal agencies to follow specific procedures before they "maintain, collect, use, or disseminate," any covered information. 5 U.S.C. § 552a(a)(3), (e), (f). Among other things, an agency must publish a notice in the Federal Register when it establishes or revises a "system of records." *Id.* § 552a(e)(4); *see id.* § 552a(a)(5) (defining "system of records"). It also must publish a notice of new or intended uses of the information it collects and give interested parties an opportunity to offer views to the agency. *Id.* § 552a(e)(11).

Equally important, federal agencies face Privacy Act restrictions on the type of data they may collect and maintain. An agency may "maintain in its records only such information about an individual as is relevant and necessary" to accomplish a clearly authorized purpose. *Id.* § 552a(e)(1). And where a record "describe[s] how any individual exercises rights guaranteed by the First Amendment," an agency is barred from retaining such records unless retention is expressly authorized by statute, the agency is given permission by the subject of the record, or retention is pertinent to and within the scope of an authorized law enforcement activity. *Id.* § 552a(e)(7); *see also* 28 C.F.R. § 16.54(g) (imposing the same as a regulatory standard of conduct for all employees and contractors of the Department of Justice). The Privacy Act likewise strictly limits disclosure of records, including to other federal agencies: "No agency shall disclose any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless a statutory

exception applies. *Id.* § 552a(b); *see also* Computer Matching and Privacy Protection Act of 1988, Pub. L. No. 100-503, 102 Stat. 2507 (1988) (amending the Privacy Act to prohibit federal agencies from disclosing records to other federal agencies, state governments, or local governments through a "computer matching program," except pursuant to a written agreement).

The federal government has not abided by any of the requirements of the Privacy Act. It has not published notice of a new "system of records" related to voter registration, nor has it provided any of Amici States with guidance on how it intends to maintain and share the data it demands. If the sensitive identifying information contained within States' voter registration rolls is collected and disclosed to other federal agencies, whether DHS, DOGE, or others, such disclosure would plainly violate the Privacy Act's important protections; the federal government, though, has not disclaimed these or other intentions. In instances like this, when the federal government attempts to compile State-collected data without adhering to the Privacy Act, the resulting harm falls on the States, whose residents may lose trust in their government's stewardship of information. This harm is even more pronounced where the information concerns core political freedoms.

### C. Neither the Help America Vote Act nor the National Voter Registration Act Mandates Disclosure.

Despite the safeguards of the Privacy Act, the United States contends that the States must provide all voter registration data to comply with HAVA and the NVRA's list-maintenance requirements. These laws, however, require only that States make reasonable efforts to maintain accurate voter registration lists. 52 U.S.C. § 21083(a)(4)(A) (HAVA), 52 U.S.C. § 20507(a)(4) (NVRA). Enacted in 2002, HAVA requires each State to create and maintain an electronic statewide voter registration list. *Id.* § 21083(a)(1)(A). When registering a voter, a State must verify the applicant's information using either a driver's license number, the last four digits of a

Social Security number, or—if the applicant has neither—a unique voter identification number assigned by the state. *Id.* § 21083(a)(5). HAVA also creates minimum standards for maintaining statewide voter registration records. *Id.* § 21083(a)(4). Each State must have a "system of file maintenance that makes reasonable effort to remove ineligible registrants" while implementing safeguards to prevent erroneous removals. *Id.* And States must prevent unauthorized access to statewide voter registration lists. *Id.* § 21083(a)(3). Likewise, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove" people who have died or moved from voter registration lists. 52 U.S.C. § 20507(a)(4)(A).[9]

These list-maintenance requirements underlie the United States' demands for data and lawsuits across the country. But neither supports its sweeping demands.

1.      **The National Voter Registration Act's Public-Data Provision Does Not Mandate the Disclosure of Sensitive Private Data.**

HAVA does not have any data-disclosure requirements. And while the NVRA does direct subject States to make some data public, its limited scope does not encompass the sensitive data that the United States seeks. The NVRA requires each State to make certain list-maintenance records publicly available. 52 U.S.C. § 20507(i). Those records must include "all records concerning the implementation of programs and activities conducted" for ensuring voter lists' accuracy and currency. *Id.* § 20507(i)(1). This category includes the names and addresses of people to whom the State sent certain notices regarding changes of residence. *Id.* § 20507(d)(2), (i)(2).

These provisions do not support the United States' demand for sensitive personal data, such as driver's license and Social Security numbers, because they must be read in harmony with state

_____

[9] States like Minnesota that have had Election Day registration since 1994 are exempt from the NVRA. *See* 52 U.S.C. § 20503(b)(2).

and federal laws concerning individual privacy. *E.g.*, *Public Int. Legal Found.*, 996 F.3d at 264; *True the Vote*, 43 F. Supp. 3d at 729-40. Under the United States' sweeping view of the NVRA, any member of the public could obtain a swath of highly personal data on all registered voters. The NVRA does not reach so broadly—and indeed, courts have consistently recognized that the NVRA does not require States to disclose highly sensitive personal information, like Social Security numbers and dates of birth. *Public Int. Legal Found.*, 996 F.3d at 264; *see also Bellows*, 92 F.4th at 56; *Project Vote*, 208 F. Supp. 3d at 1344-45; *True the Vote*, 43 F. Supp. 3d at 736-39.

