## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-cv-639-MSM-PAS |
| | ) | |
| GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island, | ) | |
| | ) | |
| *Defendant.* | ) | |

## SECRETARY OF STATE GREGG M. AMORE'S REPLY TO UNITED STATES' CONSOLIDATED OPPOSITION TO MOTIONS TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.   THE CRA DOES NOT CONFER SWEEPING AND NONREVIEWABLE POWERS ON DOJ ......... 2

    II.  THE CRA DOES NOT CREATE SPECIAL PROCEDURES EXEMPT FROM JUDICIAL REVIEW ... 3

    III. DOJ'S PROFFERED STATEMENT OF THE PURPOSE AND THE BASIS IS NOT SUFFICIENT UNDER THE CRA ............................................................................................... 5

    IV. DOJ'S ASSURANCE THAT IT WILL NOT DISCLOSE THE RECORDS FURTHER IS BELIED BY ITS OWN STATEMENTS ............................................................................... 10

    V.  DOJ FAILS TO ESTABLISH COMPLIANCE WITH THE PRIVACY ACT AND E-GOVERNMENT ACT'S PRIVACY PROTECTIONS ...................................................................... 13

        A.   DOJ's records request violates the Privacy Act ................................................ 13

        B.   DOJ's records request violates the E-Government Act. ................................... 15

CONCLUSION .................................................................................................................. 17

CERTIFICATE OF SERVICE .......................................................................................... 18

i

## <u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Becker v. United States*, 451 U.S. 1306 (1981) ........................................................... 3

*Coalition For Open Democracy v. Scanlan*, No. 24-cv-312, 2025 WL 1503937
   (D.N.H. May 27, 2025) ............................................................................................. 9

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ...................................................... 6

*Department of Com. v. New York*, 588 U.S. 752 (2019).................................................. 4

*Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539 (S.D.N.Y. 1980)............................. 13

*Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   266 F. Supp. 3d 297 (D.D.C. 2017), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017)..... 16

*Goncalves v. Reno*, 144 F.3d 110 (1st Cir. 1998) .......................................................... 7

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962), *aff'd*, 313 F.2d 867 (5th Cir. 1963) .............. 6

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ........................................................... 6

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)......................................................... 5, 8

*National Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020)...... 7

*Ritter v. United States*, 177 Fed. Cl. 84 (2025)............................................................ 13

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ............................................................ 7

*State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960),
   *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). ............................ 5

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) ........................................................ 4

*U.S. Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439 (1993) .................. 6

*United States v. Oregon*, No. 6:25-cv-0166 (D. Or. 2026)............................................. 1

*United States v. Powell*, 379 U.S. 48 (1964) ............................................................ 3, 4

*United States v. Rivera,* 131 F.3d 222 (1st Cir.1997) ...................................................... 7

*United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807
   (C.D. Cal. Jan. 15, 2026) ................................................................................... passim

**Statutes**

5 U.S.C. § 552a ................................................................................................ 13, 14

5 U.S.C. §§ 552a(a)(5), (e)(4), (e)(7), (f) ........................................................ 14

28 U.S.C. § 1331 ............................................................................................... 4

28 U.S.C. § 1345 ............................................................................................... 4

28 U.S.C. § 2201 ............................................................................................... 4

52 U.S.C. § 20701 ............................................................................................. 5

52 U.S.C. § 20703 ............................................................................................. 3

52 U.S.C. § 20704 ............................................................................................. 10

52 U.S.C. § 20706 ............................................................................................. 5

Pub. L. No. 107-347, § 208(b), 116 Stat. 2899 ................................................ 15

**Regulations**

64 Fed. Reg. 73,585-02 (Dec. 30, 1999) .......................................................... 15

66 Fed. Reg. 8,425-02 (Jan. 31, 2001) ............................................................. 15

68 Fed. Reg. 47,610-01, 611(Aug. 11, 2003) ................................................... 14

70 Fed. Reg. 43,904-01 (July 29, 2005) ........................................................... 14

74 Fed. Reg. 57,194 (Nov. 4, 2009) .................................................................. 15

82 Fed. Reg. 24,147-01 (May 25, 2017) ........................................................... 15

**Rules**

Fed. R. Civ. P. 4 ................................................................................................ 4

Fed. R. Civ. P. 12 .............................................................................................. 3, 4

Fed. R. Civ. P. 57 .............................................................................................. 4

Fed. R. Civ. P. 81(a)(5) ..................................................................................... 3

**Other Authorities**

Kyle Cheney, *Trump Administration concedes team may have misused Social Security data*, Politico (Jan. 20, 2026) ................................................................................ 10

Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republications to "Nationalize" Elections*, N.Y. Times (Feb. 2, 2026) ............................................................. 11

U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition* ..................................... 13

## INTRODUCTION

The Department of Justice ("DOJ") invokes what it describes as a "unique and sweeping" power under Title III of the Civil Rights Act of 1960 ("the CRA") to "demand all records relating to any act requisite to voting."  DOJ Consolidated Opposition, ECF No. 33 ("DOJ Opp.") at 1, 6, 10-11.  This power, it claims, is "nonreviewable" and exempt from the Federal Rules of Civil Procedure.  *Id.* at 8-9.  It faults Secretary of State Amore and the intervenor defendants for allegedly "seek[ing] to rewrite" the CRA by placing constraints on DOJ's self-invoked "sweeping" and "nonreviewable" power.  *Id.* at 1.  But it is DOJ that ignores (a) the CRA's statutory objectives and plain language by plucking words out of context, (b) controlling authority from the Supreme Court on the applicability of the federal rules to demands for the production of records by federal agencies, and (c) state and federal privacy and confidentiality laws that prevent the release of the highly sensitive and confidential information relating to nearly 750,000 active registered voters in Rhode Island that DOJ improperly seeks.

Since the filing of Secretary of State Amore's motion to dismiss, two other district courts have considered DOJ's arguments in relation to similar demands for unredacted registered voter lists from California and Oregon.  Both courts rejected DOJ's arguments and granted the states' motions to dismiss.  *United States v. Weber*, No. 2:25-cv-09149, 2026 WL 118807 (C.D. Cal. January 15, 2026); *United States v. Oregon*, No. 6:25-cv-0166, ECF No. 68 (text order granting Oregon's motion to dismiss entered Jan. 26, 2026 with formal opinion to follow).  The *Weber* court expressed its grave concerns relating to DOJ's unprecedented reliance on the CRA for its purported "sweeping" and "nonreviewable" power to demand confidential voter information from California in words equally applicable to its demand against Rhode Island:

> [DOJ] seeks to use civil rights legislation which was enacted for an entirely different purpose to amass and retain an unprecedented amount of confidential voter data.  This

1

> effort goes far beyond what Congress intended when it passed the underlying legislation. The centralization of this information by the federal government would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information is being used for some inappropriate or unlawful purpose. This risk threatens the right to vote which is the cornerstone of American democracy.

*Weber*, 2026 WL 118807, at *20. DOJ relegates these concerns to a mere footnote, DOJ Opp., n.1, and never tackles head on the district court's substantive analysis underlying its rejection of DOJ's perceived sweeping powers. The *Weber* court's analysis is consistent with the reasons detailed in Secretary Amore's motion to dismiss and, as shown below, provides additional support for the dismissal of DOJ's complaint in this action, as well as denial of DOJ's parallel motion to compel.

## ARGUMENT

### I.    The CRA does not confer sweeping and nonreviewable powers on DOJ

DOJ's demand is premised on the authority it claims Congress conferred on it under Title III of the CRA. The CRA, however, was not "passed as an unrestricted means for the Executive to collect highly sensitive information about the American people." *Weber*, 2026 WL 118807, at *1. Rather, it was passed "during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting. . . . To hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register." *Id.* "[E]ven when records were not destroyed, states refused to turn them over, thwarting efforts by the federal government to investigate whether there was a pattern and practice of disenfranchising Black Americans." *Id.* Section 20701 of the CRA was "enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes." *Id.* To gain access to and inspect those records, the CRA specifically requires DOJ to provide "a statement of

the basis and the purpose therefore," 52 U.S.C. § 20703, and grants courts jurisdiction to compel

production pursuant to "appropriate process." *Id.* at § 20705.

## II.    The CRA does not create special procedures exempt from judicial review

Contrary to DOJ's position, nothing in the text of Title III requires a special statutory

proceeding, let alone the sort of judicial rubber-stamping DOJ envisions.  *See* Memorandum in

Support of Secretary Amore's Motion to Dismiss, ECF No. 26-1 ("Amore Mem.") at 23-24.  The

Supreme Court has held that courts should apply the usual rules of civil procedure to ensure that

the government's request for records, whether by subpoena or otherwise, complies with the

relevant statutory prerequisites and, thus, is pursuant to "appropriate process."  *See Becker v.*

*United States*, 451 U.S. 1306, 1307–08 (1981); *United States v. Powell*, 379 U.S. 48, 57-58 & n.18

(1964) (interpreting a similarly worded statute); *see also* Fed. R. Civ. P. 81(a)(5).  Judicial review

of "appropriate process" is not an empty formalism but an essential check to ensure that all

statutory prerequisites are met before any motion to compel production of documents can be

enforced.  *See Weber*, 2026 WL 118807, at *8 (granting state's motion to dismiss under Fed. R.

