# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00639 |
| | (Hon. Mary McElroy) |
| GREGG M. AMORE, in his official capacity as Secretary of State for the State of Rhode Island, | |
| Defendant. | |

## INTERVENOR-DEFENDANTS COMMON CAUSE, CATHERINE SAUNDERS, STUART WALDMAN, AND JULIA SANCHES'
## REPLY IN FURTHER SUPPORT OF MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ....................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

    I.    TITLE III LAWSUITS ARE NOT EXEMPT FROM RULE 12........................................ 2

    II.   THE UNITED STATES' TITLE III REQUEST IS LEGALLY DEFICIENT. ................... 7

      A.    The United States Failed to Plead Compliance with the CRA's Basis and Purpose
Requirement................................................................................................................................. 7

      B.    The United States Failed to Plead Compliance with Applicable Privacy Laws. .......... 14

CONCLUSION.......................................................................................................................... 16

**TABLE OF AUTHORITIES**

**Cases**

*American Federation of State, County and Municipal Employees, AFL-CIO v. Social Security Administration*,
No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026)........................................................................11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................................... 9

*Becker v. United States*,
451 U.S. 1306 (1981)..................................................................................................... 3

*Bell Atlantic Corporation v. Twombly*,
550 U.S. 544 (2008)..................................................................................................... 10

*Buckley v. American Constitutional Law Foundation, Incorporated*,
525 U.S. 182 (1999)..................................................................................................... 16

*Coalition for Open Democracy v. Scanlan*,
No. 24-CV-312-SE, 2025 WL 1503937 (D.N.H. May 27, 2025) ......................................... 14

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ........................................................................................... 6

*Duncan v. Walker*,
533 U.S. 167 (2001)........................................................................................................ 9

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962).................................................................................. 6

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ................................................................................... 5, 6, 8

*Rutan v. Republican Party of Illinois*,
497 U.S. 62 (1990)....................................................................................................... 16

*Sugarloaf Funding, LLC v. United States Department of Treasury*,
584 F.3d 340 (1st Cir. 2009) ........................................................................................... 7

*Tincher v. Noem*,
No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) .................................................. 13

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)........................................................................................................ 3

*United States v. Councilman,*
   418 F.3d 67 (1st Cir. 2005) ................................................................ 3

*United States v. Menasche,*
   348 U.S. 528 (1955) ........................................................................... 9

*United States v. North Carolina State Board of Elections,*
   No. 5:25-cv-283-M-RJ (E.D.N.C. Jan. 12, 2026) ......................... 13

*United States v. Oregon,*
   No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026) ............................. 1

*United States v. Powell,*
   379 U.S. 48 (1964) ..................................................................... 3, 4, 7

*United States v. Weber,*
   --- F. Supp. 3d ----, No. 2:25-cv-9149-DOC-ADS,
   2026 WL 118807 (C.D. Cal. Jan. 16, 2026) ............... 1, 2, 3, 4, 7, 8, 9, 10, 13, 15

**Statutes**

5 U.S.C. § 552a(a)(3) ...................................................................... 15

5 U.S.C. § 552a(a)(5) ...................................................................... 15

5 U.S.C. § 552a(e)(4) ...................................................................... 15

5 U.S.C. § 552a(e)(7) ...................................................................... 15

5 U.S.C. § 552a(f) ........................................................................... 15

18 U.S.C. § 2721 ................................................................................ 6

26 U.S.C. § 7602 ................................................................................ 4

26 U.S.C. § 7604 ................................................................................ 4

26 U.S.C. § 7604(a) ........................................................................... 4

26 U.S.C. § 7604(b) ........................................................................... 4

44 U.S.C. §§ 3351 *et seq.* ................................................................ 6

52 U.S.C. § 10101 .............................................................................. 5

52 U.S.C. § 20507 ......................................................................... 9, 10

52 U.S.C. § 20703 ...........................................................................................1, 2, 7, 8, 11

52 U.S.C. § 20705 ....................................................................................................... 2, 3, 4

52 U.S.C. § 21085 ........................................................................................................... 10

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 (2002) ........................................................... 6

Privacy Act of 1974,
    Pub. L. No. 93-579, 88 Stat. 1896 (1974) ............................................................... 6