### 2. Neither the Help America Vote Act Nor the National Voter Registration Act Gives the Department of Justice Investigative Authority.

Alternatively, the United States appears to contend that its HAVA and NVRA enforcement authority entitles it to unfettered access to all voter registration data. Congress did not authorize this type of broad encroachment on States' sovereignty and their citizens' privacy. Under HAVA, the Attorney General may bring a civil action "as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under sections 301, 302, and 303." 52 U.S.C. § 21111. And under the NVRA, the Attorney General may sue for relief as "necessary to carry out [the NVRA]." *Id.* § 20510(a).

Enforcement authority does not amount to broad investigative authority, such as would authorize the federal government to demand data. For the federal government to have authority to require the production of data, that authority must derive expressly from statute. *Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988); *see also, e.g.*, *Cudahy Packing Co. of La. v. Holland*, 315 U.S. 357, 360-67 (1942) (concluding that even statute giving agency subpoena authority did not authorize agency to delegate subpoena-signing authority to other staff); *United States v.*

*Michigan*, 866 F. Supp. 890, 893 (W.D. Mich. 1994) (rejecting argument that enforcement authority implicitly granted broad investigative powers to, among other things, inspect records).

Congress has granted broad investigative or subpoena authority in more than 300 provisions of federal law. *See, e.g.*, Charles Doyle, Cong. Rsch. Serv., RL33321, *Administrative Subpoenas in Criminal Investigations: A Brief Legal Analysis* 4 (Dec. 19, 2012); *see also* U.S. Dep't of Just., Office of Legal Policy, *Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities* § I.A (2002). For instance, the Antitrust Civil Process Act gives the Department of Justice authority to collect evidence when investigating, *see* 15 U.S.C. § 1312(a); the Civil Rights of Institutionalized Persons Act gives the Department of Justice authority to subpoena documents and records, *see* 42 U.S.C. § 1997a-1(a); ERISA gives the Secretary of Labor authority to investigate and inspect records, *see* 29 U.S.C. § 1134(a); and the False Claims Act gives the Attorney General authority to issue civil investigative demands for documents, *see* 31 U.S.C. § 3733(a).

These statutes demonstrate that Congress knows how to give federal agencies authority to demand data. And it chose not to do so in HAVA or the NVRA—a policy choice that courts must honor.

> **D.    The Civil Rights Act of 1960 Does Not Authorize the Department of Justice's Demands for Voter Registration Data Unrelated to Civil Rights Violations.**

The record-inspection authority conferred by the Civil Rights Act of 1960, 52 U.S.C. § 20703, likewise does not support the Department of Justice's present demands. Congress created this inspection authority to enable the federal government to investigate and remediate racially discriminatory voting practices. The Department of Justice's present demands for records do not even purport to serve that objective.

15

The history of the record-inspection provision confirms its limited purpose. Significant opposition to sweeping civil rights legislation meant that the Civil Rights Act's voting protections were achieved incrementally, through years of revisions and expansions. The first round of legislation, adopted in 1957, did not yet require States to maintain voter registration records or make them available for inspection, but it created the bipartisan Commission on Civil Rights. Civil Rights Act of 1957, § 101(a), Pub. L. No. 85-315, 71 Stat. 634 (Sept 9, 1957). The Commission's first report, issued in 1959, included over 120 pages of findings and recommendations on voting discrimination. *Report of the United States Commission on Civil Rights* (Sept. 9, 1959), https://tinyurl.com/y253324x. The Commission understood discrimination to be a central reason for its creation, writing that "[t]he primary concern of Congress in passing the Civil Rights Act of 1957, and the single specific field of study and investigation that it made mandatory for this Commission, was alleged denials of the right to vote." *Id.* at 40.

In the report, the Commission repeatedly bemoaned that its core purposes had often been thwarted by States' failure to retain or produce rejected voting applications and other registration records. *See, e.g.*, *id.* at 93 ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."); *id.* at 137 (explaining that midway through the Commission's review of Alabama counties' records, the state legislature authorized counties to destroy denied registrants' application forms even though the forms were "essential to any investigation of denials of the right to vote"). Even where responsive records had not been destroyed, the Commission described occasions on which States had denied the Commission access. *See id.* at 70 (recounting that "when the Commission's agents arrived at the courthouse . . . the Board of Registrars told them that, by order of [Alabama] Attorney General

Patterson, the records would not be made available to the Commission on Civil Rights"); *see also id.* at 98 (describing Louisiana's refusal to permit inspection of voter records).