Civ. P. 12(b)(6) and denying DOJ's motion to compel because DOJ's records demand did not

comply with the "appropriate process" required by the CRA).

Judicial review to ensure that appropriate process is followed does not interfere with any

legitimate investigative aims DOJ may have.  *See* DOJ Opp. at 5, 8.  Rather, it ensures that "the

basis and the purpose" for the request are adequately explained as the statute requires.  *See* 52

U.S.C. § 20703.  This threshold inquiry protects against unwarranted fishing expeditions or other

potential abuses.  *See Weber*, 2026 WL 118807, at *9 (judicial review is a "critical safeguard that

ensures the request is legitimately related to the purpose of the statute"); Amore Mem. at 23-24.

It does not equate with a final determination on the merits but, instead, provides a procedural

safeguard to ensure that the judicial process being invoked to compel production is not abused.

*See Powell*, 379 U.S. at 57-58; *see also Trump v. Mazars USA, LLP*, 591 U.S. 848, 862–63 (2020) (before enforcing a congressional subpoena for records, courts must determine whether it is "related to, and in furtherance of, a legitimate task of the Congress" and serves a "valid legislative purpose"). DOJ's remarkable assertion that its stated basis and purpose are "nonreviewable"— even to determine whether they are "plausible," "truthful," or "adequate"— DOJ Opp. at 8-9, finds no support in CRA's statutory text nor any other recognized rule of law. *See Weber*, 2026 WL 118807, at *10 (judicial review is not merely an empty ritual where courts accept rationales that 'seem to be contrived'") (quoting *Department of Com. v. New York*, 588 U.S. 752, 736 (2019)).

DOJ's conduct in this litigation further confirms that the present action is subject to the usual Federal Rules of Civil Procedure, not any imagined special statutory procedures. Its Complaint expressly invokes this Court's jurisdiction under statutes applicable to civil actions, including the Declaratory Judgment Act. Compl. ¶5 (ECF No. 1) (citing 28 U.S.C. §§ 1331, 1345, and 2201(a)). In its request for relief, DOJ specifically seeks not only an order directing Secretary Amore to produce Rhode Island's complete registered voter list but also declaratory relief in the form of a declaration that Secretary Amore's refusal to provide Rhode Island's complete voter registration list violated the CRA. Compl. p. 8. Rule 57, of course, makes clear that the Federal Rules of Civil Procedure "govern the procedure for obtaining a declaratory judgement under 28 U.S.C. § 2201"—one of the statutes on which DOJ relies to invoke this Court's jurisdiction and obtain the relief it seeks. DOJ also served Secretary Amore with a standard form summons issued under Fed. R. Civ. P. 4. ECF Nos. 4, 9, 14. The summons specifically instructed the Secretary to either answer or file a motion to dismiss under Fed. R. Civ. P. 12. *Id.* at 9, 14. In sum, DOJ's assertion that the usual federal rules do not apply to this "action," Compl. p.1, therefore, is contrary to its own conduct in this litigation.

4

### III. DOJ's proffered statement of the purpose and the basis is not sufficient under the CRA

The CRA also specifically requires DOJ to provide a written statement of *both* the purpose and the basis for its records demand to Rhode Island.  Amore Mem. at 18-23.  Title III imposes document retention requirements on elected officials "to secure more effective protection of the right to vote."  *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961).  These document retention requirements require election officials to retain and preserve "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . ." for 22 months.  52 U.S.C. § 20701; *id.* § 20706.  This ensures that the records remain available to assist in any future investigation into civil rights violations like discriminatory voting practices that may be warranted.  *See Weber*, 2026 WL 118807, at **1, 8.

In the past, DOJ has routinely stated both a purpose and basis related to alleged civil rights violations and how their requested records would specifically assist in their investigation.  For example, in *Kennedy v. Lynd* (the principal case on which DOJ relies), DOJ stated that its purpose for requesting records was "to ascertain whether or not violations of Federal law in regard to registration and voting"—referencing the Civil Rights Act of 1957—"have occurred."  306 F.2d 222, 231 (5th Cir. 1962).  DOJ's stated basis for this demand in *Lynd* was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction."  *Id.*  Similarly, in *Kennedy v. Bruce,* DOJ's stated purpose was to determine whether "violations of Federal law in regard to registration and voting have occurred" based on DOJ's stated basis that "distinctions on the basis of race and color have been made with respect to registration and voting within your

5

jurisdiction." 298 F.2d 860, 861 (5th Cir. 1962). There is no comparable statement of the basis and the purpose for DOJ's records demand to Rhode Island, and certainly not one related to the CRA's statutory objective of preventing civil rights violations like discriminatory voting practices.