**Other Authorities**

Assistant Attorney General Harmeet Dhillon (@AAGDhillon),
    X (December 5, 2025, at 13:02 ET), https://perma.cc/WA3N-9T7W ................................. 12

*Basis*,
    Merriam-Webster, https://perma.cc/2CDG-7WU5 .................................................... 8

Emily Chang, Michelle Stoddart, & Alexandra Hutzler,
    *Trump urges Republicans to 'take over' and 'nationalize' voting*, ABC NEWS, Feb. 2,
    2026, https://abcnews.go.com/Politics/trump-urges-republicans-nationalize-
    voting/story?id=129793658 ...............................................................................11

Jude Joffe-Block,
    *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens
    Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-
    5588384/savevoting-data-us-citizens.................................................................. 12

Kyle Cheney,
    *Trump Administration Concedes DOGE Team May Have Misused Social Security
    Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-
    musk-doge-social-security-00737245 .................................................................. 12

Miles Parks & Jude Joffe-Block,
    *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May
    22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-
    noncitizenvoting..................................................................................... 12

*Read Bondi's Letter to Minnesota's Governor*,
    N.Y. TIMES, Jan. 24, 2026, https://perma.cc/H5GY-ZKBS.................................................... 13

United States Department of Justice, Civil Rights Division,
    *Privacy Act Statement* (last visited Feb. 3, 2026), https://perma.cc/AHX3-RN5R ............... 15

**Rules**

Federal Rules of Civil Procedure, Rule 1 ........................................................................................ 3

Federal Rules of Civil Procedure, Rule 81 ...................................................................................... 3

**INTRODUCTION**

The United States' Complaint fails to plausibly plead that the Attorney General set forth, in writing, "the basis and the purpose" of her demand for Rhode Islanders' sensitive personal data, which is an elemental requirement of the statute that provides the cause of action. 52 U.S.C. § 20703. Since the filing of Intervenor-Defendants' motion to dismiss, a district court in California has dismissed a materially identical lawsuit without leave to replead based on that core legal deficiency. *See United States v. Weber*, --- F. Supp. 3d ----, No. 2:25-cv-9149-DOC-ADS, 2026 WL 118807, at *8–11 (C.D. Cal. Jan. 16, 2026); *see also* Minutes of Proceedings, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), Dkt. No. 68 (also granting dismissal of the United States's claims with written opinion to follow). This Court should do the same.

In opposing Intervenors' motion to dismiss, the United States does not even try to identify a proper "basis" or "purpose" for its request—let alone "*the* basis" and "*the* purpose," which is what the statute says it was required to disclose. Indeed, the United States does not contest Intervenors' assertion, based on extensive public reporting and documents, that its *actual* purpose, which it *never* disclosed, is the creation of an unauthorized national voter database to be used for improper voter purges and bogus challenges to election results.

The United States' basic argument—in the end, its only argument—is that the Civil Rights Act of 1960 ("CRA"), a statute designed to protect the rights of voters, requires voters' sensitive personal data to be turned over summarily, with zero procedural protections, regardless of whether the federal government's stated purposes are even "plausible," "truthful," or "adequate." U.S. Consol. Opp'n Br. ("U.S. Br."), Dkt. No. 33 at 8. That position contravenes statutory text, congressional purpose, binding Supreme Court precedent, the Federal Rules of Civil Procedure, and common sense. And it is even more alarming in light of more recent developments, including (1) new admissions by the United States that it mishandled Americans' Social Security data as part

of ongoing efforts to create an illegal national voter database and (2) public statements by the Attorney General suggesting that the federal government might call off its massive, violent surge in immigration enforcement in Minnesota if the State turned over its unredacted voter files.

Federal Courts are not rubber stamps—not ever, and certainly not here, where the United States transparently seeks to abuse the CRA and weaponize voters' data against them on the basis of a facially deficient pleading. The motion to dismiss should be granted.

## ARGUMENT

## I. TITLE III LAWSUITS ARE NOT EXEMPT FROM RULE 12.

The United States' main argument for why its Complaint survives dismissal is to assert that federal actions brought pursuant to Title III of the CRA are summary affairs that do not allow courts to even consider the legal sufficiency of the complaint in response to a motion to dismiss. U.S. Br. 3–5, 8–10. That statute says nothing of the sort, and binding precedent and the Federal Rules are to the contrary. "Title III cannot transform an election records request by the federal government from an ordinary civil action into an action comparable to an order to show cause." *Weber*, 2026 WL 118807, at *8.