In light of these hurdles and other findings, the Commission recommended that Congress require States to preserve and retain all registration and voting records so they could be inspected. *Id.* at 138. And the Commission was not the only advocate for such a requirement. President Eisenhower urged Congress to adopt these provisions to strengthen the federal response to racially discriminatory voting practices and to counter States' efforts at obstruction:

> A serious obstacle has developed which minimizes the effectiveness of [the Civil Rights Act of 1957]. Access to registration records is essential to determine whether the denial of the franchise was in furtherance of a pattern of racial discrimination. But during preliminary investigations of complaints the Department of Justice, unlike the Civil Rights Commission, has no authority to require the production of election records in a civil proceeding. State or local authorities, in some instances, have refused to permit the inspection of their election records in the course of investigations. Supplemental legislation, therefore, is needed.

*Selected Speeches of Dwight D. Eisenhower,* 91 Cong. Rec 2d, Vol. 2-3, https://perma.cc/5KCX-3JT4, at 145.

As Congress considered the legislation that would become the Civil Rights Act of 1960, Representative Emanuel Celler remarked that inspection mechanisms were needed to prevent discriminatory application of voter qualification rules:

> [T]he objective of this legislation that we are citing has prescribed the qualification th[at] there be equal application to every person in the State who may qualify. In other words, the application cannot be the result of whim or caprice. It must be as a result of evenhanded justice. All must be treated alike when the qualifications are applied. The preservation of election records for Senators and Representatives must be a safeguard of the right to vote. *It is ancillary to the right to vote, to inspect the records and have the records preserved. They complement each other like the reverse and obverse side of a coin. One is necessary to the other as tongue to cheek.* If the records cannot be inspected, if the records are unavailing, how can you know whether the votes were even actually cast, much less counted.

86 Cong. Rec. 5450 (1960), https://tinyurl.com/yrya3xpb (emphasis added).

It was against this backdrop that, in 1960, Congress required States to preserve all voter registration records and make them available to the Attorney General for inspection. After gaining this authority, the Commission on Civil Rights and the Department of Justice wielded that power in precisely the way Congress intended: gathering evidence to investigate complaints of racially discriminatory practices, evaluating whether there were patterns or practices disenfranchising Black voters, and seeking legal remedies in the federal courts where negotiations with voting officials were ineffective. *See generally Report of United States Commission on Civil Rights* (Sept. 30, 1963), https://tinyurl.com/58v3a84u (detailing investigations, negotiations, and lawsuits initiated by the Department of Justice based on the 1957 and 1960 Civil Rights Acts.)

Here, by contrast, the Department does not claim any civil rights-related purpose for its demands for voter registration records. Instead, it has claimed that it is entitled to inspect registration records to determine compliance with the NVRA and HAVA—statutes that did not exist when Congress enacted the Civil Rights Act's record retention provisions. Inspection for this purpose is unauthorized by statute.

## CONCLUSION

The motions to dismiss should be granted.

January 23, 2026

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Virginia A. Williamson

_____
VIRGINIA A. WILLIAMSON (pro hac vice)
Assistant Attorney General
Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland  21202
vwilliamson@oag.maryland.gov
(410) 576-6584


/s/ Gil A. Bianchi, Jr.

_____
GIL A. BIANCHI, JR., ESQ.
Bianchi Brouillard Sousa & O'Connell, P.C.
The Hanley Building
56 Pine Street, Suite 250
Providence, RI 02903
(401) 223-2990
gbianchi@bbsolaw.com

Attorneys for Proposed Amicus Curiae
State of Maryland


KEITH ELLISON
Attorney General
State of Minnesota

445 Minnesota Street
St. Paul, Minnesota, 55101


DANA NESSEL
Michigan Attorney General

P.O. Box 30212
Lansing, Michigan 48909


KATHLEEN JENNINGS
Attorney General of Delaware

Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801


RAÚL TORREZ
Attorney General of New Mexico

New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501

NICHOLAS W. BROWN
Attorney General of Washington

1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100

BRIAN L. SCHWALB
Attorney General
District of Columbia

400 6th Street NW
Washington, DC 20001

ROB BONTA
Attorney General of California

1300 I Street, Suite 125
Sacramento, CA 95814

PHILIP J. WEISER
Attorney General of Colorado

Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

KRISTIN K. MAYES
Attorney General of Arizona

2005 N. Central Ave.
Phoenix, AZ 85004

LETITIA JAMES
Attorney General of New York

28 Liberty St.
New York, NY 10005

ANNE E. LOPEZ
Attorney General of Hawaiʻi

Department of the Attorney General
425 Queen Street
Honolulu, Hawaiʻi 96813

AARON M. FREY
Attorney General of Maine

6 State House Station
Augusta, ME 04333

JENNIFER DAVENPORT
Acting Attorney General of New Jersey

Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

KWAME RAOUL
Attorney General of Illinois

115 S. LaSalle St.
Chicago, IL 60603

DAN RAYFIELD
Attorney General of Oregon

1162 Court Street NE
Salem, OR 97301

AARON D. FORD
Attorney General of Nevada

100 North Carson Street
Carson City, NV 89701

CHARITY R. CLARK
Attorney General of Vermont

109 State Street
Montpelier, VT 05609

## CERTIFICATE OF SERVICE

I certify that, on this 23rd day of January, 2026 the foregoing was served by CM/ECF on all registered CMF users.


/s/ Virginia A. Williamson
_____
Virginia A. Williamson