DOJ's mistaken reliance on the Fifth Circuit's decision in *Coleman* does not show otherwise. DOJ Opp. at 4, 8 (citing *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)). The letters issued to county registers in that case stated that they were "based upon information in the possession of the Attorney General tending to show that discrimination on the basis of race and color have been made with respect to registration and voting within your jurisdiction." *In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (emphasis added). The Fifth Circuit, in affirming the district court, cited the CRA's legislative history in confirming that the Attorney General must "identify in a general way the reasons for [DOJ's] demand." 313 F.2d at 868 (cleaned up). And, consistent with past CRA record requests, DOJ's request in *Coleman* clearly related to CRA's statutory objective of preventing discriminatory voting practices. No comparable statement, let alone one based on "information" "tending to show" any civil rights violation, was made here. This failure alone warrants dismissal of DOJ's complaint. *See Weber*, 2026 WL 118807, at *9 (granting state's motion to dismiss based on DOJ's failure to provide "specific articulable facts pointing to the violation of federal law").

DOJ urges this Court to disregard the CRA's statutory objective and focus exclusively on the "words on the page," which do not specifically mention civil rights or discriminatory voting practices. DOJ Opp. at 7. But this approach is contrary to settled cannons of statutory construction and would distort Congress' plain meaning by depriving the words of their context. *See U.S. Nat'l Bank of Or. v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) (statutory construction "must account for a statute's full text, language as well as punctuation, structure, and

6

*subject matter*") (emphasis added). As the First Circuit has held, "'[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole,'" not by looking at statutory terms in isolation." *Goncalves v. Reno*, 144 F.3d 110, 127-28 (1st Cir. 1998) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997)). Thus, the "meaning of statutory language, plain or not, depends on context.'" *Id.* (quoting *United States v. Rivera,* 131 F.3d 222 (1st Cir.1997) (en banc). The title of the "Civil Rights Act of 1960" alone shows that Title III's context is civil rights so any request for document production under the CRA must relate to the protection of civil rights, such as, investigations related to suspected discriminatory voting practices. *See National Coal. On Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 475 (S.D.N.Y. 2020) (Title III is among the statutes enacted to "address defects litigants encountered in trying to vindicate the rights [the Civil Rights Act of 1957 was] meant to protect"). DOJ's attempts to sever Congress' words from the context in which it used them should accordingly be rejected.

Even ignoring this fundamental defect, DOJ's stated purpose of utilizing the CRA's records demand provision to assess Rhode Island's compliance with NVRA and HAVA list maintenance requirements remains improper. Congress could not have intended the CRA's records demand provision to be used for these purposes. As the *Weber* court held, "NVRA could never have been passed for this use . . . because the passage of Title III in 1960 preceded the NVRA by several decades which was passed in 1993. Uniform, centralized statewide voter registration lists—like the one the DOJ is seeking from [Rhode Island], were not even required until the passage of HAVA in 2002." *Weber*, 2026 WL 118807, at *9. Thus, DOJ fails to show that its stated purpose of

assessing compliance with NVRA is within the "scope of what Congress intended Title III to be used for."[1] *Id.*

Nor has DOJ presented any reason why Rhode Island's complete voter registration list is necessary to assess compliance with NVRA or HAVA. Even the principal case on which DOJ relies for its flawed summary process argument recognized that Title III was intended to provide DOJ access to "public records which ought ordinarily to be open to legitimate reasonable inspection." *Lynd*, 306 F.2d at 231. It was not intended to provide access to "confidential, private papers and effects." *Id.* Providing DOJ access to Rhode Island's complete (unredacted) voter registration list would provide the federal government with access to confidential information, including each registrant's state driver's license and last 4 digits of each registrant's Social Security number, protected by state and federal law. The CRA does not authorize DOJ to obtain this information, particularly since state driver's license numbers and partial Social Security numbers "were not required for voter registration until the passage of HAVA in 2002 so Congress could not have conceived for this highly sensitive information to be at the DOJ's disposal through the passage of Title III four decades prior." *Weber*, 2026 WL 118807, at \*9. Nor, as Secretary Amore noted in his motion to dismiss, is any of this confidential information relevant or necessary to assess Rhode Island's general policies relating to registered voter list maintenance. Amore Mem. at 20-21; *see also Weber*, 2026 WL 118807, at \*13 ("The DOJ makes no persuasive