Start with text. Title III provides that the Attorney General may make a "demand in writing" for certain voting-related records or papers, which "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. It then provides that "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title . . . shall have jurisdiction *by appropriate process* to compel the production of such record or paper." *Id.* § 20705 (emphasis added). In other words: If there is a dispute over a Title III demand, the Attorney General may go to a federal court to seek relief. The statute contains no special procedures. It does not state that courts must rule summarily or that they are stripped of their ordinary functions. It does not say that the ordinary rules for invoking and deploying judicial

power have been circumvented. *Weber*, 2026 WL 118807, at \*8 ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures."). To the contrary, Title III provides for judicial enforcement of records requests under the statute "by appropriate process," 52 U.S.C. § 20705. And the appropriate process is the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts," Fed. R. Civ. P. 1 (emphasis added), with only a narrow set of express exceptions of which the CRA is not one, Fed. R. Civ. P. 81. *See also* Fed. R. Civ. P. 81(a)(5) (expressly providing that "[t]hese rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute").

The drafters of the Federal Rules clearly knew how to carve out certain types of proceedings from the otherwise unequivocal mandate that the Rules apply to *all* civil actions and proceedings, yet they did not do so for Title III. *See, e.g.*, *United States v. Councilman*, 418 F.3d 67, 75 (1st Cir. 2005) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)). The Federal Rules— including the protections and processes they supply for testing the sufficiency of pleadings and for taking discovery—apply in this civil action.

Binding precedent is in accord. "[T]he Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (internal citation and quotation marks omitted); *see also United States v. Powell*, 379 U.S. 48, 57–58 (1964) (holding that IRS Commissioner bears the

burden to establish statutory requirements before enforcement of a tax subpoena pursuant to statute directly analogous to Title III).

The United States attempts to distinguish *Becker* and *Powell* because they involved judicial enforcement of demands made to the Internal Revenue Service's ("IRS") power to examine books and records related to tax returns, rather than the Attorney General's power to examine records and papers related to voting. *See* U.S. Br. 10. But the IRS statute at issue in *Becker* and *Powell* is *virtually identical* to Title III.[1] The IRS's statute reads: "[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other data[.]" 26 U.S.C. § 7604(a) (emphasis added). Title III reads: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). The holding in *Becker* and *Powell* that a statute materially identical to Title III did not authorize any special proceedings that deviate from the Federal Rules is on point and binding here. *See* 379 U.S. at 57–58 & n.18; *accord Weber*, 2026 WL 118807, at *8 n.15 (explaining *Powell*'s holding "that courts should apply standard civil procedures in ensuring [statutory] prerequisites are satisfied under a similarly worded statute").

---

[1] The United States refers to the IRS statutory authority at issue in *Becker* and *Powell* as "subpoena power" and argues that "[t]he word 'subpoena' is nowhere to be found in the text of Title III." U.S. Br. at 10. But the word "subpoena" is nowhere to be found in the relevant IRS statute, either— again, it is virtually identical to Title III in its terms, phrasing, and structure. *See* 26 U.S.C. § 7602, 7604 (not containing that term). Indeed, if anything, the IRS statute provides *more* summary procedures than Title III. *Compare* 26 U.S.C. § 7604(b) (providing for power to bring contempt proceedings against persons who fail to appear or produce data in response to a request), *with* 52 U.S.C. § 20705 (containing no such provision).

The United States relies on *Kennedy v. Lynd* and other Fifth Circuit cases decided in the early 1960's for its position that Rule 12 does not even apply here. *See, e.g.*, U.S. Br. at 2–5 (citing, *inter alia*, *Lynd*, 306 F.2d 222, 225–26 (5th Cir. 1962)). It does not point to any more recent caselaw supporting its position on summary enforcement. The ancient cases on which the United States relies, all of which predate *Becker* and *Powell*, and none of which are binding here, are inapposite for the reasons already explained in Intervenors' opening brief. *See* Common Cause Intervenors' Combined Br. ("Common Cause Br."), Dkt. No. 25, at 21–23.