---

[1] DOJ claims that it has used the CRA to obtain voter registration lists from other states (Georgia and Texas) in the past, DOJ Opp. at 15. In both situations, however, the states exercised their sovereign right to voluntarily enter into agreements to resolve the matters without litigation. Thus, the legal sufficiency of DOJ's requests in those matters was never presented to a court, much less resolved. Additionally, unlike here, DOJ expressly agreed that the information it obtained from Georgia and Texas would be used only to confirm compliance with voter protection laws, not distributed to any agencies beyond DOJ (except to Congress or in any presentation to a court or grand jury), and then destroyed. ECF Nos. 33-3 and 33-4.

argument for why this large amount of unredacted voter information is necessary to evaluate state policies.").

DOJ misses the point when it says that "NVRA does not supersede the CRA's as a latter enacted statute." DOJ Opp. at 11-12. The point is that DOJ cannot invoke the CRA to compel Rhode Island to produce its complete voter registration list allegedly to assess the State's compliance with NVRA when the confidential information contained in that list is protected by the very statute DOJ purports to enforce. Amore Mem. at 26-27. Any contrary result would violate NVRA's confidentiality protections by allowing DOJ to improperly obtain "information beyond the scope and purpose of what Congress envisioned" in enacting NVRA. *Weber*, 2026 WL 118807, at *12; Amore Mem. at 26-27.

DOJ further posits that NVRA's confidentiality protections apply only to private parties, not to the government. DOJ Opp. at 11. But "NVRA does not distinguish between private parties and the government regarding the 'public inspection' requirement." *Weber*, 2026 WL 118807, at *9. "This lack of distinction is particularly meaningful when taken to the logical conclusion that if DOJ is entitled to unredacted voter information, private individuals should also be entitled to this information. This conclusion cannot be." *Id.* at *13. Secretary Amore, therefore, properly agreed to allow DOJ the opportunity to inspect only Rhode Island's publicly available voter registration list, with protected confidential information redacted.[2] *See id.*

---

[2] DOJ alleges that "private parties have been granted even more detailed voter data" than what DOJ requests here. DOJ Opp. at 14 (citing *Coalition For Open Democracy v. Scanlan*, No. 24-cv-312, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025)). The only support for this assertion is *Scanlan*, which involved a discovery dispute over a request for production of New Hampshire's voter registration list. Over the state's objections, the court ordered the records to be produced subject to a comprehensive protective order designed to safeguard the confidentiality of the information. *See Scanlan*, No. 24-cv-312, Endorsed Order (dated May 20, 2025) and ECF Nos. 75, 87, & 87-1. No comparable circumstances are present here.

Given this, there also is no merit to DOJ's bald assertion that Rhode Island's statutory protections for the confidentiality of state voter records are preempted by federal law. DOJ Opp. at 11. Rhode Island's and NVRA's confidentiality provisions comfortably "coexist;" none of the protections afforded by Rhode Island law obstruct NVRA, which recognizes a similar need to protect confidential and sensitive voter information from disclosure. *See* Amore Mem. at 30-33; *Weber*, 2026 WL 118807, at *13-14 (holding that similar protections afforded under California law were not preempted by federal elections law).

### IV.    DOJ's assurance that it will not disclose the records further is belied by its own statements

DOJ attempts to assuage concerns about its collection of highly sensitive personal information relating to hundreds of thousands of registered voters in Rhode Island and millions more across the nation by noting that § 20704 places an "affirmative duty" on the Attorney General "not to disclose any record produced pursuant to the CRA." DOJ Opp. at 12. But this is misleading. Section § 20704 expressly allows the Attorney General to disclose confidential information obtained pursuant to the CRA to a broad swath of government agencies and officials, including "Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury." 52 U.S.C. § 20704.

The risks associated with such a broad swath of disclosure is exacerbated by DOJ's insistence that records be produced in electronic format, which makes them more easily transferrable and manipulable.[3]   Amore Mem. at 28-29. DOJ's conclusory assertion that the CRA anticipates electronic production not only ignores Congress's use of the phrase "inspection, reproduction, and

---

[3] Only a few days ago, DOJ admitted in court pleadings that rouge DOGE employees at the Social Security Administration (SSA) entered into a secret agreement to share SSA data unlawfully with an outside group for election-related purposes. Kyle Cheney, *Trump Administration concedes team may have misused Social Security data*, Politico (Jan. 20, 2026), https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245.

copying," which courts have interpreted as not including electronic production, but also the surrounding context for a statute enacted long before electronic production was in common use. *See* Amore Mem. at 28. And, notwithstanding DOJ's cavalier assertion that electronic production does not amount to the sort of transfer of control that Congress intended to avoid, it does precisely that. *See id.*; DOJ Opp. at 13. Once DOJ obtains electronic files, the proverbial horse is out of the barn as DOJ has control of the information and can transfer or manipulate it with ease. Amore Mem. at 28.