Decisions like *Lynd* are best understood, with the benefit of context and later, controlling decisions of the United States Supreme Court in *Becker* and *Powell,* as a pragmatic response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to facilitate discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 (Title III's "purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such evidence for use in such cases if and when filed."). The Fifth Circuit painted a clear picture of the situation: By the time *Lynd* was decided, the county registrar defendants had already spent 18 months filing " a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227. This was all despite the fact that "the factual foundation for" the basis and purpose of the Attorney General's Title III requests was utterly self-evident— massive racial disparities with

respect to registration and voting in the counties at issue were clear and the Jim Crow regimes were using every possible means to block Black Americans from registering to vote. *See id.*

In that context, the Fifth Circuit emphasized the need for a summary resolution of the Title III requests being deployed against the Jim Crow registrars, and explained that plenary "judicial review or ascertainment" of further facts was not warranted. *Id.* at 226. The 1960s Fifth Circuit cases analyzing the CRA cannot be divorced from their context. They cannot and should not be taken to stand for the general availability of summary proceedings whenever the CRA is invoked.

Notably, the 1960s Fifth Circuit cases were decided before sensitive personal identifying information, such as Social Security Numbers or driver's license numbers, was widely collected as part of a person's voter registration record, and before any federal laws had been passed to protect and constrain access to personal information.[2] And even in that context, the 1960s Fifth Circuit cases carefully noted that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." *Lynd*, 306 F.2d at 231.[3] Those courts plainly did not understand their decisions to lay down a rule of law that could justify the summary disposition of a request like the one here, where the United States has invoked the CRA with no statement of any valid basis, while

---

[2] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

[3] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity"). Indeed, the court in *Lynd* even acknowledged that courts in Title III cases might "issue protective orders as well" even where the statute's requirements were satisfied. 306 F.2d at 230.

asserting a baldly pretextual purpose, in order to obtain sensitive personal data, and with the ultimate aim of restricting and attacking voting rights.

The ancient 5th Circuit cases do not support the United States' aberrant position that this civil action is exempt from the application of the Federal Rules, including Rule 12. And if the cases could somehow be read that way, they would be inconsistent with statutory text, the applicable Federal Rules, and controlling Supreme Court precedent, all of which require adherence to the process set forth in the Rules, including Rule 12.

## II. THE UNITED STATES' TITLE III REQUEST IS LEGALLY DEFICIENT.

### A. The United States Failed to Plead Compliance with the CRA's Basis and Purpose Requirement.

Applying Rule 12, the United States has failed to plausibly plead compliance with Title III's requirements, in particular the requirement that the Attorney General make a "demand in writing" which "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The United States barely addresses the arguments for dismissal, let alone refutes them.

As the district court in *Weber* confirmed in its ruling, the basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. It prevents the statute from being used for a "fishing expedition" to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *Id. Accord Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 345 (1st Cir. 2009) (enforceability of federal demands for records depends on evaluation of whether underlying investigation is "conducted pursuant to a legitimate purpose" (citing *Powell*, 379 U.S. at 57–58)).

Here, the United States' demand fails to meet the CRA's basis-and-purpose requirement for multiple independent reasons, none of which the United States addresses in its brief.

*First*, the United States never set forth a "basis" for its demand. The "basis" for a CRA request is a statement of *why* the United States believes there may be some relevant violation of law. *See Kennedy*, 306 F.2d at 229 n.6; *accord Weber*, 2026 WL 118807 at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."); *see also Basis*, Merriam-Webster, https://perma.cc/2CDG-7WU5 ("something on which something else is established or based"). Neither the Complaint nor the August 14 Letter that first invoked the CRA state any "basis" whatsoever for why the United States believes Rhode Island's list maintenance procedures might violate the NVRA or HAVA in the first place. *See* Common Cause Br. 11–12. The failure to set forth *any* "basis" for the demand is sufficient grounds for dismissal of this action.