This is particularly concerning given the *Weber* court's findings on DOJ's "contrived statement and purpose" for demanding statewide voter registration lists. *Weber*, 2026 WL 118807, at *10-11. Discussing many of the same public statements mentioned in Secretary Amore's and the intervenors' motions to dismiss, *see* Amore Mem. at 22, the *Weber* court concluded that "[r]epresentations by the DOJ itself show that their requests to states for voter roll data go beyond the purported compliance check with the NVRA [and HAVA list maintenance requirements,] and into the territory of comprehensive data collection." *Id.* The court specifically noted the following public statements:

> Former Deputy Assistant Attorney General of the DOJ's Civil Rights Division Michael Gates said in September 2025 that the goal was for all fifty states to receive similar requests for voter rolls so that the government could get the last four digits of every voter's Social Security number. In a statement, the DOJ said that the state voter roll data provided to the Civil Rights Division is "being screened for ineligible voter entries" and Assistant Attorney General for Civil Rights Harmeet Dhillon further confirmed that the DOJ had "checked 47.5 million voter records."

*Id.* (internal citations omitted). And, only yesterday, President Trump called for nationalizing elections and taking them over from "15 states, though he did not name them." Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republications to "Nationalize" Elections*,

N.Y. Times (Feb. 2, 2026), available at https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

All of this shows that DOJ's assurances are inadequate as its true motives for collecting confidential and sensitive information on millions of registered voters across the nation are not yet known.[4]  Indeed, the *Weber* court noted that a "lawyer working in the DOJ's Voting Section tasked with obtaining states' voter rolls was concerned that 'the data would be used not for purging voter rolls of people who aren't eligible to vote, but for broader immigration enforcement.'" *Id.* at *11. DOJ's relationship with the Department of Homeland Security—just one of the many government agencies that may receive records obtained by DOJ under the CRA—"confirms that voting roll data is being used to compile a national database with millions of voters' private information." *Id.*

The grave concerns identified by the *Weber* court highlight the extraordinary risk that DOJ's demand for the release of highly sensitive and personal information relating to nearly 750,000 active registered voters in Rhode Island poses to individual voters and, more broadly, to the right to vote.  The release of this information for unspecified reasons "would have a chilling effect on voter registration which would inevitably lead to decreasing voter turnout as voters fear that their information [could be] used for some inappropriate or unlawful purpose." *Id.* at 20. Neither the CRA—nor HAVA or NVRA—authorize such a sweeping demand, let alone one that DOJ erroneously claims is "nonreviewable" and not constrained by the Federal Rules of Civil Procedure.  Accordingly, Secretary Amore's motion to dismiss should be granted based on DOJ's failure to state a claim.

---

[4] Given the *Weber* court's findings, DOJ's passing invocation of the presumption of compliance with the law is misplaced as any presumption is rebutted by DOJ's own public statements.  DOJ Opp. at 16, n.6.

V.   **DOJ fails to establish compliance with the Privacy Act and E-Government Act's privacy protections**

In addition to the privacy protections afforded by state law, *see supra* at 9, DOJ's request for release of Rhode Island's unredacted voter registration list also violates the protections afforded by the federal Privacy Act and E-Government Act. *See* Amore Mem. at 29-40. DOJ fails to demonstrate that it has complied with either act.

### A. DOJ's records request violates the Privacy Act.

DOJ acknowledges that it must comply with the Privacy Act. DOJ Opp. at 12, 16-17. It claims, however, that the Act (a) "does not restrict the ability of state actors to share information with federal agencies," and (b) further that the voter information DOJ is collecting from Rhode Island and other states falls within the list of "routine uses" covered by DOJ's existing systems of records notices ("SORN"). *Id.* at 15-17. Neither assertion is sufficient to establish compliance.