The United States offers no response. It implicitly concedes that the demand letter nowhere set forth any "basis" for the demand; the entirety of its attempt to claim that some basis for the demand was nevertheless articulated is this sentence from its brief: "The demand letter states that the authority under which the Attorney General is making the demand is the CRA." U.S. Br. 8. But that is not a statement of the basis for the request, i.e., the reasons *why* the United States believes there might be some relevant violation of law. *See Lynd*, 306 F.2d at 229 n.6; *accord Weber*, 2026 WL 118807, at *9. The tautological assertion that "the authority under which the Attorney General is making the [CRA] demand is the CRA," U.S. Br. at 8, says literally nothing about *why* the United States seeks the requested information or even what possible violations of law it might be investigating. Whenever the Attorney General requests records pursuant to Title III, she necessarily asserts her belief that the CRA entitles her to those records. If merely claiming "the CRA requires [it]" was all that was needed to meet the express statutory obligation to specifically set forth, "in writing," the "basis" for the request, 52 U.S.C. § 20703, that obligation

would be rendered "wholly superfluous," violating the cardinal need "'to give effect, if possible, to every clause and word of a statute.'" *E.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). The United States's failure to properly set forth any "basis" for the demand is sufficient grounds for dismissal of this action. *See Weber*, 2026 WL 118807, at *9.

*Second*, the United States failed to plausibly plead that it set forth the "purpose" of the request. It asserts (again, in a single unadorned sentence) that its demand letter "states that the purpose for which the records are sought is to 'ascertain Rhode Island's compliance with the list maintenance requirements of the NVRA and HAVA.'" U.S. Br. at 8. But as described in Intervenors' brief, an electronic snapshot of Rhode Island's unredacted voter file is not necessary or even relevant to that end; with respect to list maintenance, the statutes cited require Rhode Island to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters," 52 U.S.C. § 20507(a)(4), and it is a state's *procedures* that establish its compliance. Common Cause Br. 12-14 & n.7.

Again, no response. The United States gives zero explanation for *how* Rhode Island's electronic voter file will allow it to ascertain compliance with the NVRA and HAVA to supplement the minimal factual matter set forth in the demand letter and the pleadings. Rather, it argues that it is simply beyond the Court's ken to assess whether the federal government's statement of purpose for purposes of satisfying Title III, as pleaded in the Complaint, is "plausible." U.S. Br. at 8–9; *see also* U.S. Br. at 20–21. But the opposite is true—assessing the plausibility of the pleadings is what this Court *must* do on a Rule 12 motion. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2008)) (citation modified).

*Third*, the CRA claim is separately subject to dismissal because the stated reason for requesting millions of Rhode Island voters' personal data is pretextual. Common Cause Br. at 14-16. The United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 2026 WL 118807, at *10.

Stunningly, the United States never once denies what extensive public reporting and judicially noticeable documents make plain: that its true purpose in seeking state voter files is to build an unprecedented national voter file through novel, error-prone, DOGE-inspired forms of data-matching and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See* Common Cause Br. at 4–7 & nn.2–4. As the *Weber* court characterized it, considering the same robust set of public reporting and documents, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at *10.[4]

---

[4] The United States argues at one point that "production of an electronic copy of the [state voter] file . . . allow[s] the state to maintain control of the records while simultaneously allowing the Attorney General to perform her investigative duties mandated by Congress." U.S. Br. at 13. But the Memorandum of Understanding that the Department of Justice has developed with respect to the voter file data at issue demonstrates an intent to unlawfully centralize control over state voter rolls in the hands of the federal executive. *See* Common Cause Br. at 14–15. The MOU seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State." 52 U.S.C. § 21085; Mem. of Understanding, Common Cause Br., Ex. A ("MOU"), Dkt. No. 25-1 at 2, 5. In addition, the MOU would allow DOJ to compel states to remove supposedly ineligible voters in a manner that would violate multiple protections of the NVRA, 52 U.S.C. § 20507. *See* MOU at 5. Recent comments by the President strongly corroborate this reading of the MOU and the Administration's intentions. *See* Emily Chang, Michelle Stoddart, & Alexandra Hutzler, *Trump urges Republicans to 'take over' and 'nationalize' voting*, ABC NEWS,

Instead, the United States suggests that the purpose the Attorney General sets forth in its CRA demand need not be "truthful," and that Defendants in a Title III case are barred from pointing out the United States's "ulterior motives." U.S Br. at 8–9. But that position cannot be reconciled with the statutory requirement to set forth "*the* basis and *the* purpose for the demand." 52 U.S.C. § 20703. If the United States sets forth a pretextual purpose and fails to disclose its actual purpose, it necessarily has not met the literal requirements of the statute—to say nothing of the extreme violence done to the statute's purposive aims of protecting voters from predation and disenfranchisement.