The protections afforded by the Privacy Act were designed specifically to provide "safeguards" against efforts by federal government agencies, including DOJ, to collect, maintain, or disseminate records containing American's personal information. *See Ritter v. United States*, 177 Fed. Cl. 84, 87 (2025) ("The Privacy Act exists to protect individuals from disclosure of government-collected information."); *Doe v. U.S. Civ. Serv. Comm'n*, 483 F. Supp. 539, 555 (S.D.N.Y. 1980) ("The Privacy Act of 1974 serves to safeguard the public interest in informational privacy by delineating the duties and responsibilities of federal agencies that collect, store, and disseminate personal information about many individuals."). Indeed, the Act was passed in response to concerns over the federal agencies "accumulating and centralizing Americans' personal information in the wake of the Watergate and Counterintelligence Program scandals, both seen as threats to American democracy." *Weber*, 2026 WL 118807, at *17 (citing U.S. Dep't of Just., *Overview of the Privacy Act of 1974: 2020 Edition*, https://www.justice.gov/opcl/overview-

13

privacy-act-1974-2020-edition/introduction#LegHistory).  With very limited exception (none of which apply here), no federal agency can collect records regarding Americans' First Amendment activities without complying with specific procedures prior to collecting the records.[5]  *Id.* (citing 5 U.S.C. §§ 552a(a)(3), (a)(5), (e)(4), (e)(7), (f)).  Nothing in the Act suggests that records must be collected directly from an individual and that personal information held by the states may somehow be collected by federal agencies without complying with the Act's protections, particularly where, as here, DOJ's request for Rhode Island's complete (unredacted) voter registration list contains a broad range of highly personal and sensitive information expressly subject to the Act.  *See id.*; Amore Mem. at 34.

DOJ also fails to identify any existing SORN that would fulfill the Privacy Act's public notice and comment structure.  Although DOJ references multiple SORNs, *see* Compl. ¶23 and DOJ Opp. at 16-18, nn. 8-9, it provides no context to explain why any of them is apposite.  Even if this Court considers DOJ's bare assertion of "routine use" under NVRA, HAVA, and the CRA, none of the existing SORNs is sufficient to "put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity."  *Weber*, 2026 WL 118807, at *18.

Secretary Amore already has explained why DOJ's reliance on the *Central Civil Rights Division Index File and Associated Records,* 68 Fed. Reg. 47,610-01, 611 (Aug. 11, 2003), is

---

[5] Contrary to DOJ's assertion, DOJ Opp. at 14, Rhode Island's participation in ERIC is irrelevant to DOJ's demand for an unredacted copy of its voter registration list.  The Privacy Act regulates the collection, maintenance, and disclosure of information by federal agencies, not the states.  5 U.S.C. § 552a.  Those restrictions apply regardless of Rhode Island's participation in ERIC, which has extensive safeguards, including complex file encryption technology, to protect against unauthorized disclosure.  Amore Mem. at 31.

Equally misplaced is DOJ's reliance on its Justice Enterprise File Sharing system that it claims "implements strict access controls."  DOJ Opp. at 17. This internal file sharing system does not supplant the Privacy Act's statutory protections.

inadequate. *See* Amore Mem. at 36-37. DOJ fails to respond to the Secretary's arguments or address the *Weber* court's recent holding that this SORN is not sufficient to "give sufficient notice to the public as required under the Privacy Act." *Weber*, 2026 WL 118807, at *18. The remaining SORNs cited by DOJ fail for the same fundamental reason:

- 70 Fed. Reg. 43,904-01 (July 29, 2005) modifies 68 Fed. Reg. 47,60-01 to allow public disclosure of information after "the investigation is closed." Those circumstances are inapposite here. And, as the *Weber* court explained, "[t]his SORN again does not sufficiently alleviate concerns regarding what private and sensitive information will be shared and when." *Weber*, 2026 WL 118807, at *18.

- 74 Fed. Reg. 57,194 (Nov. 4, 2009) relates to a "new system of records to maintain employee directory information entitled, "Employee Directory Systems for the Department of Justice," and was modified by 82 Fed. Reg. 24151, 24153 (May 25, 2017) to address disclosures after system data breaches. 82 Fed. Reg. 24,151, 24, 153 (May 25, 2017). These SORNs likewise fail to provide any relevant or specific notice for DOJ's collection of Rhode Island's complete voter registration list. *See Weber*, 2026 WL 118807, at *18.

- 64 Fed. Reg. 73,585-02 (Dec. 30, 1999) relates to a "system for access DOJ network computers or mainframe/enterprise servers, including individuals who send and receive electronic communications, access Internet sites, or access system databases, files, or applications from DOJ computers or sending electronic communications to DOJ computers; and individuals attempting to access DOJ computers or systems without authorization." It was modified by 66 Fed. Reg. 8,425-02 (Jan. 31, 2001) and 82 Fed. Reg. 24,147-01 (May 25, 2017) to add systems for responding to suspected breaches. None of this provides notice relevant to the collection of confidential and personal voter information from Rhode Island and other states.