Recent events drive home the suspect and pretextual nature of the United States's request here, as well as the extent to which it is abusing the CRA.

For one, a recent federal court filing by the Department of Justice ("DOJ") further corroborates how United States officials have been seeking to use voter data in conjunction with novel data-matching and aggregation techniques, and have been working with outside "election integrity" advocates seeking to deny election results in those efforts. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration ("SSA"):

> [I]n March 2025, a political advocacy group contacted two members of SSA's ["Department of Governmental Efficiency" ("DOGE")] Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrs. to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026), Dkt. No. 197; *see also* Kyle Cheney, *Trump*

---

Feb. 2, 2026, https://abcnews.go.com/Politics/trump-urges-republicans-nationalize-voting/story?id=129793658.

*Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrs. to the Record, *supra*, at 6.

Again, all of that is consistent with what was already in the public record about the DOJ and the Department of Homeland Security's efforts. *See* Common Cause Br. at 4–7 & nn.2–4. For instance, according to public reporting, as another part of its efforts, DOJ last year asked staffers from DOGE to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[5] DOJ officials have since publicly claimed that "we've checked 47.5 million voter records" pursuant to those efforts and found "several thousand non-citizens who are enrolled to vote in Federal elections," although public reporting indicates that these efforts are producing false positives—i.e., flagging U.S. citizens as being non-citizens who are ineligible to vote.[6]

Most recently, and perhaps most alarming, on January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence by federal agents against the

---

[5] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[6] Assistant Attorney General Harmeet Dhillon (@AAGDhillon), X (December 5, 2025, at 13:02 ET), https://perma.cc/WA3N-9T7W; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

civilian population there.[7]  The letter purports to set out three actions that Minnesota—which is

one of the states DOJ has sued to try to obtain sensitive voter data—should take to "restore the

rule of law, support ICE officers, and bring an end to the chaos in Minnesota," one of which is to

"allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that

Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights

Act of 1960."[8]

The United States's suggestion that the Court must ignore the federal government's own

statements and admissions about what it is doing, accept a flimsy, conclusory pretext instead, and

then grant summary relief on that basis in violation of the Federal Rules is an affront to the rule of

law, the role of the judiciary, and the intelligence and rights of the American public.  "Congress

passed the NVRA, Civil Rights Act, and HAVA to protect voting rights.  If the DOJ wants to instead

use these statutes for more than their stated purpose, circumventing the authority granted to them

by Congress, it cannot do so under the guise of a pretextual investigative purpose."  *Weber*, 2026

WL 118807, at *12.[9]

---

[7] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

[8] Bondi Letter at 2, 3.

[9] The United States cites an order from the Eastern District of North Carolina denying intervention by private parties to challenge a data-sharing consent decree that had been concluded back in September, claiming it supports the assertion that "arguments that the United States is trying to use the CRA to build a national voter database in a suit for voter rolls [are] 'speculative and premature.'"  U.S. Br. at 9 (citing Order at 7, *United States v. N.C. St. Board of Elections*, No. 5:25-cv-283-M-RJ (E.D.N.C. Jan. 12, 2026), Dkt. No. 87).  That order did not involve a Rule 12 motion to dismiss at all and is thus obviously inapposite.  Moreover, the underlying motions were briefed before many of the revelations and public statements that have been set forth in the briefing here were made public.

**B. The United States Failed to Plead Compliance with Applicable Privacy Laws.**

The Complaint is separately deficient because the United States seeks only the unredacted voter file containing Rhode Islanders' sensitive personal information with no provision for redactions or modifications to safeguard privacy rights and comply with relevant laws. Common Cause Br. at 16–20.