Because DOJ has failed to demonstrate compliance with the Privacy Act's protections for its attempted collection of sensitive personal information on all active registered voters in Rhode Island, its complaint should be dismissed and its parallel motion to compel should be denied.

### B. DOJ's records request violates the E-Government Act.

The E-Government Act requires federal agencies to conduct a "privacy impact assessment" (PIA) prior to "initiating a new collection of information" that "includes any information in an identifiable form permitting the physical or online contacting of a specific individual" if the

information encompasses "10 or more persons."  Pub. L. No. 107-347, § 208(b), 116 Stat. 2899.

DOJ has not complied with these requirements.  Amore's Mem. at 37-38.

DOJ claims that the E-Government Act "is not applicable to the United States' enforcement

of HAVA and NVRA" because states are already required to maintain statewide registered voter

lists so there is no "new system" requiring a PIA.  DOJ Opp. at 18-19.  This is pure sophistry.  As

already shown, the information DOJ seeks to collect from Rhode Island, including voter driver

license and Social Security numbers, "is personal information protected by the E-Government

Act."  *See Weber*, 2026 WL 118807, at *19; *see also* Amore Mem. at 38.  Although HAVA and

NVRA require Rhode Island to maintain a statewide registered voter list, nothing in those acts

requires Rhode Island to disclose the confidential and protected information contained in that list

to DOJ.  DOJ's attempt to compel production of that information for its own unspecified uses is a

"new collection of data," triggering the requirement for a PIA.[6]  *Id.*

DOJ further claims that its failure to complete the PIA required by the E-Government Act

"does not support dismissal of a complaint."  DOJ Opp. at 19-20.  The E-Government Act,

however, clearly provides that a PIA must be completed *before* an agency like DOJ initiates any

new collection of information.  This was precisely what the district court held in *Electronic Privacy

Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 311 (D.D.C.

2017) ("EPIC"), *aff'd on other grounds*, 878 F.3d 371 (D.C. Cir. 2017); *see also Weber*, 2026 WL

118807, at *19 (reaching the same conclusion).  Merely that the District of Columbia Circuit Court

affirmed the district court's decision in EPIC based on the organizational plaintiff's lack of standing,

---

[6] DOJ's fails to explain the relevance of its reference to the PIA it allegedly undertook in relation to ServiceNow, which it describes as a "cloud-hosting provider."  DOJ Opp. at 19, n.11. That PIA for what appears to be a software application has nothing to do with its present attempt to collect personal information on hundreds of thousands of registered voters in Rhode Island.  *See Weber*, 2026 WL 118807, at *19 (finding inapposite DOJ's reliance on the ServiceNow PIA).

*see EPIC,* 878 F.3d at 380, does not give DOJ license to violate the E-Government Act by failing to conduct the statutorily required PIA before it attempts to collect voter information from Rhode Island. *See Weber*, 2026 WL 118807, at *19 (relying, among other things, on DOJ's noncompliance with the E-Government Act's PIA requirement for dismissal of complaint to compel production of state's registered voter list). Stated differently, DOJ's failure to comply with the E-Government Act cannot be raised as a shield to prevent Secretary Amore from declining to produce confidential voter records based on DOJ's failure to conduct the PIA it was statutorily required to complete *before* seeking those records. Any other result would be illogical and contrary to the sequence the E-Government Act requires. For this reason as well, DOJ's complaint should be dismissed and its parallel motion to compel denied.

## CONCLUSION

In sum, there is no lawful basis for DOJ's "sweeping" and "nonreviewable" power to demand any records relating to voting, regardless of the confidentiality and privacy protections afforded by state and federal law—including the very laws (NVRA and HAVA) DOJ claims to enforce. The Court should accordingly grant Secretary Amore's motion to dismiss and enter an order dismissing the Complaint in its entirety, together with such other relief the Court determines to be appropriate, including denial of DOJ's parallel motion to compel.

Respectfully submitted,

SECRETARY OF STATE
GREGG M. AMORE

By his counsel,
PETER F. NERONHA
ATTORNEY GENERAL

*/s/ James J. Arguin*
James J. Arguin (#10972)
Kyla Duffy (#10897)
Special Assistant Attorneys General
R.I. Office of the Attorney General
150 South Main Street
Providence, RI 02903
Telephone: (401) 274-4400
Facsimile: (401) 222-3016
jarguin@riag.ri.gov
kduffy@riag.ri.gov

Dated: February 3, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2026, a copy of the foregoing document was electronically filed with the Clerk of the Court *via* the Court's CM/ECF system, which sent notification of such filing to all counsel of record by electronic means.

*/s/ James J. Arguin*