Here too, the United States largely avoids the substance or misrepresents it. It points to a case from New Hampshire involving private parties and voters challenging a state law requiring new forms of proof of citizenship to register to vote (i.e., a case absolutely nothing like this one) and asserts based on the course of discovery in that litigation that "private parties have been granted access to even more detailed voter data than what the United States has requested where necessary to bring actions to enforce federal rights." U.S. Br. at 14 (citing *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE, 2025 WL 1503937, at *2 (D.N.H. May 27, 2025)). But the New Hampshire case proves Intervenors' point. There, the New Hampshire voter file (which was extremely relevant to determining the impact of the challenged registration restriction) was produced in discovery subject to numerous, severe restrictions, including a scrupulous protective order which designates the voter file as "highly confidential," restricts its use to the present litigation, restricts viewing to only a tight circle of designated personnel using "air-gapped computers," mandates destruction of the data after the case is closed, and bars the production of certain data like social security numbers altogether. *See* Protective Order at 4, 13–17, *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE (D. N.H. June 18, 2025), Dkt. No. 87 (attached as Exhibit A); Sched. A to Protective Order at 2–3, *Coal. for Open Democracy v. Scanlan*, No. 24-CV-312-SE (D. N.H. June 18, 2025), Dkt. No. 87-1 (attached as Exhibit B). The United States, in contrast, pleads that it seeks the complete and unredacted Rhode Island voter file, with all voters'

protected personal information included, subject to zero restrictions except its own assurances that it will comply with federal privacy rules as it sees fit.[10]

Meanwhile, the United States' brief discussion of federal privacy law's substantive requirements is not encouraging. It points to a privacy policy on DOJ's website which freely states that DOJ may share information it obtains with other agencies (like DHS and DOGE) as well as "a contractor with the Department of Justice who needs access to the information in order to perform a contract." U.S. Dep't of Just., Civ. Rts. Div., *Privacy Act Statement* ("Privacy Policy") (last visited Feb. 3, 2026), https://perma.cc/AHX3-RN5R (cited in U.S. Br. at 16 n.7). Neither that webpage nor any of the repurposed privacy notices that the United States points to give the public anywhere near adequate notice of DOJ's actions, as the Privacy Act requires. *Weber*, 2026 WL 118807, at *18.

Nor, more importantly, would they do anything to prevent the main Privacy Act violation that Intervenors pointed out, namely the creation of a prohibited national voter database, which would violate the clear statutory prohibition against maintaining records "describing how any individual exercises rights guaranteed by the First Amendment," like voting and registering to vote, 5 U.S.C. § 552a(e)(7); *see also id.* at §§ 552a(a)(3), (a)(5), (e)(4), (f). *See* Common Cause Br. at 15-16. The United States just ignores that fatal defect altogether. This Court can dismiss on that basis as well. *See Weber*, 2026 WL 118807, at *17 ("The Privacy Act bars DOJ's request for California's unredacted voter roll because fulfillment of that request would include information regarding previous election participation and party affiliation. And voter registration, participation

---

[10] The United States' suggestion that this Court should presume its "compliance with relevant laws," U.S. Br. at 16 n.6, is not well taken here, where massive evidence suggests that it is not being forthright about its intentions with respect to Rhode Islanders' sensitive personal data, and where the United States in fact claims the right to obtain the data at issue here via judicial order without being "truthful" in its pleadings.

in elections, as well as party affiliation are all types of political expression protected by the First Amendment." (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 195 (1999) and *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69, 75–76 (1990))).

The United States has failed to plead its entitlement to the sensitive personal data of hundreds of thousands of Rhode Island voters. Its transparent abuse of the civil rights laws, as part of a gambit to attack voters and elections, should be rejected. The Court should dismiss the Complaint.

## CONCLUSION

The United States' request for Rhode Island's full and unredacted electronic voter file should be denied and the Complaint dismissed.

Dated: February 3, 2026                                   Respectfully submitted,

                                                                    /s/____Ari Savitzky_____

Lynette Labinger (Bar No. 1645)
LYNETTE LABINGER, ATTORNEY AT LAW
128 Dorrance Street, Box 710
Providence, RI 02903
*Cooperating Counsel, American Civil Liberties Union Foundation of Rhode Island*
401-465-9565
LL@labingerlaw.com

Ari J. Savitzky*
William Hughes*
Theresa J. Lee*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: (212) 549-2500
asavitzky@aclu.org
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

Patricia Yan*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington, DC 20005
Tel.: (202) 457-0800
pyan@aclu.org

*admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record.

/s/ Ari Savitzky